ACCEPTED
03-14-00716-CV
4954793
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/20/2015 2:40:14 PM
JEFFREY D. KYLE
CLERK

# No. 03-14-00716-CV

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/20/2015 2:40:14 PM
JEFFREY D. KYLE
Clerk

# In the Third Court of Appeals

_____

**JANOS FARKAS,**

*Appellant*,

**v.**

**WELLS FARGO BANK, N.A. AND BRICE, VANDER LINDEN & WERNICK, P.C. n/k/a BUCKLEY MADOLE, P.C.,**

*Appellees*.

_____

*On Appeal from Cause No. D-1-GN-11-003692*
*201st District Court, Travis County, Texas*
*Hon. Lora J. Livingston, Judge Presiding*

---

### BRIEF OF APPELLEE WELLS FARGO BANK, N.A.

---

Susan A. Kidwell
 State Bar No. 24032626
 skidwell@lockelord.com
B. David L. Foster
 State Bar No. 24031555
 dfoster@lockelord.com
John W. Ellis
 State Bar No. 24078473
 jellis@lockelord.com
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas 78701
512-305-4700 (Telephone)
512-305-4800 (Facsimile)

Robert T. Mowrey
 State Bar No. 14607500
 rmowrey@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
214-740-8000 (Telephone)
214-740-8800 (Facsimile)

**ATTORNEYS FOR WELLS FARGO BANK, N.A.**

TABLE OF CONTENTS

**Page**

Index of Authorities .............................................................................iv

Statement of Facts ...............................................................................1

Summary of the Argument...................................................................4

Argument..............................................................................................6

I.      The Trial Court Did Not Abuse Its Discretion in Overruling Farkas's
        Objections to Wells Fargo's Summary-Judgment Evidence..........................6

        A.      The trial court did not abuse its discretion in overruling
                objections to the declaration of Michael Dolan. ................................7

        B.      Farkas waived any complaint about the remaining declarations. .......11

        C.      Conclusory assertions cannot establish harm....................................12

II.     The Trial Court Did Not Err in Granting Summary Judgment on
        Farkas's Claim for Violations of the Texas Constitution..............................14

        A.      The requirements of § 50(a)(6) only apply to "new extensions
                of credit.".........................................................................................14

        B.      Farkas's constitutional claims fail, as a matter of law, because
                the alleged "breaches" of the DOT are not alleged
                *constitutional* violations. ................................................................17

        C.      The trial court's judgment may also be affirmed on no-evidence
                grounds. ...........................................................................................22

III.    The Trial Court Did Not Err in Granting Summary Judgment on
        Farkas's Claim for Violations of the Texas Debt Collection Act. ................24

IV.     The Trial Court Did Not Err in Granting Summary Judgment on
        Farkas's Fraudulent-Lien Claim......................................................................27

ii

Prayer ..................................................................................................31

Certificate of Compliance ...................................................................33

Certificate of Service .........................................................................33

**INDEX OF AUTHORITIES**

**Page(s)**

CASES

*Anderson v. Nat'l City Mortg.*,
No. 3:11-CV-1687-N, 2012 WL 612562 (N.D. Tex. Jan. 17, 2012) ..................8

*Bierwirth v. BAC Home Loans Servicing, L.P.*,
No. 03-11-00644-CV, 2012 WL 3793190 (Tex. App.—Austin Aug. 30, 2012, pet. denied) (mem. op.)..................29

*Cornish v. Washington Mut. Bank, FA*,
No. 02-06-400-CV, 2007 WL 2285478 (Tex. App.—Fort Worth Aug. 9, 2007, pet. denied)..................11

*Farkas v. Aurora Loan Servs., LLC*,
No. 05-12-01095-CV, 2013 WL 6198344 (Tex. App.—Dallas Nov. 26, 2013, pet. denied)..................9

*First Am. Title Ins. Co. v. Strayhorn*,
169 S.W.3d 298 (Tex. App.—Austin 2005), *aff'd* 258 S.W. 3d 627 (Tex. 2008)..................22

*Golden v. Wells Fargo Bank, N.A.*,
557 Fed. App'x 323 (5th Cir. Feb. 20, 2014) ..................28

*In re J.P.B.*,
180 S.W.3d 570 (Tex. 2005) ..................6

*Jaimes v. Fed. Nat'l Mortg. Ass'n*,
930 F.Supp.2d 692 (W.D. Tex. 2013) ..................28

*Jones v. JP Morgan Chase Bank, N.A.*,
No. 4:13-CV-456, 2014 WL 2996673 (E.D. Tex. July 3, 2014)..................28

*Kerlin v. Arias*,
274 S.W.3d 666 (Tex. 2008) ..................8, 9

*LaSalle Bank Nat'l Ass'n v. White*,
246 S.W.3d 616 (Tex. 2007) ..................16, 20

*Lassberg v. Barrett Daffin Frappier Turner & Engel, L.L.P.*,
   No. 4:13-CV-577, 2015 WL 123756 (E.D. Tex. Jan. 8, 2015) ..........................28

*Liberty Mut. Ins. Co. v. Griesing*,
   150 S.W.3d 640 (Tex. App.—Austin 2004, pet. dism'd w.o.j.)........................26

*Marsh v. JPMorgan Chase Bank, N.A.*,
   888 F. Supp. 2d 805 (W.D. Tex. 2012) .............................................................30

*Perdomo v. Fed. Nat'l Mortg. Ass'n*,
   No. 3:11-CV-734-M, 2013 WL 1123629 (N.D. Tex. Mar. 18, 2013) ..............28

*Pickett v. Tex. Mut. Ins. Co.*,
   239 S.W.3d 826 (Tex. App.—Austin 2007, no pet.).......................................22

*Rockwall Commons Assocs., Ltd. v. MRC Mortg. Grantor Trust I*,
   331 S.W.3d 500 (Tex. App.—El Paso 2010, no pet.) ......................................25

*Seaprints, Inc. v. Cadleway Props., Inc.*,
   446 S.W.3d 434 (Tex. App.—Houston [1st Dist.] 2014, no pet.)......................11

*Sims v. Carrington Mortg. Servs., L.L.C.*,
   440 S.W.3d 10 (Tex. 2014)...............................................................14, 15, 20, 23

*Star-Telegram, Inc. v. Doe*,
   915 S.W.2d 471 (Tex. 1995) ...........................................................................22

*Steptoe v. JPMorgan Chase Bank, N.A.*,
   No. 01-14-00813-CV, 2015 WL 1263128, at *3 (Tex. App.—Houston
   [1st Dist. Mar. 19, 2015, no pet. h.)........................................................18, 19, 26

*Stringer v. Cendant Mortg. Corp.*,
   23 S.W.3d 353 (Tex. 2000)..........................................................................14, 20

*Superior Energy Servs., Inc. v. Sonic Petroleum Servs., Ltd.*,
   328 S.W.3d 623 (Tex. App.—Eastland 2010, no pet.)........................................8

*Tex. Dep't of Transp. v. Able*,
   35 S.W.3d 608 (Tex. 2000)................................................................................7

*Vincent v. Bank of Am., N.A.*,
   109 S.W.3d 856 (Tex. App.—Dallas 2003, pet. denied)..................................16

*Voice of the Cornerstone Church Corp. v. Pizza Prop. Partners*,
   160 S.W.3d 657 (Tex. App.—Austin 2005, no pet.).................................22, 24, 29

*Wells Fargo Bank, N.A. v. Robinson*,
   391 S.W.3d 590 (Tex. App.—Dallas 2012, no pet.) ...............................16, 17, 23

## CONSTITUTIONAL PROVISIONS

TEX. CONST. art. XVI, § 50 .................................................................................14

TEX. CONST. art. XVI, § 50(a)(6) ................................................................passim

TEX. CONST. art. XVI, § 50(a)(6)(D) ...........................................................3, 16, 18

TEX. CONST. art. XVI, § 50(a)(6)(I) ....................................................................16

TEX. CONST. art. XVI, § 50(a)(6)(Q)(x)..........................................................15, 22

TEX. CONST. art. XVI, § 50(k) ...........................................................................18

TEX. CONST. ART. XVI, § 50(t) .......................................................................2, 18

## STATUTES

TEX. CIV. PRAC. & REM. CODE § 12.001(d) ...........................................................28

TEX. CIV. PRAC. & REM. CODE § 12.002........................................................28, 30

TEX. CIV. PRAC. & REM. CODE § 12.002(a) ..........................................................29

TEX. CIV. PRAC. & REM. CODE § 12.002(a)(2) .......................................................30

TEX. FIN. CODE § 31.002(a)(34)..........................................................................15

TEX. FIN. CODE § 392.001..................................................................................25

TEX. FIN. CODE § 392.403(a)(2)..........................................................................27

**RULES**

TEX. R. APP. P. 38.1(i)............................................................................25

TEX. R. APP. P. 38.2(1)(B) .......................................................................1

TEX. R. APP. P. 44.1 ................................................................................7

Tex. R. Civ. P. 166a(c)........................................................................7, 25

TEX. R. CIV. P. 166a(f) ......................................................................7, 8, 9

TEX. R. CIV. P. 735.1...............................................................................18

TEX. R. CIV. P. 735.3...............................................................................18

TEX. R. CIV. P. 736......................................................................3, 18, 26

TEX. R. CIV. P. 736.11(a) ..........................................................................4

TEX. R. CIV. P. 736.11 (c) .........................................................................4

TEX. R. EVID. 801(d) .................................................................................7

TO THE HONORABLE THIRD COURT OF APPEALS:

After defaulting on a home-equity loan, Appellant Janos Farkas filed the underlying lawsuit to prevent Appellee Wells Fargo Bank, N.A., from obtaining an expedited court order to foreclose on his property. Although he succeeded in delaying foreclosure, he was unable to withstand summary judgment.

Farkas's brief essentially repeats his response to Wells Fargo's motion (and his objections to some of Wells Fargo's summary-judgment evidence). Those arguments were properly rejected by the trial court, so they provide no basis for relief on appeal. The trial court's judgment should be affirmed in its entirety.

## STATEMENT OF FACTS

Farkas's "statement of undisputed facts" is incomplete. It also contains a number of inaccurate characterizations about documents in the record. Accordingly, Wells Fargo provides its own statement. *See* TEX. R. APP. P. 38.2(1)(B).

On January 11, 2007, Farkas executed an Account Agreement (CR:47-61) and a Texas Deed of Trust (CR:70-81) securing a home equity line of credit in the principal amount of $103,441.00. The Account Agreement and the Deed of Trust will be collectively referred to as the "Loan Documents." The Loan Documents define the "Borrower" as "Janos Farkas" and the "Lender" as "Wells Fargo Bank, N.A." (CR:47, 70.) In accordance with Texas law, the Loan Documents state that

they relate to "an extension of credit as defined by section 50(a)(6) and 50(t), Article XVI of the Texas Constitution." (*Id.*)

The Deed of Trust ("DOT") securing the loan provides that "Borrower will be in default if (1) any payment required by the Debt Instrument or this Security instrument is not made when it is due . . . ." (CR:78.) In the event of a default, the DOT requires Wells Fargo to provide Farkas with notice before invoking remedies of acceleration and foreclosure. (CR:78-79.) The notice must specify: "(a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property." (CR:79.) In accordance with Texas law, the DOT also states that "[t]he lien evidenced by this Security Instrument may be foreclosed upon only by a court order." (*Id.*)

On April 21, 2011, Wells Fargo, through its foreclosure counsel (Brice, Vander Linden & Wernick, P.C.), sent Farkas a "Notice of Default and Intention to Accelerate." (CR:87.) In accordance with the DOT, the notice states that (a) "the loan is in default for failure to make the regular monthly payments required by the

Note and Deed of Trust"; (b) the amount required to cure the default[1] and the address to which payment should be made; (c) the default must be cured "within thirty (30) days of the date of this notice"; and (d) if the default is not cured by that date, "the Note will be accelerated and all sums secured by the Deed of Trust will be declared to be immediately due and payable." (*Id.*)

Instead of curing his default, Farkas sent a letter "request[ing] a validation of debt under the Fair Debt Collection Practices Act stating the owner of the debt (creditor) with its address." (CR:200.) Wells Fargo provided Farkas with the current amount to cure the default ($19,604.23), the current amount to pay off the loan ($123,127.31), and the lender's name and address. (CR:89, 203-04.) Farkas did not remit either amount, so on June 23, 2011, Well Fargo's foreclosure counsel sent Farkas notice that the debt was being accelerated. (CR:90.)

In September 2011, as permitted by the DOT (CR:79) and Rule 736 of the Texas Rules of Civil Procedure, Wells Fargo applied for an expedited "court order allowing foreclosure of a lien under Tex. Const. Art. XVI, Section 50(a)(6)(D)." (*See* CR:92.) But, before Wells Fargo could obtain an order, Farkas filed the underlying lawsuit challenging Wells Fargo's ability to foreclose. (*See* CR:3.) Farkas's filing of an independent lawsuit automatically stayed Wells Fargo's Rule

---

[1] As of March 22, 2011, the amount was $2,013.30. (CR:87.) However, the notice states that "the amount required to cure the default on the day you choose to pay may be greater." (*Id.*)

736 proceeding, which was subsequently dismissed *See* TEX. R. CIV. P. 736.11(a), (c).

Wells Fargo moved for traditional and no-evidence summary judgment on all of Farkas's claims. (*See* CR:15.) Brice, Vander Linden & Wernick, P.C. ("Brice"), which was also named as a defendant, did the same. (CR:343.) Farkas filed his own motion for partial summary judgment, and attached many of the same documents filed in support of Wells Fargo's motion. (*See* CR:173.) He also objected to some of Wells Fargo's summary-judgment evidence. (CR:505.)

After considering the motions, the responses, the pleadings, the arguments of counsel, and "all other matters properly before the Court," the trial court granted Wells Fargo's and Brice's motions, denied Farkas's motion, overruled Farkas's objections to the evidence, and entered a final judgment that Farkas take nothing on his claims. (CR:604-05.) This appeal ensued. (CR:608.)

## SUMMARY OF THE ARGUMENT

**1. Objections to Summary-Judgment Evidence:** Farkas cannot cite any legal authorities to support his contention that the trial court abused its discretion in overruling groundless objections to some of Wells Fargo's summary-judgment evidence. So he relies on unsupported assertions that run afoul of the following principles:

- Statements in a business-records affidavit are not "hearsay";

- A judgment cannot "turn" on "irrelevant" statements, so complaints about them cannot establish reversible error;

- Statements based on personal knowledge need not be confirmed by documentary evidence;

- "Inconsistencies" between the amounts required to cure a default and the amounts required to pay off a loan at different points of time do not require striking the evidence;

- Generalized objections – unsupported by arguments based on legal authorities or citations to the record – are insufficient to preserve error; and

- Conclusory assertions that unproven errors "probably resulted in an improper judgment" are also insufficient to preserve error.

**2.    The Constitutional Claim:**  Farkas's claim that Wells Fargo violated Article XIV, § 50(a)(6) of the Texas Constitution is premised on a false theory. None of the alleged "violations" relate to any constitutional requirements, so Farkas's claim fails as a matter of law.  The trial court's judgment may also be affirmed on no-evidence grounds.

**3.    The Texas Debt Collection Act Claim:**  Farkas failed to negate all grounds for summary judgment on his TDCA claim.  That, by itself, requires that the judgment be affirmed.  Farkas also waived any complaint on this issue by failing to provide a cognizable legal argument supported by citations to authority

5

and the record. Finally, even if considered, Farkas's argument should be rejected as contrary to the record and unsupported by the law.

**4. The Fraudulent Lien Claim:** Farkas makes little effort to salvage his fraudulent-lien claim. His two-page "argument" contains no citations to the record, no legal argument supported by authorities, and fails to negate all grounds for summary judgment. His argument also fails on the merits. A notice of default is not a "lien," and Farkas's hyper-technical complaints about statements in the notice neither constitute fraud nor caused any damages. Because his fraudulent-lien claim fails as a matter of law, it comes as no surprise that Farkas cannot cite to any evidence to support multiple elements that were challenged below.

In short, the judgment should be affirmed in its entirety as demonstrated more fully below:

ARGUMENT

## I. The Trial Court Did Not Abuse Its Discretion in Overruling Farkas's Objections to Wells Fargo's Summary-Judgment Evidence.

Farkas reveals the weakness of his appeal by leading with an argument that the trial court erred in overruling objections to some of Wells Fargo's summary-judgment evidence. (*See* Br. at 9-17.) But, by simply repeating the same arguments the trial court rejected, Farkas fails to show how the trial court abused its discretion. *See In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (reviewing evidentiary rulings under abuse of discretion standard). Nor do his conclusory

6

assertions about harm show how "the judgment turns on the particular evidence excluded or admitted," as required for relief on appeal. *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); TEX. R. APP. P. 44.1. Farkas's first argument should be summarily rejected.

**A. The trial court did not abuse its discretion in overruling objections to the declaration of Michael Dolan.**

In scattershot fashion, Farkas lodges various attacks on the business-records declaration of Michael Dolan. (*See* Br. at 12-15.) None have any merit.

Farkas first asserts that the Dolan declaration "contains inadmissible hearsay." (Br. at 12.) However, "'[h]earsay' is a statement, *other than one made by the declarant* . . . offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d) (emphasis added). Statements *by a declarant* in a business-records affidavit do not fall within this definition. That is why such affidavits are a valid and commonly-used form of summary-judgment proof. *See* TEX. R. CIV. P. 166a(c), (f).

Unable to back up his novel theory of "hearsay" with any citation to authority, Farkas's argument quickly morphs into unsupported assertions about the factual accuracy of two isolated statements in the affidavit. (*See* Br. at 12-13.) He first complains that Dolan's statement that "home equity loan and lines of credit were 'available through Wells Fargo Home Equity Group' is misleading *and irrelevant* to this proceeding." (Br. at 13 (emphasis added).) But, because the

7

judgment cannot "turn" on an "irrelevant" statement, Farkas's first complaint does not concern *reversible* error.

Farkas also asserts that there is "<u>zero</u> documentation"[2] to support Dolan's statement that "'Wells Fargo Home Equity' is a division of Wells Fargo Bank, N.A." (Br. at 13.) But Farkas cites no authority requiring statements based on personal knowledge to be supported by documentary evidence as well. To the contrary, the personal-knowledge requirement is satisfied when, as here, an affidavit (i) states that it is based on personal knowledge and the facts in it are true and (ii) shows the basis for the affiant's personal knowledge. *See* TEX. R. CIV. P. 166a(f); *Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008).

Dolan states that he has "personal knowledge of each of the matters stated herein, and they are true and correct." (CR:43.) In addition, he explains the basis for his knowledge: "I am employed as a Research and Mediation Manager for Wells Fargo Bank, N.A. ('Wells Fargo'). I am also the custodian of the records of Wells Fargo. I have also personally reviewed Wells Fargo's records regarding the

---

[2] The record, in fact, does contain documentation to support Dolan's statement. A letter from "Wells Fargo Bank, N.A. Home Equity Group" states that Farkas contacted "Wells Fargo Home Equity regarding [his] account." (CR:64.) In addition, the Account Agreement identifies the account as a "Wells Fargo Home Equity Account." (CR:47.) That evidence confirms the undisputable relationship between Wells Fargo *Bank* and one of its divisions, the Wells Fargo *Home Equity Group*. "A division of a corporation is not a separate legal entity but the corporation itself." *Superior Energy Servs., Inc. v. Sonic Petroleum Servs., Ltd.*, 328 S.W.3d 623, 631 (Tex. App.—Eastland 2010, no pet.). Similarly, a lender and a division of the lender are "the same entity for all intents and purposes." *Anderson v. Nat'l City Mortg.*, No. 3:11-CV-1687-N, 2012 WL 612562, at *1 n.1 & n.3 (N.D. Tex. Jan. 17, 2012).

mortgage debt at issue in the above-captioned lawsuit (the 'Loan')." (*Id.*) Dolan also states "I am familiar with Wells Fargo's lending and mortgage servicing practices, including the various groups and divisions within Wells Fargo through which it carries out those practices." (CR:45.) These statements are plainly sufficient to satisfy the applicable legal standard. *See* TEX. R. CIV. P. 166a(f); *Kerlin*, 274 S.W.3d at 668.

Farkas reveals nothing but desperation when he tries to question Dolan's credibility. (*See* Br. at 13.) Dolan's statement that he has been "employed by Wells Fargo and its predecessor institutions" (*i.e.*, banks acquired by Wells Fargo through various mergers) for "*28 years*" (CR:44) is not a claim that he started working for Wells Fargo *more than 160 years* ago, as Farkas tries to suggest. (Br. at 13.) Moreover, nothing in Texas law requires a business-records custodian to specify the exact number of years he has worked for his employer. *See* TEX. R. CIV. P. 166a(f); *Kerlin*, 274 S.W.3d at 668. Thus, contrary to Farkas's belief, the absence of such information does not cast any doubt on Dolan's personal knowledge.

The Dallas Court of Appeals recently rejected similar challenges to a similar affidavit in a similar appeal filed by Farkas. *Farkas v. Aurora Loan Servs.*, LLC, No. 05-12-01095-CV, 2013 WL 6198344, at *3 (Tex. App.—Dallas Nov. 26, 2013, pet. denied). There, as here, "Farkas d[id] not cite to any evidence in the

record controverting the appellees' evidence." *Id.* There, as here, his "unsupported assertions that [an] affidavit is factually inaccurate [were] insufficient" to show reversible error. *Id.* And there, as here, the trial court properly considered the challenged affidavit as summary-judgment evidence. *See id.*

Farkas demonstrates utter confusion in arguing that Dolan's declaration contains "*inconsistencies* when compared to . . . other [summary-judgment] evidence." (*See* Br. at 14 (emphasis added).) The alleged "inconsistencies" are simply differences between the "amount required to *cure Plaintiff's default*" on March 22, 2011 ($2,013.30) versus June 20, 2011 ($19,604.23), and differences between those amounts and the amount required to *pay off the entire loan* ($123,127.31 as of June 20, 2011). (*Compare* CR:45, *with* CR:87, 203, 204.)

Farkas appears to assume that the "amounts owed" should have remained constant over time. But he ignores the distinction amounts to cure the default and amounts to pay off the loan. He also ignores the impact of interest and other expenses (such as property taxes and attorneys' fees related to foreclosure proceedings) that accrue over time. In short, the longer Farkas waited to cure his default, the more expensive any available cure became. That Farkas would point to these alleged "inconsistencies" as evidence of reversible error only confirms that he has no viable grounds to challenge the trial court's ruling.

## B. Farkas waived any complaint about the remaining declarations.

Resorting to hyperbole, Farkas transforms the alleged "inconsistencies" into "wildly varying accounts as to the amounts allegedly owed." (Br. at 15.) Then, without any citation to the record or supporting legal authorities, he claims that "[t]he conflicting portions of *all of these declarations* should be struck due to inconsistencies." (*Id.* (emphasis added).[3]) This two-sentence "argument" has multiple defects, any one of which is fatal:

First, Farkas's generalized objection to "all of these declarations" (Br. at 15) "fails to identify specific objectionable portions of the [declarations] or explain why any particular passages should be disregarded as [conflicting]." *See Seaprints, Inc. v. Cadleway Props., Inc.*, 446 S.W.3d 434, 442 (Tex. App.— Houston [1st Dist.] 2014, no pet.); *see also Cornish v. Washington Mut. Bank, FA*, No. 02-06-400-CV, 2007 WL 2285478, at *3 (Tex. App.—Fort Worth Aug. 9, 2007, pet. denied) ("the part[y] objecting to an affidavit must identify the specific statements in the affidavit that are objectionable and state why they are objectionable"). Farkas's complaints about unidentified but allegedly "conflicting portions" of the declarations are "inadequate" and, therefore, insufficient to preserve error. *See Seaprints*, 446 S.W.3d at 442.

---

[3] This statement appears to be referencing the Declarations of Sammy Hooda (CR:84) and B. David L. Foster (CR:150).

Second, the declarations do not contain any "conflicting" statements. Although Farkas complains about "wildly varying accounts as to amounts allegedly owed," neither the Hooda nor the Foster declaration includes *any* statement about amounts allegedly owed. (*See* CR:84-86, 150-51.) Only the Dolan declaration contains such statements, so there is not conflict between "all of these declarations." Moreover, the amounts referenced in the Dolan declaration, which states that "[t]he amount required to cure Plaintiff's default on the Loan as of March 22, 2011 was $2,013.30" and "[t]he amount required to cure Plaintiff's default on the Loan as of July 25, 2011 was $4,002.64" (CR:45) are consistent with documentary evidence in the summary-judgment record. (CR:87&148; CR:69.)

Third, although the documentary evidence attached to the declarations shows variations in the amounts required to cure the default and the amounts required to pay off the loan at different times, those variations have already been explained. Farkas's unfounded assumption that the "amounts owed" should have remained constant over time is unsupported by the record and defies common sense.

## C. Conclusory assertions cannot establish harm.

Recognizing his burden to show that the alleged error "probably resulted in an improper judgment," Farkas asserts that, "[i]f the Declaration of Michael Dolan were struck, Wells_Bank's MSJ would have to be denied." (Br. at 15.) But Farkas

12

later concedes that the ruling on his objections "is not necessary nor dispositive of any ruling on Wells_Bank's and Brice's summary judgment motions concerning TDCA claims." (Br. at 27.) And he never explains why the ruling is "necessary and dispositive" of his other claims. Nor could he.

Wells Fargo presented multiple grounds for traditional and no-evidence summary judgment. (*See* CR:19-40.) Obviously, Wells Fargo did not have to present any evidence to prevail on its no-evidence grounds. For that reason alone, the judgment does not "turn" on the evidentiary rulings and, therefore, Farkas cannot show that the trial court's rulings constitutes reversible error.

In addition, Farkas cannot show that any of the traditional grounds require proof of the allegedly "disputed" (and entirely immaterial) facts over which Farkas obsesses. As explained more fully below, they do not. A judgment cannot turn on immaterial facts.

Finally, even if the Dolan affidavit were stricken in its entirety, evidence attached to his affidavit is duplicated elsewhere in the record.[4] Because those documents are sufficient to support Wells Fargo's traditional grounds, Farkas cannot show that striking the Dolan declaration would have had any effect on the outcome.

---

[4] For example, the Account Agreement appears at CR:116 and CR:272, and documents establishing various reinstatement and payoff amounts appear at CR:140-43 and 198-213.

13

*To sum up*: Farkas has not shown that the trial court abused its discretion by denying his objections to some of Wells Fargo's summary-judgment evidence. Nor has Farkas shown how the alleged error was harmful. His complaints about the trial court's evidentiary rulings provide no basis for reversal.

## II. The Trial Court Did Not Err in Granting Summary Judgment on Farkas's Claim for Violations of the Texas Constitution.

Farkas's theory that Wells Fargo violated the Constitution by breaching terms in the Loan Documents (Br. at 17-23) is pure fiction. The alleged "violations" do not involve conduct that is regulated by the Constitution, so they could never support a constitutional claim. Nor is there any evidence to support Farkas's repeated assertions that Wells Fargo failed to comply with the Loan Documents. False assertions about imaginary "violations" cast no doubt on the trial court's judgment.

### A. The requirements of § 50(a)(6) only apply to "new extensions of credit."

"[H]ome equity loans are subject to the requirements of Article XVI, Section 50 of the Texas Constitution." *Sims v. Carrington Mortg. Servs., L.L.C.*, 440 S.W.3d 10, 11 (Tex. 2014). "Section 50(a)(6), in its totality, establishes the terms and conditions a home-equity lender must satisfy to make a valid loan." *Stringer v. Cendant Mortg. Corp.*, 23 S.W.3d 353, 356 (Tex. 2000). The detailed

14

constitutional requirements, however, only apply to "new extension[s] of credit." *Sims*, 440 S.W.3d at 17.

The term "extension of credit" refers to "'direct or indirect advances of money . . . to a person that are conditioned on the obligation of the person to repay . . . .'" *Id.* at 16 n.22 (quoting TEX. FIN. CODE § 31.002(a)(34)). If a transaction does "not involve the satisfaction or replacement of the original note, an advancement of new funds, or an increase in the obligations created by the original note," then "it is not a new extension of credit that must meet the requirements of Section 50." *Id.* at 17.

If, in making a new extension of credit, a lender fails to comply with section 50, it has 60 days to cure its failure by taking specified actions that include returning any overcharges paid by the owner, sending written confirmation that the loan terms (*e.g.*, interest rates) are only valid to the extent they comply with constitutional requirements, or modifying the loan agreement to comply with constitutional requirements. *See* TEX. CONST. art. XVI, § 50(a)(6)(Q)(x). Because the constitutional requirements only relate to new extensions of credit, the methods of cure necessarily involve taking actions to ensure that the extension of credit at issue, *i.e.*, the initial loan agreement, complies with the law. *See id.* If a lender "fails to correct [its] failure to comply not later than the 60th day after the date the lender or holder is notified by the borrower of the lender's failure to comply," then

the lender or holder "shall forfeit all principal and interest of the extension of credit." *Id.*

For example, § 50(a)(6)(I) "prohibits home-equity loans from being 'secured by homestead property designated for agricultural use.'" *LaSalle Bank Nat'l Ass'n v. White*, 246 S.W.3d 616, 619 (Tex. 2007) (quoting TEX. CONST. art. XVI, § 50(a)(6)(I)). Thus, a home-equity loan secured by property designated for agricultural use violates the Constitution and is subject to forfeiture. *Id.*

The Constitution also "requires that a home equity note be secured by a lien that may only be foreclosed by court order." *Wells Fargo Bank, N.A. v. Robinson*, 391 S.W.3d 590, 595 (Tex. App.—Dallas 2012, no pet.) (discussing TEX. CONST. art. XVI, § 50(a)(6)(D)). However, as long as a deed of trust requires a court order for foreclosure, it complies with constitutional requirements. *Id.* In cases involving complaints about how foreclosure was conducted, the constitutional remedy of forfeiture is not appropriate. *See id.*

In short, "forfeiture is *only* available for violations of constitutionally mandated provisions of the loan documents." *Vincent v. Bank of Am., N.A.*, 109 S.W.3d 856, 862 (Tex. App.—Dallas 2003, pet. denied). "A borrower's recourse for a lender's failure to abide by the terms of his loan agreement is to assert traditional tort and breach of contract causes of action," not claims for violations of Article XVI, § 50(a)(6) of the Texas Constitution. *Robinson*, 391 S.W.3d at 595.

**B.** **Farkas's constitutional claims fail, as a matter of law, because the alleged "breaches" of the DOT are not alleged *constitutional* violations.**

The fatal problem that condemns Farkas's constitutional claim is that Farkas does not complain about any alleged violations of *constitutional* requirements. Instead, he repeatedly asserts that Wells Fargo violated *the DOT*. (*See* Br. at 17-21.) However, as a matter of law, alleged breaches of contract are not actionable under the Constitution. *See Robinson*, 391 S.W.3d at 595. Moreover, Farkas's hyper-technical complaints about statements in a notice of default do not violate any terms in the DOT, much less rise to the level of a *constitutional* violation.

**1.** **Farkas has not alleged any *constitutional* violation.**

Farkas has never challenged the validity of the Loan Documents. Nor has he ever taken the position that Wells Fargo failed to satisfy any of the constitutional requirements to make a valid loan. Instead, he bases his "constitutional" claim on allegations that the notice of default refers to a "wrong" loan number, mentions "non-judicial foreclosure," and demands that Farkas cure his default "within 30 days" of the notice rather than "not less than 30 days" from the notice. (Br. at 19-20.) There are two fundamental problems:

**(i)** **Farkas's complaints are groundless.**

The loan number:  Farkas repeatedly asserts that the notice references the "wrong" loan number. However, the summary-judgment evidence shows that the

17

"Loan Number" on the notice of default (0999617061) is an "internal reference number" used by Wells Fargo and Brice for their own, internal purposes. (CR:46, 86.) The undisputed fact that the notice of default makes no reference to either the "Account Number" (650-650-4349999-1XXX) or the "reference Number" (20063367500009) shown on the DOT is immaterial, because neither the Constitution nor the DOT require a notice of default to include any reference to a loan number.

The reference to "non-judicial foreclosure": The Texas Constitution requires a lien on a home-equity loan to "be foreclosed upon only be a *court order*." TEX. CONST. art. XVI, § 50(a)(6)(D) (emphasis added). From that language, Farkas assumes that the reference to a "court order" means a lender is required to pursue a "*judicial foreclosure*." His assumption is false.

"Rule 736 [of the Texas Rules of Civil Procedure] provides the procedure for obtaining a court order, when required, to allow foreclosure of a lien containing a power of sale in the security instrument . . . securing . . . a home equity loan, reverse mortgage, or home equity line of credit under article XVI, sections 50(a)(6), 50(k), and 50(t) of the Texas Constitution." TEX. R. CIV. P. 735.1. A Rule 736 court order permitting a *non-judicial* foreclosure is not a *judicial foreclosure*. *See* TEX. R. CIV. P. 735.3; *see also Steptoe v. JPMorgan Chase Bank, N.A.*, No. 01-14-00813-CV, 2015 WL 1263128, at *3 (Tex. App.—Houston [1st

18

Dist.] Mar. 19, 2015, no pet. h.) (recognizing distinction between judicial foreclosure and Rule 736 proceeding to obtain court order "to proceed with a non-judicial foreclosure"). When, as here,[5] the "home-equity lender has contracted for the right of non-judicial foreclosure under a power of sale provision, [it] may choose to pursue the special procedure found in Rule 736 to obtain an order allowing it to proceed with a non-judicial foreclosure under the Texas Property Code." *See Steptoe*, 2015 WL 1263128, at \*3. That is exactly what Wells Fargo did when it initiated a Rule 736 proceeding to obtain the requisite court order permitting non-judicial foreclosure. (*See* CR:92.) But Farkas obstructed Wells Fargo's efforts by filing this lawsuit and complaining about non-existent constitutional "violations." (*See* CR:3.)

The deadline: Farkas's hyper-technical suggestion that requiring payment *within* 30 days violates the DOT provision requiring payment "*not less than* 30 days*" from notice is semantic nonsense. (*See* Br. at 20.) Because a 30-day deadline is both "within" 30 days of notice and "not less than" 30 days of notice, it complies with the DOT as a matter of law.

---

[5] The DOT provides: "The lien evidence by this Security Instrument may be foreclosed upon only by a court order. Lender may, at its option, follow any rules of civil procedure promulgated by the Texas Supreme Court for expedited foreclosure proceedings related to the foreclosure of liens under Section 50(a)(6), Article XVI of the Texas Constitution . . . ." (CR:79.)

19

### (ii) Farkas's complaints are not actionable under the Constitution.

As explained, the Constitution focuses on the terms of the initial loan agreement, not the manner in which a lender may enforce that agreement in the event of a borrower's default. *See* TEX. CONST. art. XVI, § 50(a)(6); *Sims*, 440 S.W.3d at 16 n.22. Thus, there is *no* language in § 50(a)(6) that pertains to notices of default, much less any language that:

- requires a lender to include any particular type of "loan number" on the notice (or prohibits foreclosure counsel from including its own internal reference number on the notice);

- requires a lender to specify the type of foreclosure remedy that will be conducted (or prohibits a lender from stating that it was asked to pursue a "non-judicial foreclosure in accordance with the terms of the Note and the Deed of Trust and applicable law"); or

- requires a lender to demand payment "not less than 30 days from the date notice [of default] is given" (or prohibits a lender from demanding payment "within 30 days of the date of this notice").

(*Contra* Br. at 19-22.)

"When interpreting the Texas Constitution," the Texas Supreme Court "'rel[ies] heavily on its literal text and must give effect to its plain language.'" *LaSalle Bank*, 246 S.W.3d at 619 (quoting *Stringer*, 23 S.W.3d at 355). Applying that principle, the Court "decline[s] to engraft [unwritten] prohibition[s] onto the constitutional language." *Id*. This Court should do the same. Because nothing in the Constitution prohibited Wells Fargo from referencing an internal loan number,

20

pursuing non-judicial foreclosure, or demanding payment within 30 days, Farkas's complaints about the notice of default cannot support a constitutional claim.

**2.** **Farkas has not even alleged facts that would support a claim for breach of contract.**

Unable to identify any constitutional requirement that was potentially violated, Farkas asserts that Wells Fargo failed to comply with the DOT. (*See* Br. at 17-21.) That unpleaded claim is not at issue. In any event, the notice of default establishes – on its face – that it includes all information required by the DOT. (*Compare* CR:79 (DOT requirements), *with* CR:87 (notice).) Contrary to Farkas's apparent belief, nothing in the DOT:

- required Wells Fargo to include any particular type of "loan number" on its notice of default (or prohibited foreclosure counsel from including its own internal reference number on the notice);

- required Wells Fargo to specify the type of foreclosure remedy that would be conducted (or prohibited foreclosure counsel from making a reference to a "non-judicial foreclosure in accordance with the terms of the Note and the Deed of Trust and applicable law"); or

- required Wells Fargo to demand payment "not less than 30 days from the date notice [of default] is given" (or prohibited foreclosure counsel from demanding payment "within 30 days" of the date the notice of default was given.

Consequently, Wells Fargo (through foreclosure counsel) could not have "breached" the DOT by referring to an internal loan number, stating that it had been "requested to pursue a non-judicial foreclosure," or demanding payment "within 30 days." (CR:87.) As the trial court correctly concluded, Farkas's faulty

21

constitutional theory and groundless allegations are insufficient to survive summary judgment.

## C. The trial court's judgment may also be affirmed on no-evidence grounds.

Implicitly recognizing his burden to negate all grounds for summary judgment,[6] Farkas falsely contends that "Wells-Bank fails to challenge specific element of complaint regarding liability under TEX. CONST. ART. XVI, §50(a)(6)(Q)(x)." (Br. at 23.) But again, Farkas fails to support his "argument" with any citation to legal authorities or the record. And again, his "argument" is premised on an invalid theory of liability.

Section 50(a)(6)(Q)(x) is the provision that specifies methods to *cure* a failure to comply with requirements applicable to new extensions of credit. None of those methods have any application here, because Farkas has never complained that the initial extension of credit violated section 50. Although he contends that "there is no support" for an argument that "the constitutional obligation to fulfill the terms of extension of credit" only applies to "origination of the extension of credit" (*see* Br. at 22), he ignores the Texas Supreme Court's recent decision in

---

[6] This Court has repeatedly recognized that, "[w]hen the trial court does not specify the basis for its summary judgment, the appealing party must show it is error to base it on any ground asserted in the motion." *Pickett v. Tex. Mut. Ins. Co.*, 239 S.W.3d 826, 840 (Tex. App.—Austin 2007, no pet.) (citing *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995)); *accord First Am. Title Ins. Co. v. Strayhorn*, 169 S.W.3d 298, 303 (Tex. App.—Austin 2005), *aff'd* 258 S.W.3d 627 (Tex. 2008); *Voice of the Cornerstone Church Corp. v. Pizza Prop. Partners*, 160 S.W.3d 657, 671 (Tex. App.—Austin 2005, no pet.). If the appellant fails to meet this burden, "the summary judgment must be affirmed." *Voice of the Cornerstone*, 160 S.W.3d at 671.

22

*Sims*, 440 S.W.3d at 17. That decision makes it amply clear that the requirements in section 50 only apply to "new extensions of credit." *Id*. Farkas thus spins in circles when he asserts that "Wells_Bank had ample opportunity to cure" but "chose not to cure." (*See* Br. at 21.) Absent a violation, there is nothing to cure.

Farkas is also wrong in asserting that Wells Fargo did not allege specific no-evidence grounds relating to his faulty constitutional theory. In its motion for summary judgment, Wells Fargo argued:

> Plaintiff has no evidence that the loan was invalid at the time of origination or somehow later became invalid. Moreover, Plaintiff has no evidence that any alleged violation was not cured, as no non-judicial foreclosure sale occurred.

(CR:37.)

Farkas cannot overcome *his* failure to allege and present evidence of a constitutional violation by asserting that Wells Fargo failed to cure an imaginary violation. Farkas presented no evidence of violation in response to Wells Fargo's motion in the trial court, and he cites none on appeal. For this additional reason, the trial court's summary judgment on the constitutional claim should be affirmed.

*To sum up*: Farkas has never identified any *constitutional* requirement that was allegedly violated. When, as here, the terms of the original extension of credit comply with the Constitution, there is no constitutional violation. *See Sims*, 440 S.W.3d at 17; *Robinson*, 391 S.W.3d at 595. As the trial court correctly concluded, Farkas's "constitutional" claim fails as a matter of law. (*See* CR:604-05.)

**III.** **The Trial Court Did Not Err in Granting Summary Judgment on Farkas's Claim for Violations of the Texas Debt Collection Act.**

Farkas's four-page issue on his Texas Debt Collection Act claim wrongly assumes that the only dispute is "over whether Wells_Bank's actions were wrongful." (*See* Br. at 24.) To the contrary, Wells Fargo moved for traditional summary judgment on two grounds: (i) the "factual allegations" on which Plaintiff bases his TDCA claim are conclusively disproven by the summary judgment evidence and, therefore, "fail as a matter of law"; and (ii) "Plaintiff's TDCA claim is barred by the economic loss rule." (CR:28-29.) In addition, Wells Fargo moved for no-evidence summary judgment on multiple grounds, including two that are particularly relevant on appeal: (i) "Plaintiff has no evidence that Wells Fargo threatened to take action prohibited by law"; and (ii) "Plaintiff has no evidence that the alleged violations of the TDCA caused him damages." (CR:37-38.)

Farkas attempts to show "error" by relying on conclusory assertions that Wells Fargo "threatened an act prohibited by law." (Br. at 24.) He also contends that there is "ample evidence of the conduct actionable under [the TDCA]." (Br. at 25.) But there are multiple, fatal problems with his approach.

First, when, as here, the appellant fails to negate all grounds for summary judgment, "the summary judgment must be affirmed." *Voice of the Cornerstone*, 160 S.W.3d at 671.

24

Second, Rule 38.1(i) of the Texas Rules of Appellate Procedure requires an appellant's brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). Farkas's "argument" on the TDCA claim contains *no* citations to the record – and *no* meaningful citations to any legal authorities.[7] When, as here, a brief fails to comply with the requirements of Rule 38.1(i), a party waives the appellate points intended for the court's consideration. *Rockwall Commons Assocs., Ltd. v. MRC Mortg. Grantor Trust I*, 331 S.W.3d 500, 509 (Tex. App.—El Paso 2010, no pet.).

Third, Farkas's conclusory "argument" is contradicted by the record and the law. His TDCA claim appears to be premised on the same unsupported allegations he used in trying to salvage his constitutional claim – allegations that (i) "Wells Fargo Bank, N.A." "misrepresent[ed]" itself as "Wells Fargo Home Equity Group"; (ii) Wells Fargo "misrepresented" the amount of Farkas's debt; and (iii) Wells Fargo "threatened non-judicial foreclosure of the property." (*See* Br. at 26.) The first two allegations are contradicted by the record, which may be why Farkas omits any citations to it:

---

[7] He does make generic references to "Tex. R. Civ. P. 166a(c)" and "TEX. FIN. CODE § 392.001, *et seq.*" (*See* Br. at 25.)

(i) "'Wells Fargo Home Equity' is a division of 'Wells Fargo Bank, N.A.' and is not a separate legal entity." (CR:45; *see also* CR:64 (letter from "Wells Fargo Bank, N.A.; Home Equity Group").) There is no competent evidence to the contrary. Unsupported assertions are insufficient for relief on appeal. *Liberty Mut. Ins. Co. v. Griesing*, 150 S.W.3d 640, 648 (Tex. App.—Austin 2004, pet. dism'd w.o.j.).

(ii) The variations in "the amount of debt" reflect differences between the amounts required to cure Farkas's default versus the amounts requires to pay off Farkas's entire loan. (*See, e.g.*, CR:45, 62-63, 87, 203-06.) These differing amounts also varied over time. (*See id*.) There is no evidence to show support Farkas's theory that these variations somehow amount to "misrepresentations."

As explained (*supra* at 18-19), Texas law expressly permits a lender "who has contracted for the right of non-judicial foreclosure under a power of sale provision [to] choose to pursue the special procedure found in Rule 736 to obtain an order allowing it to proceed with a non-judicial foreclosure . . . ." *See Steptoe*, 2015 WL 1263128, at \*3. Thus, the statement that foreclosure counsel "has been requested to pursue non-judicial foreclosure process *in accordance with the terms of the Note and Deed of Trust and applicable law*" (CR:87 (emphasis added)) is, as a matter of law, not a threat to do something in violation of the law.

Fourth, because the "threatened" foreclosure never occurred, Farkas cannot cite any evidence showing that he sustained actual damages as a result of the alleged violation, as required to recover on a TDCA claim. *See* TEX. FIN. CODE § 392.403(a)(2).

For any or all of these reasons, the trial court's summary judgment that Farkas take nothing on his TDCA claim should be affirmed.

## IV. The Trial Court Did Not Err in Granting Summary Judgment on Farkas's Fraudulent-Lien Claim.

Farkas's final argument is largely pasted from his response to Wells Fargo's motion for summary judgment. (*Compare* Br. at 29, *with* CR:555.) As a result, it suffers from some of the same fatal defects that plague his other arguments: it contains no citations to the record, and it contains no argument, supported by citations to legal authorities, negating all grounds for summary judgment. Those defects, alone, are enough to condemn his point. But there are additional problems, the most fundamental of which is that Farkas's argument is premised on another false theory. In short, he assumes that any document relating to a home-equity loan (*e.g.*, a notice of default) is a "lien" and, therefore, any alleged "misrepresentation" in the "lien" (*e.g.*, a reference to the "wrong" loan number) makes the lien "fraudulent." It is hardly surprising that he cites no legal authority to support this remarkable proposition.

Under Chapter 12 of the Texas Civil Practice and Remedies Code, a "'[l]ien' means a claim in property for the payment of a debt and includes a security interest." TEX. CIV. PRAC. & REM. CODE § 12.001(d). In the mortgage context, a deed of trust is a lien; a notice that a borrower is in default is not. *See Lassberg v. Barrett Daffin Frappier Turner & Engel, L.L.P.*, No. 4:13-CV-577, 2015 WL 123756, at \*5 (E.D. Tex. Jan. 8, 2015); *Jaimes v. Fed. Nat'l Mortg. Ass'n,* 930 F.Supp.2d 692, 697 (W.D. Tex. 2013)); *see also Jones v. JP Morgan Chase Bank, N.A.*, No. 4:13-CV-456, 2014 WL 2996673, at \*8 (E.D. Tex. July 3, 2014) (agreeing that "the assignment, appointment of substitute trustee, and foreclosure notices are not liens, and section 12.002 is not applicable to this case."); *Perdomo v. Fed. Nat'l Mortg. Ass'n*, No. 3:11-CV-734-M, 2013 WL 1123629, at \*5 (N.D. Tex. Mar. 18, 2013) (collecting cases holding that an a lender's use of an assignment, notice of foreclosure, or substitute trustee's deed are not actionable under Chapter 12); *but see Golden v. Wells Fargo Bank, N.A.*, 557 Fed. App'x 323, 327 (5th Cir. Feb. 20, 2014) (unpublished) (recognizing a split in authority as to "whether a document assigning a deed of trust constitutes a 'lien or claim' under Section 12.002," and noting that the "majority of federal district courts have held that a document assigning a deed of trust does not qualify as a 'lien or claim' under Section 12.002") (citations omitted).[8]

---

[8] As this Court has recognized: "Federal authority is persuasive here because a great amount of

The statute further provides, in relevant part, that:

A person may not make, present, or use a document or other record with:

(1) knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;

(2) intent that the document or other record be given the same legal effect as a court record or document . . . evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and

(3) intent to cause another person to suffer . . . financial injury . . . .

*Id.*, § 12.002(a).

Without any citation to the record, Farkas accuses Wells Fargo of "shirk[ing]" its "obligation to disprove an element" of Farkas's claim. (*See* Br. at 29.) But Wells Fargo's motion set forth several reasons – all supported by citations to legal authorities – why Farkas's fraudulent-lien claim fails as a matter of law. (*See* CR:30-34.) Any one of those grounds is a sufficient basis upon which to uphold the judgment. Farkas negates none, and that is fatal. *See Voice of the Cornerstone*, 160 S.W.3d at 671.

As in the trial court, Farkas has no answer to Wells Fargo's arguments that, as a matter of law, complaints about documents used to foreclose on a lien are not

---

home-mortgage litigation in Texas is tried in its federal courts, applying Texas foreclosure law." *Bierwirth v. BAC Home Loans Servicing, L.P.*, No. 03-11-00644-CV, 2012 WL 3793190, at *1 n.3 (Tex. App.—Austin Aug. 30, 2012, pet. denied) (mem. op.).

actionable under Chapter 12 if the underlying note and deed of trust are valid. (*See* CR:555 (citing authorities).) So he attempts to divert the Court's attention with assertions that "the statute does not require recordation of a document but rather merely making, presenting, or using the document," and that "[e]ven a *lis pendens* is actionable under TEX. CIV. PRAC. & REM. CODE § 12.002." (Br. at 29.) But those assertions are meaningless when, as here, the documents that allegedly provide the basis for a Chapter 12 claim do not falsely "evidenc[e] a valid lien or claim against real or personal property." *See* TEX. CIV. PRAC. & REM. CODE § 12.002(a)(2). Because Farkas does not contest the validity of the underlying note or DOT, his Chapter 12 claim fails as a matter of law. *Marsh v. JPMorgan Chase Bank, N.A.*, 888 F. Supp. 2d 805, 813 (W.D. Tex. 2012).

Farkas also fails to negate Wells Fargo's no-evidence grounds for summary judgment. Assertions about burden-shifting are no substitutes for evidence. And, as in the trial court, Farkas cannot cite *any* evidence that even remotely suggests:

- "a fraudulent lien or claim [was] made, presented, or used by Defendant";

- "Defendant had knowledge that a lien or claim made, presented, or used was fraudulent";

- "Defendant made, presented, or used a fraudulent lien or claim with intent that it be given the same legal effect as a valid lien or claim"; or

30

- "Defendant made, presented, or used a fraudulent lien or claim with intent to cause Plaintiff injury."

(CR:38-39.)

There is no such evidence because Farkas's fraudulent-lien claim is premised on a false theory. For any or all of the above reasons, the trial court's summary judgment on the fraudulent-lien claim should be affirmed.

## PRAYER

For these reasons, Appellee Wells Fargo Bank, N.A. prays that the trial court's take-nothing judgment be affirmed in its entirety. Wells Fargo also prays for any additional relief to which it may be entitled.

Respectfully submitted,

**LOCKE LORD LLP**

By: /s/ Susan A. Kidwell

Susan A. Kidwell
 State Bar No. 24032626
 skidwell@lockelord.com
B. David L. Foster
 State Bar No. 24031555
 dfoster@lockelord.com
John W. Ellis
 State Bar No. 24078473
 jellis@lockelord.com
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas 78701
Telephone: (512) 305-4700
Facsimile: (512) 305-4800

Robert T. Mowrey
 State Bar No. 14607500
 rmowrey@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201
Telephone: (214) 740-8000
Facsimile: (214) 740-8800

**COUNSEL FOR APPELLEE WELLS FARGO BANK, N.A.**

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Brief of Appellee Wells Fargo Bank, N.A. contains 7, 265 words (excluding the sections excepted under Texas Rule of Appellate Procedure 9.4(i)(1)).

/s/ Susan A. Kidwell<br>
Susan A. Kidwell

## CERTIFICATE OF SERVICE

I certify that on April 20, 2015 a true and correct copy of the foregoing was served by EfileTx.gov upon the following:

| | |
|---|---|
| Mr. William D. Davis | Mr. Luke Madole |
| bdavis@capital-ip.com | luke.madole@buckleymadole.com |
| DAVIS & ASSOCIATES | BUCKLEY MADOLE, P.C. |
| P. O. Box 1093 | 14841 Dallas Parkway, Suite 425 |
| Dripping Springs, Texas 78620 | Dallas, Texas 75254 |
| *Counsel for Appellant Janos Farkas* | *Counsel for Appellee Brice, Vander Linden & Wernick, P.C. (n/k/a Buckley Madole, P.C.* |

/s/ Susan A. Kidwell<br>
Susan A. Kidwell

HYPERLINKED MATERIAL

CAUSE NO. D-1-GN-11-003692

| JANOS FARKAS, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| WELLS FARGO BANK, N.A. AND BRICE, | § | |
| VANDER LINDEN & WERNICK, P.C., | § | |
| Defendants. | § | 201ST JUDICIAL DISTRICT |

## DECLARATION OF MICHAEL DOLAN

| STATE OF CALIFORNIA | § |
| | § |
| COUNTY OF LOS ANGELES | § |

I, Michael Dolan, hereby declare the following:

1.      "I am of sound mind, over the age of twenty-one (21) years, and capable of making this Declaration.  I am fully competent to testify to the matters stated herein.  I have personal knowledge of each of the matters stated herein, and they are true and correct.

2.      I am employed as a Research and Mediation Manager for Wells Fargo Bank, N.A. ("Wells Fargo").  I am also a custodian of the records of Wells Fargo.  I have also personally reviewed Wells Fargo's records regarding the mortgage debt at issue in the above-captioned lawsuit (the "Loan").

3.      The Loan Records attached hereto are kept by Wells Fargo in the regular course of business, and it was the regular course of business of Wells Fargo for an employee or representative of Wells Fargo, with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the records or to transmit information thereof to be included in such records; and the records were made at or near the time or reasonably soon thereafter.

4.      Attached hereto and incorporated by reference, are true and correct copies of the following records.

- **Exhibit 1-A** is a true and correct copy of the Wells Fargo Home Equity Account Agreement and Disclosure Statement executed on or about January 11, 2007 by Janos Farkas.

- **Exhibit 1-B** is a true and correct copy of the Reinstatement Quote for the Loan at issue in this suit that is good through November 1, 2013.

- **Exhibit 1-C** is a true and correct copy of the Payoff Statement for the Loan at issue in this suit that is good through November 1, 2013.

- **Exhibit 1-D** is a true and correct copy of a letter dated February 7, 2011, sent to Plaintiff Janos Farkas concerning the Loan at issue in this suit.

- **Exhibit 1-E** is a true and correct copy of relevant portions of Wells Fargo's internal loan notes concerning the Loan at issue in this dispute.

5.      The attached records are the originals or exact duplicates of the originals.

6.      As a Research and Mediation Manager for Wells Fargo Bank, N.A., part of my job responsibilities include researching the facts of mortgage loans associated with litigation for which Wells Fargo acts or acted as the mortgagee and/or mortgage servicer. I have gained personal knowledge of the facts stated herein through my experience in the mortgage industry, my job duties and responsibilities, my personal investigation, and my review of the Loan Records. Prior to serving as a Research and Mediation Manager for Wells Fargo, I have been employed by Wells Fargo and its predecessor institutions and held various positions, including the position of vice president in charge of portfolio retention and operations analyst. During my tenure as vice president of the portfolio and retention group, I managed a team that included all of the loan servicing functions of the company. During my 33 years of experience in the mortgage industry, including 28 years as an employee of Wells Fargo and its predecessor institutions, I have created, reviewed, and analyzed hundreds of loan records, including

AUS:0567447/00358:551946v2

amortization schedules to determine total principal and interest payments owed based on the terms of the loan. I am familiar with Wells Fargo's lending and mortgage servicing practices, including the various groups and divisions within Wells Fargo through which it carries out those practices. I am also familiar with Wells Fargo's accounting systems and methods of calculating and loan payoff and reinstatement quotes. I am familiar with Wells Fargo's record keeping system. I have had access to and reviewed various corporate and business records of Wells Fargo, and have had the opportunity to review the business records and account information related specifically to the Loan at issue in this case. All statements made herein are true and correct and based upon my personal knowledge.

7.     The Loan Records reflect that Wells Fargo Bank, N.A. began acting as the Loan's mortgage servicer on or around January 11, 2007 and continues to be the mortgage servicer.

8.     "Wells Fargo Home Equity" is a division of "Wells Fargo Bank, N.A." and is not a separate legal entity. Home equity loans and lines of credit were available through Wells Fargo Home Equity Group. Wells Fargo Home Equity assisted with the account management of the Loan at issue in this dispute.

9.     Plaintiff has not made a payment on the Loan since August 2010.

10.    The amount required to cure Plaintiff's default on the Loan as of March 22, 2011 was $2,013.30.

11.    The amount required to cure Plaintiff's default on the Loan as of July 25, 2011 was $4,002.64.

12.    Because of Plaintiff's default on the Loan, Wells Fargo, through its foreclosure counsel, filed an Application for Court Order Allowing Foreclosure of Lien Under Tex. Const.

AUS:0567447/00358:551946v2

Wells Fargo Bank, N.A.

**AGREEMENT DATE: 01-11-2007**
**ACCOUNT #: 650-650-4349999-1998**
**REFERENCE #: 20063367500069**



### *Wells Fargo Home Equity* Account Agreement
### and Disclosure Statement (the "Agreement")

THIS IS AN EXTENSION OF CREDIT AS DEFINED BY SECTION 50(a)(6) and (t), ARTICLE XVI OF THE TEXAS CONSTITUTION.

**Borrower Name:** JANOS FARKAS

**Property Address:** 6315 FARMDALE LN, AUSTIN, TEXAS 78749

**Mailing Address for Billing Purposes (if different):** PO BOX 180383, AUSTIN, TX 78718

**Credit Line Limit:** 103,441.00

### SECTION 1: MY ACCOUNT AGREEMENT

In this Agreement, the words, "I," "me," "my," and "Borrower" (which also means "we," "us," "our," and "Borrowers," if more than one customer signs below) refer to each person who signs this Agreement. The words "you," "your," "Lender," and "the Bank" refer to Wells Fargo Bank, N.A. and any successor or assign or subsequent holder of this Agreement. This Agreement governs my *Wells Fargo Home Equity Account* (the "Account") with the Bank. If more than one person signs this Agreement, we are jointly and individually bound by its terms. We are separately liable to the Bank for the entire amount owed on the Account. We are each liable as a principal and not merely as a guarantor, even if one or more of us does not use the Account.

This Agreement is made without recourse to other assets of any owner of the property securing this Agreement or any owner's spouse, unless the owner or owner's spouse obtained the loan evidenced by this Agreement by actual fraud. If I or any person or entity acting on my direction or with my knowledge or consent commits actual fraud in connection with the loan application process or the documents executed in connection with this Agreement, I will be fully and personally liable under this Agreement.

### SECTION 2: SECURITY INTEREST

This Agreement is intended to evidence an "Extension of Credit" as that term is defined by Section 50(a)(6) and (t), Article XVI of the Texas Constitution, and is secured by a deed of trust including all modifications, addenda and amendments thereto (the "Security Instrument"), signed the same date as this Agreement. The Security Instrument gives you a security interest in my homestead located at the address shown above (the "Property").

### SECTION 3: MY *WELLS FARGO HOME EQUITY ACCOUNT*

My Account is a revolving account. My credit limit is shown above and will be displayed on each of my billing statements. During the Draw Period (described below), my available credit will be my credit limit minus the sum of all unpaid Advances posted to my Account. During the Draw Period, as I repay the principal balance I owe on my Account, my available credit will be replenished. I agree not to request an Advance that would cause

Wells Fargo Home Equity Account Agreement
HCWF#937v7 - TX (05/23/06)

1/15
Documents Processed 01-09-2007, 13:44:53

**50119221**

my balance to exceed my credit limit. If at any time the balance of my Account exceeds my credit limit, I agree to immediately repay the amount that exceeds my credit limit.

## SECTION 4: MY ACCOUNT DURING THE DRAW PERIOD

### DRAW PERIOD
My Account has a Draw Period of 10 years and one month from the date of this Agreement during which I may request Advances. At the end of the Draw Period, I may request that the Bank renew the Draw Period for an additional 10 years and one month. The Bank may, at its option, approve my request to extend the Draw Period. I may not obtain Advances after the Draw Period ends.

When the Draw Period ends, the outstanding unpaid Line of Credit Advances will convert to a Final Fixed Rate Advance as detailed below in Section 5, MY ACCOUNT DURING THE REPAYMENT PERIOD.

### ADVANCES DURING THE DRAW PERIOD
There are 2 types of Advances on my Account:
- Line of Credit Advances
- Fixed Rate Advances

The Bank must honor my request for Line of Credit Advances and Fixed Rate Advances (collectively, "Advances") as long as I am in compliance with all terms of this Agreement, including all modifications, addenda and amendments to it, and the Security Instrument.

As I use my Account, my available credit will be my credit limit minus the sum of all unpaid Advances. As I repay the principal balance I owe on my Account, my available credit will be replenished. I will not request an Advance that would cause the balance in my Account to exceed my credit limit, or which would violate the terms of this Agreement or any law. If I do exceed my credit limit, I agree to immediately repay the amount that exceeds my credit limit.

I understand that the Bank may refuse to allow any Advance if the Advance does not comply with every requirement of this Agreement. The Bank may choose at its sole discretion to make an Advance that does not comply. The Bank may allow any Advances in any sequence convenient to the Bank.

The Bank is authorized to make an Advance from my Account when it receives a request given by any person who has signed this Agreement. If there are conflicting demands made by any of us who signed this Agreement, the Bank has the option to refuse to make any Advance that has not been requested by all of us together. The Bank will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when the Bank acts upon such instructions believing them to be genuine.

**Section 50(t), Article XVI of the Texas Constitution limits the maximum principal amount outstanding and debits and advances against the Account under certain circumstances. I understand that the Bank may refuse to allow any Advance if the Advance does not comply with Section 50(t), Article XVI of the Texas Constitution.**

### LINE OF CREDIT ADVANCES
Each Line of Credit Advance I request will be in the amount of $4,000.00 or greater.

### LINE OF CREDIT ADVANCE METHODS
While my Account is not in default, closed, or suspended, I may obtain a Line of Credit Advance by:
Requesting a Line of Credit Advance in person at any Bank branch
Requesting a Line of Credit Advance by phone
Transferring funds by using Wells Fargo Online℠
In other ways the Bank authorizes from time to time, and as permitted by § 50(t) Article XVI, of the Texas Constitution.

## LINE OF CREDIT ADVANCES PERIODIC FINANCE CHARGES

Finance charges begin to accrue on Line of Credit Advances immediately when funds are advanced. The periodic FINANCE CHARGE for a billing cycle is the sum of the periodic FINANCE CHARGE for each day in the billing cycle. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for Line of Credit Advances (including current transactions) each day. To determine the daily balance, take the Line of Credit Advances balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), add any new Line of Credit Advances, and subtract any payments or credits that apply to the repayment of Line of Credit Advances. The result is the daily balance.

The Daily Periodic Rate for Line of Credit Advances is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Margin, the initial Daily Periodic Rate, and the initial ANNUAL PERCENTAGE RATE, are each disclosed below. The Margin will increase if the Automatic Payment feature described in Section 6 below is terminated for any reason. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

The Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE on my Line of Credit Advances will be adjusted on the first day of every billing cycle, using the last Index value published during the preceding billing cycle. Therefore, the Daily Periodic Rate for Line of Credit Advances may change (increase or decrease) as often as once each billing cycle based on changes in the Index. I understand that any increase may cause me to make larger monthly payments.

## LIFETIME RATE CAP FOR LINE OF CREDIT ADVANCES

The Daily Periodic Rate for Line of Credit Advances will never exceed 0.049315% (corresponding ANNUAL PERCENTAGE RATE of 18.00%). This is the Lifetime Rate Cap for Line of Credit Advances.

## LIFETIME RATE FLOOR FOR LINE OF CREDIT ADVANCES

The Daily Periodic Rate for Line of Credit Advances will never fall below 0.011616% (corresponding ANNUAL PERCENTAGE RATE of 4.240%). This is the Lifetime Rate Floor for Line of Credit Advances.

## MY INITIAL RATE FOR LINE OF CREDIT ADVANCES

As discussed above, my Daily Periodic Rate is based on the value of the Index plus a Margin. The initial Index value that applies to my Account will be the value of the Index on the day I open my Account. The following disclosures are based on the value of the Index in effect on 01-09-2007. I understand that if I open my Account after this date, my actual Index value, Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE may be higher or lower than the rates disclosed below.

My Margin for Line of Credit Advances is equal to NEGATIVE FIVE HUNDRED TEN THOUSANDTHS OF ONE PERCENTAGE POINT percentage points (-0.510%). As a result, unless the Lifetime Rate Cap for Line of Credit Advances or Lifetime Rate Floor for Line of Credit Advances require the Bank to apply a different rate to my Account, my initial Daily Periodic Rate is 0.021205% (corresponding ANNUAL PERCENTAGE RATE of 7.740%).

## LINE OF CREDIT ADVANCES MINIMUM MONTHLY PAYMENT

During the Draw Period, my Minimum Monthly Payment for Line of Credit Advances shall be equal to:

The sum of all accrued and unpaid periodic FINANCE CHARGES on Line of Credit Advances, plus credit insurance premiums, if any.

## FIXED RATE ADVANCES DURING THE DRAW PERIOD

I have the option to convert outstanding unpaid Line of Credit Advances to Fixed Rate Advances during the Draw Period based on credit limit availability. The minimum Fixed Rate Advance during the Draw Period is $10,000.00. I may request up to 2 Fixed Rate Advances each year. For purposes of this rule, the first "year" will begin on the date of this Agreement. Subsequent years will begin on each anniversary date of this Agreement. I may have no more than 3 Fixed Rate Advances outstanding at any one time. I must select the repayment term for

the Fixed Rate Advance at the time I request the Fixed Rate Advance.

**Interest-Only Payment Option:**
If I select the interest-only payment option for a Fixed Rate Advance during the Draw Period (see the section below titled "**FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD**"), the repayment term must be at least one year and not more than the lesser of 10 years or the remaining term of the Draw Period minus one month. At the end of the term, the balance will convert to a Line of Credit Advance.

**Fully Amortizing Payment Option:**
If I select the fully amortizing payment option for a Fixed Rate Advance during the Draw Period (see the section below titled "**FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD**"), the repayment term must be at least one year and not more than the lesser of 10 years or the remaining term of the Draw Period minus one month.

## FIXED RATE ADVANCE METHODS DURING THE DRAW PERIOD
While my Account is not in default, closed, or suspended, I may obtain a Fixed Rate Advance by:
- Requesting a Fixed Rate Advance in person at any Bank branch.
- Requesting a Fixed Rate Advance by phone.

## FIXED RATE ADVANCES PERIODIC FINANCE CHARGES DURING THE DRAW PERIOD
Fixed Rate Advances will accrue periodic FINANCE CHARGES beginning on the day that the Bank converts any Line of Credit Advances to a Fixed Rate Advance. I will be charged a periodic FINANCE CHARGE on all outstanding unpaid Fixed Rate Advances each day at a fixed Daily Periodic Rate. To determine the periodic FINANCE CHARGE for a day in the billing cycle, multiply the Daily Periodic Rate by the daily balance for the Fixed Rate Advance (including current transactions) each day. To determine the daily balance for the Fixed Rate Advance, take the Fixed Rate Advance balance at the beginning of each day (excluding any unpaid FINANCE CHARGES or other charges provided for under this Agreement), and subtract any payments or credits that apply to the repayment of the Fixed Rate Advance. The result is the daily balance.

The Daily Periodic Rate for Fixed Rate Advances is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the value of the Index in effect on the last business day preceding the day the Bank receives my request for a Fixed Rate Advance. The Margin for Fixed Rate Advances is eight percentage points (8.000%). The Bank may, in its sole discretion, apply a lower Margin. The corresponding ANNUAL PERCENTAGE RATE for Fixed Rate Advances will never be more than the Lifetime Rate Cap for Fixed Rate Advances shown below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

The Margin for any existing Fixed Rate Advances will increase by one quarter of one percentage point (0.25%) if the Automatic Payment feature is terminated, as described in Section 6, below. Therefore, the Daily Periodic Rate for Fixed Rate Advances may also increase at least once during the Account based on an increase in the Margin when the Automatic Payment feature is terminated. Any such increase will result in an increase in the then outstanding Fixed Rate Advance Minimum Monthly Payments. If I selected the interest-only payment option for a Fixed Rate Advance, the Fixed Rate Advance Minimum Monthly Payment for that Advance will equal the sum of all accrued and unpaid periodic FINANCE CHARGES on the remaining balance of the Fixed Rate Advance at the increased corresponding ANNUAL PERCENTAGE RATE. If I selected the fully amortizing payment option for a Fixed Rate Advance, the Fixed Rate Advance Minimum Monthly Payment for that Advance will be reset at an amount sufficient to repay the remaining balance of the applicable Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at its increased corresponding ANNUAL PERCENTAGE RATE.

## LIFETIME RATE CAP FOR FIXED RATE ADVANCES DURING THE DRAW PERIOD
The Daily Periodic Rate for Fixed Rate Advances will not exceed 0.049315% (corresponding ANNUAL PERCENTAGE RATE of 18.000%). This is the Lifetime Rate Cap for Fixed Rate Advances.

## FIXED RATE ADVANCE AT ACCOUNT OPENING

I have requested an initial Fixed Rate Advance at Account opening in the amount of $103,441.00, and for a term of 120 months. My Daily Periodic Rate on this initial Fixed Rate Advance is 0.0198% (corresponding ANNUAL PERCENTAGE RATE of 7.240%). I have selected the fully amortizing payment option.

## FIXED RATE ADVANCES MINIMUM MONTHLY PAYMENT DURING THE DRAW PERIOD

I may select one of the following minimum payment options when I request a Fixed Rate Advance during the Draw Period:

**Interest-Only Payment Option:** If I select this option, my Minimum Monthly Payment for the Fixed Rate Advance during the Draw Period will be equal to the sum of all accrued and unpaid periodic FINANCE CHARGES on the Fixed Rate Advance.

**Fully Amortizing Payment Option:** If I select this option, my Minimum Monthly Payment for the Fixed Rate Advance will be equal to the amount of principal plus periodic FINANCE CHARGE sufficient to repay the Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at the applicable corresponding ANNUAL PERCENTAGE RATE. This assumes that all payments will be made on their due dates, which will be the same as the due dates for my Line of Credit Advances Minimum Monthly Payment described above. If my payments are not consistently made when due, the Fixed Rate Advance Minimum Monthly Payment may not fully repay the Fixed Rate Advance over its term and my final payment may be higher.

During the Draw Period, my available credit for new Line of Credit Advances will be replenished by the amount of principal I repay on my Fixed Rate Advances.

## MY TOTAL PAYMENT DUE DURING THE DRAW PERIOD

I will receive monthly billing statements from the Bank. I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Draw Period consists of my Line of Credit Advances Minimum Monthly Payment plus my Fixed Rate Advance Minimum Monthly Payment(s) together with all past due amounts and overlimit amounts and all other charges due.

## SECTION 5: MY ACCOUNT DURING THE REPAYMENT PERIOD

### REPAYMENT PERIOD

I understand that I may not receive new Advances after the Draw Period ends. At that time, I will begin the Repayment Period, which will continue until the Maturity Date described below, but in no event more than 30 years.

### REPAYMENT OF FINAL FIXED RATE ADVANCE

At the end of the Draw Period, the outstanding unpaid Line of Credit Advances balance will be converted into a Final Fixed Rate Advance. The Final Fixed Rate Advance will have a term of 15 years if my total Final Fixed Rate Advance balance is less than $20,000, or 30 years if my Final Fixed Rate Advance balance is $20,000 or more.

The Final Fixed Rate Advance Minimum Monthly Payment will be the greater of $100 or an amount sufficient to repay the Final Fixed Rate Advance balance by the end of the scheduled term in substantially equal, fully amortizing monthly payments of principal and periodic FINANCE CHARGE at the applicable corresponding ANNUAL PERCENTAGE RATE. If my payments are not consistently made when due, the Final Fixed Rate Advance Minimum Monthly Payment may not fully repay the Final Fixed Rate Advance over its term and my final payment for the Final Fixed Rate Advance may be higher. The Bank will notify me in advance of any changes to my Total Payment Due as a result of the Final Fixed Rate Advance Minimum Monthly Payment.

### PERIODIC FINANCE CHARGE ON FINAL FIXED RATE ADVANCE BALANCE

Periodic FINANCE CHARGES on my Final Fixed Rate Advance balance will begin to accrue on the first day of

Wells Fargo Home Equity Account Agreement
HCWF#937v7 - TX (05/23/06)

Documents Processed 01-09-2007, 13:44:53

the Repayment Period. I will be charged a periodic FINANCE CHARGE based on the unpaid Final Fixed Rate Advance balance at the end of each day at a fixed Daily Periodic Rate.

The Daily Periodic Rate for the Final Fixed Rate Advance is equal to 1/365 (1/366 during leap years) of an Index plus a Margin. The Index is the highest Prime Rate as published in the Western Edition of *The Wall Street Journal* "Money Rates" table. The Bank will use the Index value published on the last business day during the Draw Period. The Margin for the Final Fixed Rate Advance is eight percentage points (8.000%). The Bank may, in its sole discretion, apply a lower Margin. The corresponding ANNUAL PERCENTAGE RATE on my Final Fixed Rate Advance will never be more than the Lifetime Rate Cap for my Final Fixed Rate Advance shown below. The ANNUAL PERCENTAGE RATE does not include costs other than interest.

The Margin for the Final Fixed Rate Advance will increase by one quarter of one percentage point (0.25%) if the Automatic Payment feature is terminated, as described in Section 6, below, during the Repayment Period. Therefore, the Daily Periodic Rate for the Final Fixed Rate Advance may also increase at least once during the Repayment Period based on an increase in the Margin when the Automatic Payment feature is terminated. Any such increase will result in an increase in the then outstanding Final Fixed Rate Advance Minimum Monthly Payment, which will be reset at the greater of $100 or the amount sufficient to repay the remaining balance of the Final Fixed Rate Advance within its applicable term in substantially equal, fully amortizing monthly payments at its applicable corresponding ANNUAL PERCENTAGE RATE.

### LIFETIME RATE CAP FOR MY FINAL FIXED RATE ADVANCE
The Daily Periodic Rate for my Final Fixed Rate Advance will not exceed 0.049315% (corresponding ANNUAL PERCENTAGE RATE of 18.000%). This is the Lifetime Rate Cap for my Final Fixed Rate Advance.

### MY TOTAL PAYMENT DUE DURING THE REPAYMENT PERIOD
I must pay at least the amount of the Total Payment Due by the Date Due, as shown on each monthly billing statement.

The "Total Payment Due" during the Repayment Period is the Final Fixed Rate Advance Minimum Monthly Payment as described above, together with all past due amounts and overlimit amounts and all other charges due.

### MATURITY DATE
The Maturity Date on my Account shall be the maturity date of the Final Fixed Rate Advance, but in no event more than 30 years from the end of the Draw Period. At that time, any remaining balance must be paid in full.

## SECTION 6: AUTOMATIC PAYMENT DISCOUNT

I have chosen to make Automatic Payments as specified in the Authorization for Automatic Transfer. I have received an interest rate discount for making this choice. I understand that the ANNUAL PERCENTAGE RATE and the Margin that apply to my Line of Credit Advances, as described in Section 4 above, reflect a discount you gave me for this Authorization for Automatic Transfer. If the Automatic Payments are terminated for any reason at any time during the Draw Period by anyone, the Margin that applies to my Line of Credit Advances, as set forth in Section 4 above, will increase by one quarter of one percentage point (0.25%) effective the day the Automatic Payments are terminated. If the Margin increases, the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE applicable to my Line of Credit Advances, and my Line of Credit Advances Minimum Monthly Payment, may also increase. My monthly billing statement will show me my new Daily Periodic Rate, corresponding ANNUAL PERCENTAGE RATE and Line of Credit Advances Minimum Monthly Payment as applicable.

## SECTION 7: OTHER FINANCE CHARGES

In addition to paying periodic FINANCE CHARGES, as described in Sections 4 and 5 above, I also agree to pay the following additional fees, each of which is a FINANCE CHARGE:

N/A

## SECTION 8: CLOSING COSTS

I agree to pay to the Bank the following closing costs at the opening of my Account:

N/A

\* This amount is an estimate. The actual recording/filing fee is shown on the HUD Settlement Statement that is attached to and incorporated into this Agreement.

The following closing costs are **FINANCE CHARGES**:

N/A

## SECTION 9: ADDITIONAL FEES, COSTS AND CHARGES

In addition to the FINANCE CHARGES and closing costs described above, I agree to pay the following non-refundable fees, costs and charges, which will be owed once charged to my Account.

**LATE CHARGES**
During the Draw Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the Line of Credit Minimum Monthly Payment if my payment is more than 10 days past due.

During the Repayment Period, I will pay a late charge equal to the greater of five dollars ($5.00) or five percent (5%) of the sum of all Fixed Rate Advance Minimum Monthly Payments if my payment is more than 10 days past due.

**PREPAYMENT FEE**
There is no prepayment fee on my Account.

**OTHER CHARGES**
To the extent allowed by law, I agree to pay the following fees if I request or authorize these additional services:
(a) **Fax Fee**: The Bank will charge a fax fee in the amount of $10 if I request or authorize others to request any document or letter to be transmitted by facsimile (fax) machine.
(b) **Research Fee and Photocopy Fee**: The Bank will charge a research/photocopy fee in the amount of $5 per photocopy if I request or authorize others to request that the Bank research my Account or provide photocopies of Account documents for any purpose other than a billing error inquiry.
(c) **Reconveyance or Satisfaction Fee**: The Bank will charge reconveyance and satisfaction fees as allowed by applicable law.
(d) **Stop Payment Fee**: The Bank will charge a stop payment fee in the amount of $25 if I request or authorize others to request that the Bank stop payment on a draft I have used to request a Line of Credit Advance.
(e) **Return Check Fee**: The Bank will charge a return check fee in the amount of $25 if I make a payment with a check that is dishonored for any reason.
(f) **Overlimit Fee**: The Bank will charge an overlimit fee in the amount of $25 for each billing cycle in which I have exceeded my credit limit or have requested an Advance that would have caused me to exceed my credit limit.
(g) **Return Advance Check Fee (Insufficient funds)**: The Bank will charge a return advance check fee in the amount of $25 for each check or draft used to request a Line of Credit Advance that is returned unpaid (dishonored) by the Bank due to the requested Advance not meeting all requirements of this Agreement.

## SECTION 10: COLLECTION COSTS AND ATTORNEY'S FEES

If I am in default, I will pay the Bank's collection costs, attorney's fees and other expenses of enforcing the Bank's rights under this Agreement and the Security Instrument, unless prohibited by applicable law.

## SECTION 11: METHOD OF PAYMENT

The Bank will provide me with a monthly billing statement and automatically charge my qualified deposit account (under the terms of a separate written Authorization for Automatic Transfer) for the Total Payment Due. If I owe other charges (other than credit insurance premiums and annual fees), I must pay them separately. If I owe past due amounts on my Account, the Bank will not collect these amounts by using an Automatic Payment, and I must pay them separately.

## SECTION 12: SCHEDULED PAYMENT DUE DATE

My monthly payment due date for my Total Payment Due is the 15TH day of each and every month during both the Draw and Repayment Periods.

## SECTION 13: MY PROMISE TO PAY

I promise to pay to the order of the Bank the total of all Advances which I receive or which I authorize to be made from my Account. I promise to pay the total of any FINANCE CHARGE, plus all amounts past due, overlimit amounts, and any late charges, fees, other charges and other obligations charged to my Account under this Agreement or the Security Instrument. All payments made under this Agreement will be made in U.S. Dollars. I will not mail any cash payments to the Bank. I may not use Advance request checks to make payments on my Account.

The Bank may, at its discretion, withhold a portion of the available credit on my Account up to the amount of any payment due in order to assure that my check or other payment instrument is honored.

I will make payments at the Bank's address for receiving a payment, as indicated on my payment coupon and billing statement, unless another payment method is authorized by the Bank. Each non-electronic payment I make will be accompanied by the remittance portion of my billing statement.

I understand that payments I make by mail to the address indicated on my billing statement or payment coupon will be credited to my Account as of the date received (including Saturdays, Sundays, and holidays) if the Bank receives the payment prior to 5 p.m. local time for the payment address.

Payments I make from a qualified account ("Automatic Payments") pursuant to an Authorization for Automatic Transfer will be credited to my Account on the date received (including Saturdays, Sundays, and holidays).

Payments I make at a Bank branch and received prior to established cut-off times will be credited to my Account on the business day the payment is received by the Bank. For purposes of this rule, a business day includes any day other than Saturdays, Sundays, and Bank observed holidays. Payments made at a Bank branch received on a Saturday, Sunday, or Bank observed holiday or after established cut-off times will be credited as of the next business day.

Payments I make online, by ATM, by telephone, or by any other means the Bank may make available to me and received prior to established cut-off times will be credited to my Account on the business day the payment is received by the Bank. For purposes of this rule, a business day includes any day other than Saturdays, Sundays, and federal holidays. Payments made online, by ATM, by telephone, or by any other means the Bank may make available to me received on a Saturday, Sunday, or federal holiday or after established cut-off times will be credited as of the next business day.

I will not make payment or authorize others to make payment for me by means of a single aggregated payment, which includes payments for this Account and any other account(s), unless the payment is made in compliance with the Bank's requirements for multiple account payments.

The Bank may accept late payments, partial payments, post-dated checks, or any form of payment containing a restrictive endorsement, without losing any of the Bank's rights under this Agreement. The Bank's acceptance of checks or money orders labeled "payment in full," or words to that effect, will not constitute an accord and

satisfaction nor a waiver of any rights the Bank has to receive full payment. If I intend to condition a payment, pay the Account in full with less than the total amount owed, or give payment instructions, I will clearly set out such intention, conditions and instructions in a separate letter accompanying my payment, and mail both to Wells Fargo Bank, N.A., P.O. Box 2993, Portland, OR 97208.

## SECTION 14: TAX DEDUCTIBILITY

I understand that I should consult a tax advisor regarding the deductibility of interest and charges under my Account.

## SECTION 15: REEVALUATION OF CREDIT QUALIFICATIONS AND CREDIT REPORTS

My signature on this Agreement authorizes the Bank to obtain credit information about me, including credit bureau reports, at any time. Such credit bureau reports may be requested or used in connection with (a) renewal or extension of this Agreement, (b) review of my Account, (c) taking any collection action, or (d) any other legitimate purposes associated with my Account. I agree to submit current financial information to the Bank upon the Bank's request. The Bank may reexamine and reevaluate my credit qualifications at any time. The Bank may report its experience with me and my Account to others, to the extent allowed by law.

## SECTION 16: PAYOFF BALANCE INFORMATION

The Bank will tell me the balance required on any given day to pay off my Account in full, if I so request. If such request is made on my behalf by an escrow holder, settlement agent or other third party on my behalf during the Draw Period, the Bank may immediately freeze my Account. I agree that the Bank's receipt of such a request from an escrow holder, settlement agent or other third party on my behalf will be considered to be a request by me to suspend credit privileges on my Account. While my Account is frozen, I cannot receive new Advances and the Bank will return unpaid any Advance request checks the Bank receives and will refuse to honor any other Advance request made on my Account. This payoff freeze will be lifted and my Account reopened if the request for payoff balance information is withdrawn, in which event the Bank may require written confirmation from the escrow holder, settlement agent or other third party on my behalf that the escrow or other settlement has been cancelled.

## SECTION 17: DEFAULT

I will be in default if (a) I fail to meet the repayment terms of this Agreement for any outstanding balance, or (b) there is fraud or material misrepresentation by me in connection with this Agreement, or (c) any action or inaction by me adversely affects the Bank's security in the Property, including without limitation, transfer of the Property without the Bank's consent, failure to maintain required insurance or pay required taxes, revocation or termination of any revocable trust that is an owner of the Property, or the death of any person who has signed this Agreement, or (d) I am an executive officer of the Bank and federal law governing credit extended by a bank to its executive officer, including without limitation Section 215.5(d)(4) of Federal Reserve Regulation O (12 CFR § 215.5(d)(4)), permits or requires immediate payment of my entire Account balance.

If I am in default, the Bank, subject to applicable law, may do any or all of the following: (a) close my Account immediately, without notice; (b) return unpaid any outstanding Advance request checks drawn on my Account and refuse to honor any other Advance request made on my Account; and (c) require immediate payment of the entire balance of my Account, and, if I fail to pay, exercise the Bank's rights under the Security Instrument, which may result in the loss of the Property. I waive my common law rights to receive notice of the Bank's intent to accelerate the sums I owe under this Agreement and notice of acceleration. If I am in default, the method of determining the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will remain as described in this Agreement.

The Bank and I agree that notwithstanding any other provision of this Agreement or the Security Instrument, the Bank will have the right to terminate or suspend my Account to the extent permitted by applicable law.

## SECTION 18: CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT

## LIMIT; REINSTATEMENT OF CREDIT

### CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT BY BORROWER

Any one Borrower can close the Account by paying in full and sending a signed letter to the Bank at the address indicated on my monthly billing statement requesting that the Account be closed. Any one Borrower may terminate the Advance feature, at any time during the Draw Period, by sending a signed letter to the Bank at the address indicated on my monthly billing statement requesting the termination of the Advance feature. To reactivate the Advance feature on the Account during the Draw Period, the Bank will require all Borrowers to sign a written request and mail to the address indicated on my monthly billing statement.

### CLOSURE OR SUSPENSION OF ACCOUNT, REDUCTION OF CREDIT LIMIT BY BANK

I will receive a written notice if the Bank suspends or freezes my Account or reduces my credit limit as required under applicable law. The notice will include the reason(s) for such action(s). Thereafter, if I wish to reinstate my Account or increase my credit limit, I agree to send a written request to the Bank at the address specified on my monthly billing statement, signed by all of the Borrowers, along with satisfactory evidence to the Bank that the reason(s) for suspension or reduction of my Account no longer exist(s). I also agree to provide the Bank promptly with any additional information necessary to support my request.

The Bank may suspend the use of my Account and temporarily prohibit future Advances during the Draw Period, or the Bank may reduce my credit limit, for any reason permitted by applicable law, including without limitation, (a) if the annualized Daily Periodic Rate equals or exceeds the Lifetime Rate Cap stated herein, (b) there is any material change in my financial circumstances that the Bank reasonably believes will make me unable to fulfill my repayment obligations under this Agreement, (c) the value of the Property declines significantly below its original appraised value, as determined by the Bank, (d) my failure to comply with any material obligation under this Agreement or the Security Instrument, (e) a regulatory authority has notified the Bank that continued Advances would constitute an unsafe and unsound business practice, (f) I am in default under Section 17 above, or (g) government action prevents the Bank from imposing the ANNUAL PERCENTAGE RATE provided for in this Agreement or impairs the Bank's security interest in the Property, such that the value of the security interest is less than 120 percent of the credit limit.

In the event of a suspension of my Account, the Bank is authorized to obtain such information as may be required by the Bank, including without limitation, credit reports and appraisals of the Property, to evaluate any request by me to reinstate the Account. To the extent permitted by applicable law, I agree to pay to the Bank the cost of obtaining such additional information.

If my Account is closed or suspended for any reason, the Bank may return unpaid any outstanding Advance request checks drawn on my Account and refuse to honor any other Advance request made on my Account. I will continue to be responsible for full payment of the balance of my Account as well as all other Account obligations, according to the terms of this Agreement.

## SECTION 19: FURTHER ASSURANCES

I agree that I will take any steps, including but not limited to, signing, filing or recording any documents, which are necessary or which the Bank deems appropriate, to be sure that my obligations to the Bank under this Agreement become and continue to be secured by the Security Instrument.

## SECTION 20: CHANGE IN RESIDENCE OR OWNERSHIP OF THE PROPERTY

I agree to notify the Bank immediately if (a) the Property is my primary residence and I cease to live in the Property as my primary residence, or (b) there is any change in the ownership of the Property; or (c) I have declared the Property my Texas Homestead as defined by Chapter 41 of the Texas Property Code, and the Property or any part of the Property ceases to be used as Homestead property or I declare other property I own to be my Texas Homestead.. I agree that my Account shall be closed and that the entire outstanding balance of my Account shall be due and payable immediately on any sale or other transfer of the Property, unless prohibited by applicable law. In this regard, I understand that my Account is secured by a Security Instrument containing the following or a substantially similar provision:

56

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 13 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## SECTION 21: CHANGE IN TERMS

To the extent allowed by law, I agree that the Bank may make certain changes to the terms of this Agreement at specified times or upon the occurrence of specified events. The Bank may make insignificant changes, such as changes in the address for payments, billing cycle dates, payment due dates, day of the month on which Index values are determined, Index or interest rate rounding rules, and balance computation method (if the change produces an insignificant difference in the interest or FINANCE CHARGE I am required to pay). The Bank may also make changes that will benefit me, such as additional options or a temporary reduction in rates or fees. In accordance with federal law, the Bank may also change the Index and Margin used to determine the ANNUAL PERCENTAGE RATE(S) that apply to my Line of Credit Advances and/or Fixed Rate Advances if the original Index is no longer available. The Bank may make any of the changes discussed above without my consent, unless applicable law provides otherwise. The Bank will give me any notice of change that is required by law. I may also agree to changes in writing.

So long as the Property securing this Agreement is my Texas homestead as defined by Chapter 41 of the Texas Property Code, the Bank may not, in any circumstance, unilaterally amend the terms of this Agreement.

## SECTION 22: WAIVERS

### BORROWER'S WAIVERS
I waive my rights to require the Bank to do certain things. Those things are: (a) to demand payment of amounts due (known as "presentment"); (b) to give notice that amounts due have not been paid (known as "notice of dishonor"); (c) to obtain an official certification of nonpayment (known as "protest").

### BANK'S NON-WAIVER
The Bank may fail to make use of any of its rights under this Agreement or the Security Instrument or under applicable law on one or more occasions, or delay or partially exercise such rights, without waiving any of its rights or amending any of my obligations. The Bank may fail to make use of any of its rights or delay or partially exercise such rights against one party, without waiving any of its rights against any other party to this Agreement.

## SECTION 23: GOVERNING LAW; SEVERABILITY

All interest, fees and other amounts charged or accruing in connection with this Agreement which are considered "interest" within the meaning of Section 85 of the National Bank Act (12 USC § 85; 12 CFR 7.4001(a)) shall be governed by and interpreted under South Dakota law. In all other respects, this Agreement and all related documents, as well as the rights, remedies, and duties of the Bank and the Borrower(s), shall be governed and interpreted by federal law with respect to national banks and, to the extent not preempted by federal law, the laws of the state in which the Property is located, except that Texas Finance Code Chapter 346 (which regulates certain revolving credit accounts) does not apply to this Agreement. .

If any provision of this Agreement or the Security Instrument is determined to be invalid or unenforceable by a court of competent jurisdiction, the rest of this Agreement will remain in full force and effect and enforceable according to its terms. All references in this Agreement to the singular shall include the plural and vice versa.

# SECTION 24: LOST OR STOLEN ADVANCE REQUEST CHECKS; BILLING ERRORS

## LOST OR STOLEN ADVANCE REQUEST CHECKS (WHERE AVAILABLE); BILLING ERRORS

I will immediately contact the Bank at the phone number on my monthly billing statement and confirm by letter if any of my Advance request checks are ever lost or stolen, if there are any errors in my monthly billing statement, or if I suspect any unauthorized use of my Account.

The Bank will not return to me my cancelled Advance request checks or other Advance request instruments after paying them. The Bank will make available photocopies of my Advance request checks and other Advance request instruments upon request. I will examine my Account statements promptly in order to identify any improper or unauthorized entries. In consideration for the Bank's payment of each Advance request check, I agree that even though I will not receive the original Advance request checks, all time periods under the Uniform Commercial Code (UCC) for examining my monthly billing statement and reporting improper entries, including the UCC's statutes of limitation with respect to forged, unauthorized, or missing signatures or endorsements, will begin from the time my Account statement is first sent or made available to me.

## UNAUTHORIZED TRANSACTIONS

I will notify the Bank if someone has transferred, or may transfer money from my Account without my permission, or if I suspect any fraudulent activity on my Account. I can call the Wells Fargo Phone Bank at the telephone number on my monthly billing statement, anytime, 24 hours a day, 7 days a week, or advise my local Bank branch office. I may also send written notice to the Bank at the address indicated on my billing statement.

## Billing Rights - Keep This Notice For Future Use

This notice contains important information about my rights and the Bank's responsibilities under the Fair Credit Billing Act.

## Notify The Bank In Case Of Errors Or Questions About My Bill

If I think my billing statement is wrong, or if I need more information about a transaction on my billing statement, I will send a letter on a separate page to the Bank, as soon as possible, at the address listed on my billing statement. The Bank must hear from me no later than 60 days after the Bank sent me the first billing statement on which the suspected error or problem appears. I can telephone the Bank, but doing so will not preserve my rights.

In my letter, I will provide the Bank with the following information:

- My name, Account number and daytime phone number, and
- The dollar amount of the suspected error, and
- A description of the error and explanation, if possible, as to why I believe there is an error. If I need more information, I will describe the item I am not sure about.

If I have authorized the Bank to pay my minimum monthly payment automatically from my checking account at the Bank, I can stop the payment of any scheduled automatic payment if I believe a billing error has occurred. To stop the payment, my letter must reach the Bank at least three business days before the automatic payment is scheduled to occur.

## My Rights And The Bank's Responsibilities After Receipt Of My Written Notice

The Bank must acknowledge my letter within 30 days, unless the Bank has corrected the error by then. Within 90 days, the Bank must either correct the error or explain why the Bank believes the billing statement was correct.

After the Bank receives my letter, the Bank cannot try to collect any amount I question, or report me as delinquent. The Bank can continue to bill me for the amount I question, including finance charges, and the Bank can apply any unpaid amount against my credit limit. I do not have to pay any questioned amount while the Bank is researching my Account, but I am still obligated to pay the parts of my bill that are not in question.

Wells Fargo Home Equity Account Agreement
HCWF#937v7 - TX (05/23/06)

12/15
Documents Processed 01-09-2007, 13:44:53

If the Bank finds that a mistake was made on my billing statement, I will not have to pay any finance charges related to the questioned amount. If the Bank didn't make a mistake, I will have to pay finance charges, and I will have to make up any missed payments on the questioned amount. In either case, the Bank will send me a statement of the amount I owe and the date that payment is due.

If I fail to pay the amount that the Bank determines I owe, the Bank may report me as delinquent. However, if the Bank's explanation does not satisfy me and I write to the Bank within ten days telling the Bank that I still refuse to pay, the Bank must tell anyone the Bank reports me to that I have a question about my bill. And, the Bank must tell me the name of anyone the Bank reports me to. When the matter has been settled between the Bank and me, the Bank must tell anyone the Bank reports me to that the matter has been settled.

If the Bank does not follow the above rules, the Bank cannot collect the first $50 of the questioned amount, even if my billing statement was correct.

## SECTION 25: NOTICES

Unless applicable law requires a different method, any notice that must be given to me or to anyone else who signs, guarantees or endorses this Agreement may be given by mailing it to my address as set forth above in this Agreement, or to a different address if I have properly notified the Bank of that different address. Any notice that I may send to the Bank must be given by mailing it to the Bank at the address provided on my billing statement, unless the type of notice is more specifically addressed in this Agreement and a different address is provided herein.

If I contact you by phone, I acknowledge that telephone calls between me and the Bank or any of the Bank's affiliates may be monitored and recorded by the Bank or the Bank's affiliates to ensure that my inquiries are handled promptly, courteously and accurately.

I agree that the Bank may contact me by telephone. I agree to accept calls from the Bank at any telephone number that I provide to the Bank.

I agree to accept calls from the Bank or the Bank's designated representatives which begin with a verbal statement or tabbed message identifying the call as a business call from the Bank. I acknowledge and understand that some of the telephone calls between me and the Bank may be monitored and recorded to ensure that the Bank handles these calls courteously and accurately.

## SECTION 26: ADDENDA
I agree to the following attached addenda, modifications or amendments:
   N/A

## SECTION 27: STATE DISCLOSURES

N/A

THIS AGREEMENT, THE SECURITY INSTRUMENT AND THE CLOSING DOCUMENTS EXECUTED HEREWITH CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT OF THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES RELATING TO THIS AGREEMENT.

## SECTION 28: PERSONAL LIABILITY (Texas Homestead Property Only)

I intend to comply with all provisions and conditions of the Equity Law in order to secure this Agreement with a valid lien upon the Property. I will execute any document necessary to comply with all provisions and conditions of the Equity Law in order to secure this Agreement with a valid lien upon the Property. If, for any reason the Property described in the Security Instrument is not homestead property, due to mistake, error or misrepresentation by me or anyone else signing this Agreement, then the parties intend and agree that this line of

credit is not an equity line of credit made under the Equity Law, the non-recourse provisions of the Equity Law are not applicable, and the Security Instrument remains a valid lien on the Property.

## SECTION 29: FORFEITURE OF PRINCIPAL AND INTEREST; CURE OF VIOLATION

The Bank shall comply with any of its obligations under sections 50(a)(6), 50(e)-(i), or 50(t) Article XVI, Texas Constitution or other provisions of this Agreement and related loan documents (collectively, the "Obligations") within 60 days after the Bank receives notice of the failure to comply, unless the Bank remedies that failure as provided in Texas Constitution Art. XVI, Section 50(a)(6)(Q)(x). Any notice of non-compliance with any portion of the Obligations must be in writing, mailed postage prepaid by first class mail to:

Wells Fargo Bank Executive Office
MAC P6053-016
PO Box 4233
Portland, Oregon 97208

or to a different address if I am given notice pursuant to this Agreement of that different address. As a precondition to taking any action premised on the failure of the Bank to comply, I will cooperate in reasonable efforts to effectuate any compliance.

### NOTICE TO THE BORROWER
**DO NOT SIGN THIS AGREEMENT IF IT CONTAINS BLANK SPACES. ALL SPACES SHOULD BE COMPLETED BEFORE THIS AGREEMENT IS SIGNED. READ THIS AGREEMENT BEFORE SIGNING IT.**

### ACKNOWLEDGMENT

I have received, read and retained a copy of this *Wells Fargo Home Equity Account* Agreement and Disclosure Statement (the "Agreement"), the Security Instrument, the Agreement to Provide Insurance, and the HUD Settlement Statement provided to me at the closing, all of which I agree to by signing this Agreement. The HUD Settlement Statement is incorporated into and made a part of this Agreement. I acknowledge receipt of the *Wells Fargo Home Equity Account* Important Terms disclosure and the home equity brochure when I applied for this Account. In addition, I hereby agree that the terms of this Agreement replace the terms of any prior oral or written agreements between the Bank and me about this Account, including, for example, any and all commitment letters and pre-approval letters between the Bank and me about this Account.

| | (Seal) | 01-11-07 |
|---|---|---|
| **BORROWER** | | DATE SIGNED |
| **JANOS FARKAS** | | |

| | (Seal) | |
|---|---|---|
| **BORROWER** | | DATE SIGNED |

| | (Seal) | |
|---|---|---|
| **BORROWER** | | DATE SIGNED |

| | (Seal) | |
|---|---|---|
| **BORROWER** | | DATE SIGNED |

_____ (Seal) _____
BORROWER                                              DATE SIGNED

_____ (Seal) _____
BORROWER                                              DATE SIGNED

_____ (Seal) _____
BORROWER                                              DATE SIGNED

_____ (Seal) _____
BORROWER                                              DATE SIGNED

After Recording Mail to:
Wells Fargo Bank, N.A.
Attn: Document Mgt.
P.O. Box 31557
MAC B6908-012
Billings, MT 59107-9900

DT  2007015512

14 PGS

This Instrument Prepared by:
Wells Fargo Bank, N.A.
2202 W ROSE GARDEN LN
PHOENIX, ARIZONA 85027

---

Account Number: 650-650-4349999-1XXX          Reference Number: 20063367500009

**THIS SECURITY INSTRUMENT SECURES AN EXTENSION OF CREDIT AS DEFINED BY SECTION 50(a)(6) AND 50(t), ARTICLE XVI OF THE TEXAS CONSTITUTION.**

## TEXAS DEED OF TRUST
(Securing Future Advances)

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined elsewhere in this document. Certain rules regarding the usage of words used in this document are also provided in Section 14.

**(A)** "**Security Instrument**" means this document, which is dated **JANUARY 11, 2007**, together with all Riders to this document.
**(B)** "**Borrower**" is **JANOS FARKAS, AN UNMARRIED PERSON**. Borrower is the grantor under this Security Instrument. Borrower's Address is **6315 FARMDALE, AUSTIN, TEXAS 78749**.
**(C)** "**Lender**" is Wells Fargo Bank, N.A.. Lender is a National Bank organized and existing under the laws of the United States. Lender's address is **101 North Phillips Avenue, Sioux Falls, SD 57104**. Lender includes any holder of the Debt Instrument who is entitled to receive payments under the Debt Instrument. Lender is the beneficiary under this Security Instrument.
**(D)** "**Trustee**" is **Stephen F. Marquart**.
Trustee's address is **4406 Piedras Drive West, Suite 120,  San Antonio, TX 78228**.
**(E)** "**Debt Instrument**" means the loan agreement or other credit instrument signed by Borrower and dated **JANUARY 11, 2007**. The Debt Instrument states that Borrower owes Lender, or may owe Lender, an amount that may vary from time to time up to a maximum principal sum outstanding at any one time of, **ONE HUNDRED THREE THOUSAND FOUR HUNDRED FORTY-ONE AND 00/100THS** Dollars (U.S. $ **103,441.00**) plus interest. Borrower has promised to pay this debt in Periodic Payments and to pay the debt in full not later than **January 11, 2047**.
**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)** "**Extension of Credit**" means the debt evidenced by the Debt Instrument, as defined by Section 50(a)(6) and 50(t), Article XVI of the Texas Constitution and all the documents executed in connection with the debt.
**(H)** "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

| | |
|---|---|
| [N/A] Leasehold Rider | |
| [N/A] Trust Rider | [N/A] Renewal and Extension Rider |
| [N/A] Other(s) [specify] | _____ N/A _____ |

EXHIBIT 2

TEXAS--OPEN-END SECURITY INSTRUMENT
HC#162v7 (2/3/05)

*(page 1 of 14 pages)*

Documents Processed 01-09-2007, 13:44:53

70

**(I)** "**Applicable Law**" means all controlling applicable federal law and, to the extent not preempted by federal law, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that may be imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: condemnation or other taking of all or any part of the Property or conveyance in lieu of condemnation.

**(M)** "**Periodic Payment**" means the amounts as they become due for principal, interest and other charges as provided for in the Debt Instrument.

**(N)** "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Debt Instrument and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Extension of Credit, and all future advances, renewals, extensions and modifications of the Debt Instrument, including any future advances made at a time when no indebtedness is currently secured by this Security Instrument; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Debt Instrument. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | TRAVIS | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

327357
**LOT 18, BLOCK 5, OF VILLAGE AT WESTERN OAKS SECTION 14, A SUBDIVISION IN TRAVIS COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT OF RECORD IN VOLUME 86, PAGES 80B-81A, OF THE PLAT RECORDS OF TRAVIS COUNTY, TEXAS.**

which currently has the address of _____ **6315 FARMDALE LN** _____

_____ **AUSTIN** _____, Texas _____ **78749** _____ ("Property Address"):
   [City]       [Zip Code]

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument.

   All of the foregoing is referred to in this Security Instrument as the "Property"; provided however, that the Property is limited to homestead property in accordance with Section 50(a)(6)(H), Article XVI of the Texas Constitution. The Property shall also include any additional property described in Section 20.

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record as of the execution date of this Security Instrument. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**TEXAS—OPEN-END SECURITY INSTRUMENT**
HC#162v7 (2/3/05)

*(page 2 of 14 pages)*

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Prepayment and Other Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Debt Instrument and any prepayment charges, late charges and other charges due under the Debt Instrument. Payments due under the Debt Instrument and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Debt Instrument or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Debt Instrument and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in (or in accordance with) the Debt Instrument or at such other location as may be designated by Lender in accordance with the notice provisions in Section 13. Subject to Applicable Law, Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Extension of Credit current. Lender may accept any payment or partial payment insufficient to bring the Extension of Credit current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future.

2. **Application of Payments or Proceeds.** Unless other procedures are set forth in the Debt Instrument or Applicable Law, Lender may apply payments in any order that Lender deems appropriate.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Debt Instrument shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) has disclosed such lien to Lender at application for the Extension of Credit or agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien that can attain priority over this Security Instrument and which was not disclosed on the application for the Extension of Credit that Borrower provided to Lender, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions satisfactory to Lender set forth above in this Section 3.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Extension of Credit.

4. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Extension of Credit. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Extension of Credit, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower secured by this Security

TEXAS–OPEN-END SECURITY INSTRUMENT *(page 3 of 14 pages)*
HC#162v7 (2/3/05)

Instrument. These amounts shall bear interest at the rate applicable to the Debt Instrument from time to time, from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Debt Instrument up to the amount of the outstanding loan balance. Upon Lender's request, Borrower shall promptly give to Lender copies of all policies, renewal certificates, receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Debt Instrument up to the amount of the outstanding loan balance.

In the event of loss and subject to the rights of any lienholder with rights to insurance proceeds that are superior to Lender's rights, the following provisions in this Section 4 shall apply. Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 21 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Debt Instrument or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Debt Instrument or this Security Instrument, whether or not then due, subject to the rights of any lienholder with rights to insurance proceeds that are superior to Lender's rights.

5. **Occupancy.** Borrower now occupies and uses the Property as Borrower's Texas homestead and shall continue to occupy the Property as Borrower's Texas homestead for at least one year after the date of this Security Instrument, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

6. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

7. **Borrower's Loan Application.** Borrower's actions shall constitute actual fraud under Section 50(a)(6)(c), Article XVI of the Texas Constitution and Borrower shall be in default and may be held personally liable for the debt evidenced by the Note and this Security Instrument if, during the Extension of Credit, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Extension of Credit or any other action or inaction that is determined to be actual fraud. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as a Texas homestead, the representations and warranties contained in the Texas Home Equity Extension of Credit Agreement and Acknowledgement of Fair Market Value Affidavit as described in Section 27.

8. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument or any obligation that is secured by a lien that is superior to this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of any lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 8 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the rate applicable to the Debt Instrument from time to time, from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

9. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. Subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights, if the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

Subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights, in the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**TEXAS--OPEN-END SECURITY INSTRUMENT**
HC#162v7 (2/3/05)

*(page 5 of 14 pages)*

74

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights, any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2, subject to the rights of any lienholder with rights to Miscellaneous Proceeds that are superior to Lender's rights.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**11. Joint and Several Liability; Co-trustors; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several, however, for any extension of credit subject to Tex. Const. Art. XVI § 50(a)(6), no owner of the Property or spouse of the owner of the Property will be held personally liable for the amount due under the Debt Instrument, unless the owner or the spouse of the owner obtained the extension of credit under the Debt Instrument by actual fraud. Any Borrower who signs this Security Instrument but does not execute the Debt Instrument (a "co-trustor"): (a) is signing this Security Instrument only to mortgage, grant and convey the co-trustor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Debt Instrument without the co-trustor's consent.

Borrower's obligations are not assumable. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 17) and benefit the successors and assigns of Lender.

75

**12. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Extension of Credit is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Extension of Credit exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Debt Instrument or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Debt Instrument). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**13. Notices.** Unless otherwise described in the Debt Instrument or in another agreement between Borrower and Lender, the following provisions regarding notices shall apply. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address for Borrower under the Extension of Credit at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**14. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and, to the extent not preempted by federal law, the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Debt Instrument conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Debt Instrument which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; (c) the word "may" gives sole discretion without any obligation to take any action; and (d) headings that appear at the beginning of the sections of this Security Instrument are inserted for the convenience of the reader only, shall not be deemed to be a part of this Security Instrument, and shall not limit, extend, or delineate the scope or provisions of this Security Instrument.

**15. Borrower's Copy.** Borrower shall be given one copy of the Debt Instrument and of this Security Instrument.

**16. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 16, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 13 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**17. Sale of Debt Instrument; Change of Loan Servicer; Notice of Grievance.** The Debt Instrument or a partial interest in the Debt Instrument (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Debt Instrument and this Security Instrument and performs other mortgage loan servicing obligations under the Debt Instrument, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Debt Instrument. If there is a change of the Loan Servicer, Borrower will be given written notice of the change as required by Applicable Law. If the Debt Instrument is sold and thereafter the Extension of Credit is serviced by a Loan Servicer other than the purchaser of the Debt Instrument, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the purchaser of the Debt Instrument unless otherwise provided by the purchaser of the Debt Instrument.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 13) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 21 and the notice of acceleration given to Borrower pursuant to Section 16 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 17. If Borrower and Lender have entered into an agreement to arbitrate disputes, the provisions of any such arbitration agreement shall supersede any provision in this Section 17 that would conflict with the arbitration agreement.

**18. Hazardous Substances.** As used in this Section 18: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, mold, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

19. **Condominiums; Planned Unit Developments.** Solely to the extent permitted by § 50(a)(6)(H), Article XVI of the Texas Constitution, the Property shall include the types of property described in this Section 19. If the Property is a unit in a condominium project ("Condominium Project") or is part of a planned unit development ("PUD"), Borrower agrees to the following:

A. Obligations. Borrower shall perform all of Borrower's obligations under the Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project or PUD and any condominium association, homeowners association or equivalent entity ("Community Association"); (ii) any by-laws or other rules or regulations of the Community Association; and (iii) other equivalent documents. Borrower shall promptly pay, when due, all Community Association Dues, Fees, and Assessments.

B. Property. For units in a Condominium Project, the Property includes the unit in, together with an undivided interest in the common elements of, the Condominium Project, and Borrower's interest in the Community Association and the uses, proceeds and benefits of Borrower's interest. For PUDs, the Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in the Constituent Documents, and Borrower's interest in the Community Association and the uses, benefits and proceeds of Borrower's interest.

C. Property Insurance. So long as the Community Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then Borrower's obligation under Section 4 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Community Association policy. Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy. In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements of the Condominium Project or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower, subject to the rights of any lienholder with rights to insurance proceeds that are superior to Lender's rights.

D. Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure that the Community Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

E. Condemnation. The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements of the Condominium Project or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the rights of any lienholder with rights to such proceeds that are superior to Lender's rights. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 9.

F. Lender's Prior Consent. Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project or PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Community Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Community Association unacceptable to Lender.

G. Remedies. If Borrower does not pay Community Association Dues, Fees, and Assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph G shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest at the rate applicable to the Debt Instrument from time to time, from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

20. **Acceleration; Remedies. Borrower will be in default if (1) any payment required by the Debt Instrument or this Security Instrument is not made when it is due; (2) Lender discovers that Borrower or any co-applicant has committed fraud or made a material misrepresentation in connection with the Extension of Credit; (3) Borrower takes any action or fails to take any action that adversely affects Lender's rights under this Security Instrument, any of Lender's other security for the Debt Instrument, or any right Lender has in**

TEXAS--OPEN-END SECURITY INSTRUMENT
HC#162v7 (2/3/05)

*(page 9 of 14 pages)*

the Property; or (4) Borrower is an executive officer of Lender and federal law permits or requires immediate payment of the Loan. If a default occurs (other than under Section 16 or under subsection (4) of this Section 21, unless Applicable Law provides otherwise), Lender will give Borrower notice specifying: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Insofar as allowed by Section 50(a)(6), Article XVI of the Texas Constitution, Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 21, including, but not limited to, court costs, reasonable attorneys' fees and costs of title evidence.

The lien evidenced by this Security Instrument may be foreclosed upon only by a court order. Lender may, at its option, follow any rules of civil procedure promulgated by the Texas Supreme Court for expedited foreclosure proceedings related to the foreclosure of liens under Section 50(a)(6), Article XVI of the Texas Constitution ("Rules"), as amended from time to time, which are hereby incorporated by reference. The power of sale granted herein shall be exercised pursuant to such Rules, and Borrower understands that such power of sale is not a confession of judgment or a power of attorney to confess judgment or to appear for Borrower in a judicial proceeding.

21. **Power of Sale.** It is the express intention of Lender and Borrower that Lender shall have a fully enforceable lien on the Property. It is also the express intention of Lender and Borrower that Lender's default remedies shall include the most expeditious means of foreclosure available by law. Accordingly, Lender and Trustee shall have all the powers provided herein except insofar as may be limited by the Texas Supreme Court. To the extent the Rules do not specify a procedure for the exercise of a power of sale, the following provisions of this Section 21 shall apply, if Lender invokes the power of sale. Lender or Trustee shall give notice of the time, place and terms of sale by posting and filing the notice at least 21 days prior to sale as provided by Applicable Law. Lender shall mail a copy of the notice of sale to Borrower in the manner prescribed by Applicable Law. Sale shall be made at public venue. The sale must begin at the time stated in the notice of sale or not later than three hours after that time and between the hours of 10 a.m. and 4 p.m. on the first Tuesday of the month. Borrower authorizes Trustee to sell the Property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale. In the event of any conflict between such procedure and the Rules, the Rules shall prevail, and this provision shall automatically be reformed to the extent necessary to comply.

Trustee shall deliver to the purchaser who acquires title to the Property pursuant to the foreclosure of the lien a Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, court costs and reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Section 21, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.

22. **Release.** Within a reasonable time after termination and full payment of the Extension of Credit, Lender shall cancel and return the Debt Instrument to the owner of the Property and give the owner, in recordable form, a release of the lien securing the Extension of Credit or a copy of an endorsement of the Debt Instrument and assignment of the lien to a lender that is refinancing the Extension of Credit. Owner shall pay only recordation costs. **OWNER'S ACCEPTANCE OF SUCH RELEASE, OR ENDORSEMENT AND ASSIGNMENT, SHALL EXTINGUISH ALL OF LENDER'S OBLIGATIONS UNDER SECTION 50(a)(6), ARTICLE XVI OF THE TEXAS CONSTITUTION.**

23. **Non-Recourse Liability.** Lender shall be subrogated to any and all rights, superior title, liens and equities owned or claimed by any owner or holder of any liens and debts outstanding immediately prior to execution

hereof, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

Borrower understands that Section 50(a)(6)(C), Article XVI of the Texas Constitution provides that the Debt Instrument is given without personal liability against each owner of the Property and against the spouse of each owner unless the owner or the spouse of the owner obtained this Extension of Credit by actual fraud. This means that, absent such actual fraud, Lender can enforce its rights under this Security Instrument solely against the Property and not personally against the owner of the Property or the spouse of an owner.

If this Extension of Credit is obtained by such actual fraud, then, subject to Section 10, Borrower will be personally liable for the payment of any amounts due under the Debt Instrument or this Security Instrument. This means that a personal judgment could be obtained against Borrower, if Borrower fails to perform Borrower's responsibilities under the Debt Instrument or this Security Instrument, including a judgment for any deficiency that results from Lender's sale of the Property for an amount less than is owing under the Debt Instrument, thereby subjecting Borrower's other assets to satisfaction of the debt.

If not prohibited by Section 50(a)(6)(C), Article XVI of the Texas Constitution, this Section 23 shall not impair in any way the lien of this Security Instrument or the right of Lender to collect all sums due under the Debt Instrument and this Security Instrument or prejudice the right of Lender as to any covenants or conditions of the Debt Instrument and this Security Instrument.

**24. Substitute Trustee; Trustee Liability.** All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

**25. Provisions Related to Section 50(a)(6) and Section 50(t), Article XVI of the Texas Constitution**

**(a) Proceeds.** Borrower has not been required to apply the proceeds of the Extension of Credit to repay another debt except a debt secured by the Property or debt to another lender.

**(b) No Assignment of Wages.** Borrower has not assigned wages as security for the Extension of Credit.

**(c) Acknowledgment of Fair Market Value.** Lender and Borrower have executed a written acknowledgment as to the fair market value of Borrower's Property on the date the Extension of Credit is made.

**(d) Acknowledgment of Waiver by Lender of Additional Collateral.** Borrower acknowledges that Lender waives all terms in any of Lender's loan documentation (whether existing now or created in the future) which (a) create cross default; (b) provide for additional collateral; and/or (c) create personal liability for any Borrower (except in the event of actual fraud), for the Extension of Credit. This waiver includes, but is not limited to, any (a) guaranty; (b) cross collateralization; (c) future indebtedness; (d) cross default; and/or (e) dragnet provisions in any loan documentation with Lender.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

**DO NOT SIGN IF THERE ARE BLANKS LEFT TO BE COMPLETED IN THIS DOCUMENT. THIS DOCUMENT MUST BE EXECUTED AT THE OFFICE OF LENDER, AN ATTORNEY AT LAW OR A TITLE COMPANY. YOU MUST RECEIVE A COPY OF THIS DOCUMENT AFTER YOU HAVE SIGNED IT.**

**YOU MAY, WITHIN 3 DAYS AFTER CLOSING, RESCIND THIS EXTENSION OF CREDIT WITHOUT PENALTY OR CHARGE.**

TEXAS—OPEN-END SECURITY INSTRUMENT

*(page 11 of 14 pages)*

HC#162v7 (2/3/05)

80

_____                                    _____ (Seal)

**JANOS FARKAS**                                                                        - Borrower

Printed Name: _Janos Farkas_
                [Please Complete]


_____                                    _____ (Seal)

                                                                                         - Borrower

Printed Name:_____
                [Please Complete]


_____                                    _____ (Seal)

                                                                                         - Borrower

Printed Name:_____
                [Please Complete]


_____                                    _____ (Seal)

                                                                                         - Borrower

Printed Name:_____
                [Please Complete]


_____                                    _____ (Seal)

                                                                                         - Borrower

Printed Name:_____
                [Please Complete]


_____                                    _____ (Seal)

                                                                                         - Borrower

Printed Name:_____
                [Please Complete]

81

## Brice, Vander Linden & Wernick, P.C.

Attorneys and Counselors
9441 LBJ Freeway, Suite 250
Dallas, Texas 75243
Office: (972) 643-6600

*LEGAL PRECEDENT IS NOT CLEAR AS TO WHETHER THE SENDING OF THIS LETTER MAKES US A DEBT COLLECTOR. TO THE EXTENT IT DOES, WE ARE PLEASED TO ADVISE YOU THAT THIS IS AN ATTEMPT TO COLLECT A DEBT, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU ARE IN BANKRUPTCY OR HAVE BEEN DISCHARGED IN BANKRUPTCY, THIS LETTER IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT INTENDED AS AN ATTEMPT TO COLLECT A DEBT OR AS AN ACT TO COLLECT, ASSESS, OR RECOVER ALL OR ANY PORTION OF THE DEBT FROM YOU PERSONALLY.*

*Certified Mail return receipt requested*

April 21, 2011

JANOS FARKAS
6315 FARMDALE LN
AUSTIN, TX 78749

Re: 0999617061 ; 6315 FARMDALE LN, AUSTIN, TX 78749

### NOTICE OF DEFAULT AND INTENTION TO ACCELERATE

We represent Wells Fargo Home Equity, whose address is 3476 Stateview Blvd, Fort Mill, SC 29715 which, if it is not the Current Mortgagee, is acting as the Mortgage Servicer and representing the Current Mortgagee pursuant to a Mortgage Servicing Agreement concerning the Note and Deed of Trust which are associated with the above referenced loan number.

Our firm has been requested to pursue non-judicial foreclosure processing in accordance with the terms of the Note and Deed of Trust and applicable law. As a prerequisite to exercising the contractual rights of the Note and Deed of Trust, and pursuant to the provisions of the Texas Property Code, Section 51.002, the following notices are provided to you:

1. The loan is in default for failure to make the regular monthly payments required by the Note and Deed of Trust.
2. The action required to cure the default is the payment of all sums due under the Note and Deed of Trust.
3. If the default is not cured by such payment within thirty (30) days of the date of this notice, without further notice or demand, the maturity date of the Note will be accelerated and all sums secured by the Deed of Trust will be declared to be immediately due and payable. Thereafter, it is intended that the property be sold by a Substitute Trustee at a public foreclosure sale.
4. After acceleration, a curing of the default and reinstatement of the loan will be permitted prior to the time of sale by paying the past due regular monthly payments and other sums due under the Note and Deed of Trust and by complying with all terms of reinstatement.

According to the information provided to us by our client, as of March 22, 2011, the amount required to cure the default is $2,013.30. Because of additional installments that may become due and other charges that may vary from day to day, the amount required to cure the default on the day you choose to pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after your check is received in which event we will inform you before the check is deposited for collection. For further information, write us at Brice, Vander Linden & Wernick, P.C., Foreclosure Department, 9441 LBJ Freeway, Suite 250, Dallas, Texas 75243 or call us at 972/643-6600.

Persons who are obligated on the debt evidenced by this Note and Deed of Trust or who otherwise purchased and have an interest in the property secured by the Deed of Trust are hereby given notice of the foregoing together with the following additional matters:

1. You have the right to bring a court action to assert the non-existence of a default or any other defense that may exist.
2. Legal precedent is not clear as to whether the sending of this letter makes us a debt collector. To the extent it does, we are pleased to advise you that this letter is an attempt to collect a debt and any information obtained will be used for that purpose.
3. You are encouraged to send to us any information you have that suggests that the loan is not in default or that the amount of default is different from the amount indicated in this letter. Upon receipt of such information, we will be pleased to forward the information to the lender for review and further response.

We hope that this matter may be cleared up in a manner that satisfies all concerned.

Very truly yours,

Brice, Vander Linden & Wernick, P.C.

Selim Taherzadeh

**EXHIBIT**

**3-A**

File Number 9508-0790

# Brice, Vander Linden & Wernick, P.C.    Attorneys and Counselors

9441 LBJ Freeway, Suite 250
Dallas, Texas 75243
Office (972) 643-6600

May 24, 2011

LEGAL PRECEDENT IS NOT CLEAR AS TO WHETHER THE SENDING OF THIS LETTER MAKES US A DEBT COLLECTOR. TO THE EXTENT IT DOES, WE ARE PLEASED TO ADVISE YOU THAT THIS IS AN ATTEMPT TO COLLECT A DEBT, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU ARE IN BANKRUPTCY OR HAVE BEEN DISCHARGED IN BANKRUPTCY, THIS LETTER IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND IS NOT INTENDED AS AN ATTEMPT TO COLLECT A DEBT OR AS AN ACT TO COLLECT, ASSESS, OR RECOVER ALL OR ANY PORTION OF THE DEBT FROM YOU PERSONALLY.

JANOS FARKAS
9600 ESCARPMENT BLVD STE 745-4
AUSTIN, TX 78749-1982

Re:    6315 FARMDALE LN, AUSTIN, TX 78749
Loan No. 0999617061
Our File No. 9508-0790
Our Case No. VS-0999617061-FC

## DEFAULT CURE INQUIRY RESPONSE

In response to your recent inquiry, we are pleased to provide the attached default cure information from your lender. We encourage you to read it carefully. The following brief summary is provided as an aid but not an alternative to your reading of the attached.

| | |
|---|---|
| Default Cure Amount: | $19,604.23 |
| Good Through Date: | 06/20/2011 |
| Receipt Deadline: | 10:00 A.M. (Central) on 11/01/2011, or the good through date above, whichever is earlier. |
| Certified Funds Payable To: | Wells Fargo Home Equity |
| Deliver Payment To: | ATTN: FRCL Inquiry Unit<br>Brice, Vander Linden & Wernick, P.C.<br>9441 LBJ Freeway, Suite 250<br>Dallas, Texas 75243 |

Foreclosure processing will continue and will not be stopped unless the default cure amount is _received_ in our office before the receipt deadline. If the default cure amount is not received by the receipt deadline and the _good through date expires_ before the scheduled sale date, you must submit a request for an updated default cure amount.

The default cure amount reported in the attached may not include amounts incurred or accrued but not currently appearing in your lender's records. Your timely tendering of the default cure amount will stop the current foreclosure processing; however, you will have to arrange for the timely payment of any additional amounts incurred or accrued or your loan may be returned to foreclosure processing.

The foreclosure fees and costs reported in the attached may include both fees and costs already incurred and fees and costs projected to be incurred on/or before the good through date. Upon receipt of your timely payment, we will determine the actual fees and costs due to us at that time, invoice that amount to our client, and report the difference, if any, to your lender for further handling.

Should you have any questions concerning the attached information, please do not hesitate to contact us at 972/643-6600.

Very truly yours,

Brice, Vander Linden & Wernick, P.C.

Selim Taherzadeh

Attachment

203

# Brice, Vander Linden & Wernick, P.C.    Attorneys and Counselors

9441 LBJ Freeway, Suite 250
Dallas, Texas 75243
Office (972) 643-6600

May 24, 2011

**LEGAL PRECEDENT IS NOT CLEAR AS TO WHETHER THE SENDING OF THIS LETTER MAKES US A DEBT COLLECTOR. TO THE EXTENT IT DOES, WE ARE PLEASED TO ADVISE YOU THAT THIS IS AN ATTEMPT TO COLLECT A DEBT, AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU ARE IN BANKRUPTCY OR HAVE BEEN DISCHARGED IN BANKRUPTCY, THIS LETTER IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND IS NOT INTENDED AS AN ATTEMPT TO COLLECT A DEBT OR AS AN ACT TO COLLECT, ASSESS, OR RECOVER ALL OR ANY PORTION OF THE DEBT FROM YOU PERSONALLY.**

JANOS FARKAS
9600 ESCARPMENT BLVD STE 745-4
AUSTIN, TX 78749-1982

| | |
|---|---|
| Re: | 6315 FARMDALE LN, AUSTIN, TX 78749 |
| Loan No.: | 0999617061 |
| Our File No.: | 9508-0790 |
| Our Case No.: | VS-0999617061-FC |

## LOAN PAYOFF INQUIRY RESPONSE

In response to your recent inquiry, we are pleased to provide the attached payoff information from your lender. We encourage you to read it carefully. The following brief summary is provided as an aid but not an alternative to your reading of the attached.

| | |
|---|---|
| Payoff Amount: | $123,127.31 |
| Good Through Date: | 06/20/2011 |
| Receipt Deadline: | 10:00 A.M. (Central) on 11/01/2011, or the good through date above, whichever is earlier. |
| Certified Funds Payable To: | Wells Fargo Home Equity |
| Deliver Payment To: | ATTN: FRCL Inquiry Unit<br>Brice, Vander Linden & Wernick, P.C.<br>9441 LBJ Freeway, Suite 250<br>Dallas, Texas 75243 |

Foreclosure processing will continue and will not be stopped unless the payoff amount is <u>received</u> in our office before the receipt deadline. If the payoff amount is not received by the receipt deadline and the <u>good through date expires</u> before the scheduled sale date, you must submit a request for an updated payoff amount.

The payoff amount reported in the attached may not include amounts incurred or accrued but not currently appearing in your lender's records. Your timely tendering of the payoff amount will stop the current foreclosure processing; however, you will have to arrange for the timely payment of any additional amounts incurred or accrued or your loan may be returned to foreclosure processing.

The foreclosure fees and costs reported in the attached may include both fees and costs already incurred and fees and costs projected to be incurred on/or before the good through date. Upon receipt of your timely payment, we will determine the actual fees and costs due to us at that time, invoice that amount to our client, and report the difference, if any, to your lender for further handling.

Should you have any questions concerning the attached information, please do not hesitate to contact us at 972/643-6600.

Very truly yours,

Brice, Vander Linden & Wernick, P.C.

Selim Taherzadeh

Attachment

204

Filed in the District ... of Travis County, Texas

OCT 1 3 2014 RT

At ___12:00 P M.

Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-11-003692

| | | |
|---|---|---|
| JANOS FARKAS, | § | IN THE DISTRICT COURT OF |
|    *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| | § | TRAVIS COUNTY, TEXAS |
| WELLS FARGO BANK, N.A. AND BRICE, | § | |
| VANDER LINDEN & WERNICK, P.C., | § | |
| n/k/a BUCKLEY MADOLE, P.C. | § | |
|    *Defendants.* | § | 201ST JUDICIAL DISTRICT |

## FINAL ORDER AND JUDGMENT

On this day, the Court considered the First Amended Traditional and No-Evidence Motion for Summary Judgment and Motion to Sever ("Wells Fargo's Motion") filed by Defendant Wells Fargo Bank, N.A.; the Motion for Partial Summary Judgment ("Plaintiff's Motion") filed by Plaintiff Janos Farkas; Plaintiff's Objections and Motion to Strike and Exclude the Summary Judgment Evidence of Defendant Wells Fargo Bank, N.A. (the ("Objections"); and Defendant Brice, Vander Linden & Wernick, P.C.'s Traditional and No-Evidence Motion for Summary Judgment ("Brice's Motion").

After careful consideration of Wells Fargo's Motion, Plaintiff's Motion, the Objections, and Brice's Motion, any timely responses thereto, the competent evidence, all pleadings properly before the Court, the arguments of counsel, and all other matters properly before the Court, the Court rules as follows:

Wells Fargo's First Amended Traditional and No-Evidence Motion for Summary Judgment is GRANTED and Plaintiff Janos Farkas shall take nothing by his claims against Defendant Wells Fargo Bank, N.A.

Plaintiff's Motion for Partial Summary Judgment is hereby DENIED.

Plaintiff's Objections are hereby OVERRULED and Plaintiff's motion to strike and exclude Defendant Wells Fargo Bank, N.A.'s summary judgment evidence is hereby DENIED.

**ORDER**

**PAGE 1 OF 2**

AUS:0567447/00358:551442v3

Defendant Brice, Vander Linden & Wernick, P.C.'s Traditional and No-Evidence Motion for Summary Judgment is GRANTED and Plaintiff Janos Farkas shall take nothing by his claims against Defendant Brice, Vander Linden & Wernick, P.C.

Defendant Wells Fargo Bank, N.A.'s Motion to Sever is DENIED as moot.

This judgment finally disposes of all claims by Plaintiff and is appealable.

SIGNED this the _13th_ day of October, 2014.

THE HONORABLE LORA J. LIVINGSTON
TRAVIS COUNTY DISTRICT JUDGE

AGREED AS TO FORM:

William D. Davis
DAVIS & ASSOCIATES
P.O. Box 1093
Dripping Springs, Texas 78620
*Attorneys for Plaintiff*

Sammy Hooda
Michael Burns
BUCKLEY MADOLE, P.C.
9441 LBJ Freeway, Suite 250
Dallas, Texas 75243
*Attorneys for Brice, Vander Linden & Wernick, P.C. n/k/a Buckley Madole, P.C.*

B. David L. Foster
John W. Ellis
LOCKE LORD LLP
600 Congress Ave., Suite 2200
Austin, Texas 78701
*Attorneys for Wells Fargo Bank, N.A.*

ORDER

AUS:0567447/00358:551442v3

440 S.W.3d 10, 57 Tex. Sup. Ct. J. 588
**(Cite as: 440 S.W.3d 10)**



Supreme Court of Texas.
Frankie SIMS, on Behalf of Himself and all Others Similarly Situated; and Patsy Sims, on Behalf of Herself and all Others Similarly Situated, Appellants,
v.
CARRINGTON MORTGAGE SERVICES, L.L.C., Appellee.

No. 13–0638.
Argued Dec. 4, 2013.
Decided May 16, 2014.
Rehearing Denied Oct. 3, 2014.

**Background:** Borrowers brought putative class action against loan servicer for their home equity loans, alleging that parties' post-loan transactions violated Texas Constitution. The United States District Court for the Northern District of Texas, John McBryde, J., 889 F.Supp.2d 883, granted servicer's motion to dismiss. Borrowers appealed. The United States Court of Appeals for the Fifth Circuit, 538 Fed.Appx. 537, affirmed in part and certified questions to the Texas Supreme Court.

**Holding:** The Supreme Court, Hecht, C.J., held that restructuring of home equity loan was not extension of new credit required to comply with constitutional requirements for new loan.

Questions answered.

West Headnotes

**Homestead 202 ☜99**

202 Homestead
   202I Nature, Acquisition, and Extent
         202I(E) Liabilities Enforceable Against Homestead
         202k99 k. Loans and advances. Most Cited Cases

**Mortgages 266 ☜306**

266 Mortgages
   266VII Payment or Performance of Condition, Release, and Satisfaction
      266k306 k. Change in time or mode of payment. Most Cited Cases

The restructuring of a home equity loan that involved capitalization of past-due amounts owed under the terms of the initial loan and a lowering of the interest rate and the amount of installment payments, but did not involve the satisfaction or replacement of the original note, an advancement of new funds, or an increase in the obligations created by the original note, was not a new extension of credit that was required to meet the constitutional requirements for a new loan; capitalization of past-due amounts was simply a mechanism for deferring payments of obligations already owed in a way that allowed borrowers to retain their homes. Vernon's Ann.Texas Const. Art. 16, § 50.

**\*11** David M. Gottfried, Law Office of David Gottfried, P.C., Austin, Earl Berry Jr., Hurt & Berry, LLP, Edom, James Patrick Sutton, The Law Office of J. Patrick Sutton, Austin, Jeffrey W. Hurt, Hurt & Berry LLP, Dallas, TX, for Appellant.

Amanda Schaeffer, Benjamin David Lee Foster, Daron L. Janis, Robert T. Mowrey, Thomas G. Yoxall, William Scott Hastings, Locke Lord LLP, Austin, TX, for Appellee.

Ken Carroll, Carrington Coleman Sloman & Blumenthal, Dallas, TX, for Amicus Curiae Federal National Mortgage Association.

Karen M. Neeley, Cox Smith Matthews, Inc., Austin, TX, for Amicus Curiae Independent Bankers Association of Texas.

B. Scott Daugherty, for Amicus Curiae, Texas Bankers Association.

John C. Fleming, Law Office of John C. Fleming, Austin, TX, for Amicus Curiae Texas Bankers Association.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Chief Justice HECHT delivered the opinion of the Court.

To avoid foreclosure, homeowners and lenders often try to restructure underwater home mortgage loans that are in default by capitalizing past-due amounts as principal, lowering the interest rate, and reducing monthly payments, thereby easing the burden on the homeowners. But home equity loans are subject to the requirements of Article XVI, Section 50 of the Texas Constitution. The United States Court of Appeals for the Fifth Circuit has asked whether those requirements apply to such loan restructuring.[FN1] We answer that as long as the original note is not satisfied and replaced, and there is no additional extension of credit, as we define it, the restructuring is valid and need not **\*12** meet the constitutional requirements for a new loan.

> FN1. 538 Fed.Appx. 537 (5th Cir.2013) (per curiam); *see* TEX. CONST. art. V, § 3–c(a) ("The supreme court [has] jurisdiction to answer questions of state law certified from a federal appellate court.").

**I**

Frankie and Patsy Sims obtained a 30–year home equity loan in 2003. In 2009, the Simses, behind on their payments, reached what was entitled a "Loan Modification Agreement" with Carrington Mortgage Services, L.L.C. The agreements involved capitalizing past-due interest and other charges, including fees and unpaid taxes and insurance premiums, and reducing the interest rate and monthly payments. Two years later, the Simses were again behind, and this time CMS sought foreclosure. The Simses resisted, asserting that the 2009 restructuring violated constitutional requirements for home equity loans. The parties then reached a second "Loan Modification Agreement", further reducing the interest rate and payments. The following chart summarizes the loan data at the outset and after the two restructurings:

|  | Principal | Amt. Cap'd | New Prin. | Rate | Payment | Appraisal |
|---|---|---|---|---|---|---|
| 2003 Loan | $76,000.00 | — | — | 9% | $611.51 | $96,000 |
| 2009 Mod. | $72,145.50 | $2,200.00 | $74,345.50 | 6.5% | $511.16 | $72,300 |
| 2011 Mod. | $72,655.61 | $7,368.44 | $80,023.95 | 4.75% | $492.34 | $73,000 |

The original note required the Simses to pay principal, interest, and late charges.[FN2] The security agreement echoed that requirement and added an obligation for the Simses to make payments for "Escrow Items", such as taxes, assessments, and insurance premiums.[FN3] The security agreement also authorized the lender to "do and pay for whatever is reasonable or appropriate" to protect its interest in the property and its rights under the agreement and provided that any amount the lender disbursed to that end "shall become additional debt of Borrower secured by this Security Instrument." The 2009 and 2011 "Loan Modification Agreements" provided that all the Simses' obligations and all the loan documents remained unchanged.[FN4]

> FN2. The note signed by the Simses stated: "In return for a loan that I have received, I promise to pay U.S. $76,000.00 (this amount is called 'principal'), plus interest, to the order of the Lender." The note also provided for a 5% late charge on overdue principal and interest.

> FN3. The security instrument stated: "Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the 'Funds') to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; ... and (c) premiums for any and all insurance required by Lender under Section 5. These items are called 'Escrow Items.' "

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN4. The 2009 agreement stated: "All covenants, agreements, stipulations, and conditions in your Note and Mortgage will remain in full force and effect, except as modified herein, and none of your obligations or liabilities under your Note and Mortgage will be diminished or released by any provisions hereof, nor will this Agreement in any way impair, diminish, or affect [the] rights under or remedies on your Note and Mortgage."

Similarly, the 2011 Agreement stated: "[A]ll terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and [ ] except as otherwise specifically provided in, and expressly modified by, this Agreement, the Lender and you will be bound by, and will comply with, all of the terms and conditions of the Loan Documents."

Two months after the 2011 agreement, the Simses brought this class action **\*13** against CMS in the United States District Court, alleging that CMS's loan modifications for them and other similarly situated borrowers violated Article XVI, Section 50 of the Texas Constitution. Before considering certification, the court dismissed the case under Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action,[FN5] and the Simses appealed. After oral argument, the Fifth Circuit certified the following four questions to us:

FN5. 889 F.Supp.2d 883, 884 (N.D.Tex.2012).

1. After an initial extension of credit, if a home equity lender enters into a new agreement with the borrower that capitalizes past-due interest, fees, property taxes, or insurance premiums into the principal of the loan but neither satisfies nor replaces the original note, is the transaction a modification or a refinance for purposes of Section 50 of Article XVI of the Texas Constitution?

If the transaction is a modification rather than a refinance, the following questions also arise:

2. Does the capitalization of past-due interest, fees, property taxes, or insurance premiums constitute an impermissible "advance of additional funds" under Section 153.14(2)(B) of the Texas Administrative Code?

3. Must such a modification comply with the requirements of Section 50(a)(6), including subsection (B), which mandates that a home equity loan have a maximum loan-to-value ratio of 80%?

4. Do repeated modifications like those in this case convert a home equity loan into an open-end account that must comply with Section 50(t)?

**II**

As we have more fully explained in prior decisions, because of Texas' strong, historic protection of the homestead, home equity loans are regulated, not by statute as one might suppose, but by the "elaborate, detailed provisions" of Article XVI, Section 50 of the Texas Constitution.[FN6] To provide guidance to lenders, the Finance Commission and the Credit Union Commission have been authorized by the Constitution and by statute to interpret these provisions, subject to judicial review,[FN7] and the Commissions have done so in Chapter 153 of the Texas Administrative Code.[FN8] "A lender's compliance with an agency interpretation of Section 50, even a wrong interpretation, is compliance with Section 50 itself."[FN9] Thus, in answering the certified questions, we look to the constitutional text and the Commissions' interpretations. However, those interpretations "can do no more than interpret the constitutional text, just as a court would."[FN10] The issue is not whether a lending practice or policy is advisable, something the Commissions would decide in exercising their regulatory functions; the issue is what the Constitution requires.[FN11]

FN6. *Fin. Comm'n of Tex. v. Norwood,* 418 S.W.3d 566, 571 (Tex.2013); *see also LaSalle Bank Nat'l Ass'n v. White,* 246 S.W.3d 616, 618 (Tex.2007) (per curiam) ("Texas became the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

last state in the nation to permit home-equity loans when constitutional amendments voted on by referendum took effect in 1997.").

FN7. *Norwood,* 418 S.W.3d at 573; TEX. CONST. art. XVI, § 50(u).

FN8. 7 TEX. ADMIN. CODE §§ 153.1–.96

FN9. *Norwood,* 418 S.W.3d at 573.

FN10. *Id.* at 585.

FN11. *Id.*

### A

The certified questions assume a distinction between a loan modification and a refinancing that, if understood in financial **\*14** circles,[FN12] is not clear in the text of Section 50. Neither concept is defined in Section 50. The word "refinance" is used eleven times in Section 50, and "refinancing" once.[FN13] In each instance, the reference seems to be to a redone transaction. A form of the word "modify" is used in three places in Section 50. In one, lenders are authorized to "modify" previously provided documentation at closing in exigent circumstances.[FN14] In the other two, lenders can correct noncompliance with Section 50 by sending a borrower "notice modifying any ... amount, percentage, term, or other provision prohibited by this section",[FN15] or, if noncompliance cannot be cured under the other provisions, by offering the borrower a $1,000 credit and "the right to refinance the extension of credit" for the remaining term at no cost "with any modifications necessary to comply" or that the parties agree will comply.[FN16] In these two instances, if not also in the first, a modification could substantially alter the loan; indeed, in the last situation, modifications can shape the refinancing.[FN17]

FN12. CMS points to the Federal Reserve Board's definition of a "refinancing" requiring new Truth In Lending Act disclosures under Regulation Z when refinancing is undertaken by the original creditor, or a holder or servicer of the original obligation. Under this definition, a refinancing is "a new transaction requiring new disclosures" that "occurs when an existing obligation that was subject to [federal 'closed end credit' disclosure requirements] is satisfied and replaced by a new obligation". 12 C.F.R. § 226.20(a); 12 C.F.R. pt. 226, supp. 1, cmt. 20(a) (Official Staff Interpretations). Some transactions, however, will not be treated as a refinancing under this section, including "[a] change in the payment schedule or a change in collateral requirements as a result of the consumer's default or delinquency, unless the rate is increased, or the new amount financed exceeds the unpaid balance plus earned finance charge and premiums for continuation insurance...." *Id.* § 226.20(a)(4). The Federal National Mortgage Association, in an amicus brief, references the same regulation but does not otherwise attempt to define a distinction between refinancings and modifications. An amicus brief by the Independent Bankers Association of Texas, the Texas Bankers Association, and the Texas Mortgage Bankers Association refers to the distinction but does not attempt to define it. Other federal entities, like HUD and FDIC, have their own glossaries referring to and defining general terms like "modification," "mortgage modification," "refinancing," and "debt restructuring," but these agencies, to fulfill their specific missions, also define and apply more specific classifications or limitations.

FN13. TEX. CONST. art. XVI, § 50(a)(4), (a)(6)(M)(iii), (a)(6)(Q)(vii), (a)(6)(Q)(x)(f), (a)(8); § 50(e) and (f).

FN14. *Id.* § 50(a)(6)(M)(ii).

FN15. *Id.* § 50(a)(6)(Q)(x)(c).

FN16. *Id.* § 50(a)(6)(Q)(x)(f).

FN17. Section 153.96(b) of the Commissions' interpretations contemplates that in order to comply with constitutional requirements, "the lender ... and borrower may ... modify the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

equity loan without completing the requirements of a refinance". 7 TEX. ADMIN. CODEE § 153.96(b)(2)(A).

The modification-refinancing distinction is one drawn by the Commissions in interpreting Section 50(a)(6)(M)(iii). The effect of that provision is to prohibit a second home equity loan within a year of the first, with certain exceptions. As interpreted by the Commissions, the provision prohibits a "refinancing" like a "new equity loan" but not a "modification".[FN18] According to the **\*15** Commissions, a modification does not involve satisfaction or replacement of the original note, an "advance of additional funds", or new terms that would not have been permitted for the original "extension of credit".[FN19] Further, the original loan and a subsequent modification are treated as a single transaction, including for purposes of the 3% fee cap.[FN20]

> FN18. " § 153.14. One Year Prohibition: Section 50(a)(6)(M)(iii)
>
> "An equity loan may not be closed before the first anniversary of the closing date of any other equity loan secured by the same homestead property.
>
> "(1) Section 50(a)(6)(M)(iii) prohibits an owner who has obtained an equity loan from:
>
> "(A) **refinancing** the equity loan before one year has elapsed since the loan's closing date; or
>
> "(B) obtaining a new equity loan on the same homestead property before one year has elapsed since the previous equity loan's closing date, regardless of whether the previous equity loan has been paid in full.
>
> "(2) Section 50(a)(6)(M)(iii) does not prohibit **modification** of an equity loan before one year has elapsed since the loan's closing date. A modification of a home equity loan occurs when one or more terms of an existing equity loan is modified, but the note is not satisfied

and replaced. A home equity loan and a subsequent modification will be considered a single transaction. The home equity requirements of Section 50(a)(6) will be applied to the original loan and the subsequent modification as a single transaction.

> "(A) A modification of an equity loan must be agreed to in writing by the borrower and lender, unless otherwise required by law. An example of a modification that is not required to be in writing is the modification required under the Soldiers' and Sailors' Civil Relief Act.
>
> "(B) The advance of additional funds to a borrower is not permitted by modification of an equity loan.
>
> "(C) A modification of an equity loan may not provide for new terms that would not have been permitted by applicable law at the date of closing of the extension of credit.
>
> "(D) The 3% fee cap required by Section 50(a)(6)(E) applies to the original home equity loan and any subsequent modification as a single transaction."
>
> 7. TEX. ADMIN. CODE § 153.14 (emphasis added).
>
> FN19. *Id.* § 153.14(2).
>
> FN20. *Id.* § 153.14(2)(D).

But Section 50(a)(6)(M)(iii) of the Constitution does not mention refinancing or modification. It states:

(a) The homestead ... is ... protected from forced sale[ ] for the payment of all debts except for: ...

(6) *an extension of credit* that: ...

(M) is closed not before: ...

(iii) the first anniversary of the closing date of any other extension of credit described by Subsec-

440 S.W.3d 10, 57 Tex. Sup. Ct. J. 588
**(Cite as: 440 S.W.3d 10)**

tion (a)(6) of this section secured by the same homestead property [with certain exceptions]....FN21

> FN21. TEX. CONST. art. XVI, § 50 (a)(6)(M)(iii) (emphasis added).

The applicability of this particular provision, as well as all of Section 50(a)(6), which governs home equity loans, depends not on whether the transaction is a modification or a refinance but on whether it is an "extension of credit". If the restructuring of a home equity loan does not involve a new extension of credit, the requirements of Section 50(a)(6) do not apply. Thus, we restate the first certified question as follows:

> 1. After an initial extension of credit, if a home equity lender enters into a new agreement with the borrower that capitalizes past-due interest, fees, property taxes, or insurance premiums into the principal of the loan but neither satisfies nor replaces the original note, is the transaction *a new extension of credit* for purposes of section 50 of Article XVI of the Texas Constitution?

**B**

Neither the Constitution nor the Commissions' interpretations define an "extension of credit", but its meaning is clear. Credit is simply the ability to assume a debt repayable over time, and an extension of credit affords the right to do so in a **\*16** particular situation.FN22

> FN22. *See, e.g.,* TEX. FIN.CODE § 31.002(a)(34) (" 'Loans and extensions of credit' means direct or indirect advances of money ... to a person that are conditioned on the obligation of the person to repay...."); *id.* § 181.002(a)(28) (same); *id.* § 350.001(a) ("credit means the right granted to a debtor to defer payment of debt or to incur debt and defer its payment"); *id.* § 393.001(4) (" 'extension of consumer credit' means the right to defer payment"); *see also* 7 TEX. ADMIN. CODE § 12.3(a)(2) (defining "[l]oans or exten-

sions of credit" for purposes of TEX. FIN.CODE § 34.201 as including various transactions involving an advance of funds to be repaid over time).

The Simses argue that any increase in the principal amount of a loan is a new extension of credit within the meaning of Section 50(a)(6), in effect equating the loan principal with an extension of credit. The Constitution contradicts the Simses' argument. Section 50(a)(6)(E) refers to principal as a component of an extension of credit, capping fees at "three percent of the original principal amount *of* the extension of credit".FN23 The extension of credit for purposes of Section 50(a)(6) consists not merely of the creation of a principal debt but includes all the terms of the loan transaction. Terms requiring the borrower to pay taxes, insurance premiums, and other such expenses when due protect the lender's security and are as much a part of the extension of credit as terms requiring timely payments of principal and interest. The Simses argue that in restructuring a loan to capitalize past-due amounts, the lender is actually advancing additional funds to itself (past-due interest) or others (past-due taxes and insurance) to pay those amounts for the borrower, and that this constitutes a new extension of credit. But the borrower's obligation for such amounts, and the lender's right to pay them to protect its security, were all terms of the original extension of credit. The Simses argue that requiring interest on capitalized, past-due amounts is really a new loan, but it is simply a mechanism for deferring payment of obligations already owed in a way that allows the borrower to retain his home.

> FN23. TEX. CONST. art. XVI, § 50(a)(6)(E) (emphasis added).

The Simses argue that a loan that can be restructured to change the amount of the periodic payments does not meet the requirement of Section 50(a)(6)(L)(i) that loans be "scheduled to be repaid ... in substantially equal successive period installments".FN24 But the required schedule is not one that, when initially set, can never be altered. After all, whenever a payment is missed, the schedule is altered. Further, Section 50(g) gives the borrower the right to prepay the loan,FN25

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

which would alter the initial schedule. Section 50(a)(6) does not forbid a revision of the initial repayment schedule that merely adjusts the regular installment amount.

> FN24. *Id.* § 50(a)(6)(L)(i).

> FN25. TEX. CONST. art. XVI, § 50(g).

CMS argues that restructuring a loan does not involve a new extension of credit so long as the borrower's note is not satisfied or replaced and no new money is extended. We agree that these two conditions are necessary, but we cannot say with assurance that they are sufficient. For example, a restructuring to make the homestead lien security for another indebtedness, such as the borrower's consumer or credit card debt, would certainly be a new extension of credit. The test should be whether the secured obligations are those incurred under the terms of the original loan.

**\*17** The Simses object that this test provides no effective limit on the size or frequency of additions to principal. But the terms of the original loan supply the limit. The Simses' argument is that any change in principal is a new extension of credit, but as we have shown, their position is inconsistent with Section 50.

The Simses argue that it matters not that, as in their own situation, restructuring lowers the interest rate and the amount of installment payments, and makes it possible for borrowers to keep their homes and meet their obligations. Lenders have two options other than foreclosing on loans in default: further forbearance and forgiveness. Nevertheless, the Simses' argument encourages lenders to foreclose, which is certainly at odds with the fundamental purpose of Section 50: to protect the homestead.

To the first certified question, we answer: the restructuring of a home equity loan that, as in the context from which the question arises, involves capitalization of past-due amounts owed under the terms of the initial loan and a lowering of the interest rate and the amount of installment payments, but does not involve the satisfaction or replacement of the original note, an advance-

ment of new funds, or an increase in the obligations created by the original note, is not a new extension of credit that must meet the requirements of Section 50.

## C

Our reasons for answering the first question as we have largely dictate our answers to the other three certified questions.

Is the capitalization of past-due interest, taxes, insurance premiums, and fees an "advance of additional funds" under the Commissions' interpretations of Section 50?[FN26] No, if those amounts were among the obligations assumed by the borrower under the terms of the original loan. And more importantly, such capitalization is not a new extension of credit under Section 50(a)(6).

> FN26. 7 TEX. ADMIN. CODE § 153.14.

Must a restructuring like the Simses' comply with Section 50(a)(6)? No, because it does not involve a new extension of credit, for the reasons we have explained. The Simses argue that any restructuring must satisfy Section 50(a)(6)(B), which requires a home equity loan to be

> of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead *on the date the extension of credit is made....*[FN27]

> FN27. TEX. CONST. art. XVI, § 50(a)(6)(B) (emphasis added).

The Simses' argument incorrectly assumes that the restructuring is a new extension of credit.[FN28]

> FN28. The Circuit noted that if the highlighted phrase modified the word "value" and not the word "exceed", the provision would never allow the loan principal, during the life of the loan, to exceed the amount that was the value of the property when the loan was closed. 538

Fed.Appx. 537, 545–546 (5th Cir.2013) (per curiam). This could happen if the loan-to-value ratio was very close to the limit at the time the loan closed, and when the loan was restructured, the amount capitalized caused the total principal indebtedness to exceed the limit. But nothing in Section 50 suggests that a loan's compliance is to be determined at any time other than when it is made.

Finally, would repeated restructuring convert a home equity loan into an open-**\*18** end account subject to Section 50(t)? Section 50(t) applies to a home equity line of credit—"a form of an open-end account that may be debited from time to time, under which credit may be extended from time to time and under which ... the owner requests advances, repays money, and reborrows money". The repeat transactions are clearly contemplated from the outset. [FN29] This description does not remotely resemble a loan with a stated principal that is to be repaid as scheduled from the outset but must be restructured to avoid foreclosure.

> FN29. *See also* TEX. FIN.CODE § 301.002(a)(14)(A) ("In this subtitle ... 'Open-end account' ... means an account under a written contract between a creditor and an obligor in connection with which: (i) the creditor reasonably contemplates repeated transactions and the obligor is authorized to make purchases or borrow money; (ii) an interest or time price differential may be charged from time to time on an outstanding unpaid balance; and (iii) the amount of credit that may be extended during the term of the account is generally made available to the extent that any outstanding balance is repaid....").

\* \* \* \* \* \*

Fundamentally, the requirements of Article XIV, Section 50 of the Texas Constitution for extensions of credit secured by the homestead are designed to protect the homestead, not endanger it. The Constitution does not prohibit the restructuring of a home equity loan that already meets its requirements in order to avoid fore-

closure while maintaining the terms of the original extension of credit. We answer the certified questions accordingly.

Tex.,2014.
Sims v. Carrington Mortg. Services, L.L.C.
440 S.W.3d 10, 57 Tex. Sup. Ct. J. 588

END OF DOCUMENT

THE TEXAS CONSTITUTION

ARTICLE 16. GENERAL PROVISIONS

Sec. 1.  OFFICIAL OATH.  (a) All elected and appointed officers, before they enter upon the duties of their offices, shall take the following Oath or Affirmation:

"I, _____, do solemnly swear (or affirm), that I will faithfully execute the duties of the office of _____ of the State of Texas, and will to the best of my ability preserve, protect, and defend the Constitution and laws of the United States and of this State, so help me God."

(b)  All elected or appointed officers, before taking the Oath or Affirmation of office prescribed by this section and entering upon the duties of office, shall subscribe to the following statement:

"I, _____, do solemnly swear (or affirm) that I have not directly or indirectly paid, offered, promised to pay, contributed, or promised to contribute any money or thing of value, or promised any public office or employment for the giving or withholding of a vote at the election at which I was elected or as a reward to secure my appointment or confirmation, whichever the case may be, so help me God."

(c)  Members of the Legislature, the Secretary of State, and all other elected and appointed state officers shall file the signed statement required by Subsection (b) of this section with the Secretary of State before taking the Oath or Affirmation of office prescribed by Subsection (a) of this section.  All other officers shall retain the signed statement required by Subsection (b) of this section with the official records of the office.

(Amended Nov. 8, 1938, and Nov. 6, 1956; Subsecs. (a)-(c) amended and (d)-(f) added Nov. 7, 1989; Subsecs. (a) and (b) amended, Subsecs. (c) and (d) deleted, and Subsecs. (e) and (f) amended and redesignated as Subsec. (c) Nov. 6, 2001.)  (TEMPORARY TRANSITION PROVISION for Sec. 1: See Appendix, Note 3.)


Sec. 2.  EXCLUSIONS FROM OFFICE, JURY SERVICE AND RIGHT OF SUFFRAGE; PROTECTION OF RIGHT OF SUFFRAGE.  Laws shall be made to

exclude from office persons who have been convicted of bribery, perjury, forgery, or other high crimes.

(Amended Nov. 6, 2001.)  (TEMPORARY TRANSITION PROVISION for Sec. 2: See Appendix, Note 3.)


Sec. 3.   (Repealed Aug. 5, 1969.)


Sec. 4.   (Repealed Aug. 5, 1969.)


Sec. 5.   DISQUALIFICATION TO HOLD OFFICE BY GIVING OR OFFERING BRIBE.  Every person shall be disqualified from holding any office of profit, or trust, in this State, who shall have been convicted of having given or offered a bribe to procure his election or appointment.


Sec. 6.   APPROPRIATIONS FOR PRIVATE PURPOSES; STATE PARTICIPATION IN PROGRAMS FINANCED WITH PRIVATE OR FEDERAL FUNDS FOR REHABILITATION OF BLIND, CRIPPLED, OR PHYSICALLY OR MENTALLY HANDICAPPED PERSONS.  (a) No appropriation for private or individual purposes shall be made, unless authorized by this Constitution.  A regular statement, under oath, and an account of the receipts and expenditures of all public money shall be published annually, in such manner as shall be prescribed by law.

(b)  State agencies charged with the responsibility of providing services to those who are blind, crippled, or otherwise physically or mentally handicapped may accept money from private or federal sources, designated by the private or federal source as money to be used in and establishing and equipping facilities for assisting those who are blind, crippled, or otherwise physically or mentally handicapped in becoming gainfully employed, in rehabilitating and restoring the handicapped, and in providing other services determined by the state agency to be essential for the better care and treatment of the handicapped.  Money accepted under this subsection is state money. State agencies may spend money accepted under this subsection, and no other money, for specific programs and projects to be conducted by local level or other private, nonsectarian associations, groups, and nonprofit organizations, in establishing and equipping facilities for assisting those who are blind, crippled, or otherwise physically or

mentally handicapped in becoming gainfully employed, in rehabilitating and restoring the handicapped, and in providing other services determined by the state agency to be essential for the better care or treatment of the handicapped.

The state agencies may deposit money accepted under this subsection either in the state treasury or in other secure depositories.  The money may not be expended for any purpose other than the purpose for which it was given.  Notwithstanding any other provision of this Constitution, the state agencies may expend money accepted under this subsection without the necessity of an appropriation, unless the Legislature, by law, requires that the money be expended only on appropriation.  The Legislature may prohibit state agencies from accepting money under this subsection or may regulate the amount of money accepted, the way the acceptance and expenditure of the money is administered, and the purposes for which the state agencies may expend the money.  Money accepted under this subsection for a purpose prohibited by the Legislature shall be returned to the entity that gave the money.

This subsection does not prohibit state agencies authorized to render services to the handicapped from contracting with privately-owned or local facilities for necessary and essential services, subject to such conditions, standards, and procedures as may be prescribed by law.

(Amended Nov. 8, 1966.)


Sec. 7.   (Repealed Aug. 5, 1969.)


Sec. 8.   (Redesignated as Sec. 14, Art. IX, Nov. 6, 2001.)

(TEMPORARY TRANSITION PROVISION for Sec. 8: See Appendix, Note 3.)


Sec. 9.   FORFEITURE OF RESIDENCE BY ABSENCE ON PUBLIC BUSINESS. Absence on business of the State, or of the United States, shall not forfeit a residence once obtained, so as to deprive any one of the right of suffrage, or of being elected or appointed to any office under the exceptions contained in this Constitution.

Sec. 10.  DEDUCTIONS FROM SALARY FOR NEGLECT OF DUTY.  The Legislature shall provide for deductions from the salaries of public officers who may neglect the performance of any duty that may be assigned them by law.

Sec. 11.  USURY; RATE OF INTEREST IN ABSENCE OF LEGISLATION. The Legislature shall have authority to define interest and fix maximum rates of interest; provided, however, in the absence of legislation fixing maximum rates of interest all contracts for a greater rate of interest than ten per centum (10%) per annum shall be deemed usurious; provided, further, that in contracts where no rate of interest is agreed upon, the rate shall not exceed six per centum (6%) per annum.

(Amended Aug. 11, 1891, Nov. 8, 1960, and Nov. 6, 2001.)  (TEMPORARY TRANSITION PROVISION for Sec. 11: See Appendix, Note 3.)

Sec. 12.  MEMBERS OF CONGRESS; OFFICERS OF UNITED STATES OR FOREIGN POWER; INELIGIBILITY TO HOLD OFFICE.  No member of Congress, nor person holding or exercising any office of profit or trust, under the United States, or either of them, or under any foreign power, shall be eligible as a member of the Legislature, or hold or exercise any office of profit or trust under this State.

Sec. 13.  UNOPPOSED CANDIDATE FOR OFFICE.  For an office for which this constitution requires an election, the legislature may provide by general law for a person to take the office without an election if the person is the only candidate to qualify in an election to be held for that office.

(Former Sec. 13 repealed Aug. 5, 1969; current Sec. 13 added Sept. 13, 2003.)

Sec. 13A.  UNOPPOSED CANDIDATE FOR OFFICE OF POLITICAL SUBDIVISION.  For an office of a political subdivision for which this constitution requires an election, the legislature may provide by general law for a person to assume the office without an election if the person is the only candidate to qualify in an election to be held

for that office.

(Added Sept. 13, 2003.)


Sec. 14.   CIVIL OFFICERS; RESIDENCE; LOCATION OF OFFICES.  All civil officers shall reside within the State; and all district or county officers within their districts or counties, and shall keep their offices at such places as may be required by law; and failure to comply with this condition shall vacate the office so held.


Sec. 15.   SEPARATE AND COMMUNITY PROPERTY.  All property, both real and personal, of a spouse owned or claimed before marriage, and that acquired afterward by gift, devise or descent, shall be the separate property of that spouse; and laws shall be passed more clearly defining the rights of the spouses, in relation to separate and community property; provided that persons about to marry and spouses, without the intention to defraud pre-existing creditors, may by written instrument from time to time partition between themselves all or part of their property, then existing or to be acquired, or exchange between themselves the community interest of one spouse or future spouse in any property for the community interest of the other spouse or future spouse in other community property then existing or to be acquired, whereupon the portion or interest set aside to each spouse shall be and constitute a part of the separate property and estate of such spouse or future spouse; spouses also may from time to time, by written instrument, agree between themselves that the income or property from all or part of the separate property then owned or which thereafter might be acquired by only one of them, shall be the separate property of that spouse; if one spouse makes a gift of property to the other that gift is presumed to include all the income or property which might arise from that gift of property; spouses may agree in writing that all or part of their community property becomes the property of the surviving spouse on the death of a spouse; and spouses may agree in writing that all or part of the separate property owned by either or both of them shall be the spouses' community property.

(Amended Nov. 2, 1948, Nov. 4, 1980, Nov. 3, 1987, and Nov. 2, 1999.)

Sec. 16.   CORPORATIONS WITH BANKING AND DISCOUNTING PRIVILEGES. (a) The Legislature shall by general laws, authorize the incorporation of state banks and savings and loan associations and shall provide for a system of State supervision, regulation and control of such bodies which will adequately protect and secure the depositors and creditors thereof.

No state bank shall be chartered until all of the authorized capital stock has been subscribed and paid in full in cash.  Except as may be permitted by the Legislature pursuant to Subsections (b), (d), and (e) of this Section 16, a state bank shall not be authorized to engage in business at more than one place which shall be designated in its charter; however, this restriction shall not apply to any other type of financial institution chartered under the laws of this state.

No foreign corporation, other than the national banks of the United States domiciled in this State, shall be permitted to exercise banking or discounting privileges in this State.

(b)   If it finds that the convenience of the public will be served thereby, the Legislature may authorize State and national banks to establish and operate unmanned teller machines within the county or city of their domicile.  Such machines may perform all banking functions.  Banks which are domiciled within a city lying in two or more counties may be permitted to establish and operate unmanned teller machines within both the city and the county of their domicile.  The Legislature shall provide that a bank shall have the right to share in the use of these teller machines, not situated at a banking house, which are located within the county or the city of the bank's domicile, on a reasonable, nondiscriminatory basis, consistent with anti-trust laws.  Banks may share the use of such machines within the county or city of their domicile with savings and loan associations and credit unions which are domiciled in the same county or city.

(c)   A state bank created by virtue of the power granted by this section, notwithstanding any other provision of this section, has the same rights and privileges that are or may be granted to national banks of the United States domiciled in this State.

(d)   The Legislature may authorize a state bank or national bank of the United States domiciled in this State to engage in business at more than one place if it does so through the purchase and assumption

of certain assets and liabilities of a failed state bank or a failed national bank of the United States domiciled in this State.

(e)  The Legislature shall authorize a state bank or national bank of the United States domiciled in this State to establish and operate banking facilities at locations within the county or city of its domicile, subject to limitations the Legislature imposes.  The Legislature may permit a bank domiciled within a city located in two or more counties to establish and operate branches within both the city and the county of its domicile, subject to limitations the Legislature imposes.

(f)  A bank may not be considered a branch or facility of another bank solely because it is owned or controlled by the same stockholders as the other bank, has common accounting and administrative systems with the other bank, or has a name similar to the other bank's or because of a combination of those factors.

(Amended Nov. 8, 1904, and Aug. 23, 1937; Subsecs. (a) and (b) amended Nov. 4, 1980; Subsec. (c) added Nov. 6, 1984; Subsecs. (a) and (c) amended and (d)-(f) added Nov. 4, 1986.)


Sec. 17.  OFFICERS TO SERVE UNTIL SUCCESSORS QUALIFIED.  All officers within this State shall continue to perform the duties of their offices until their successors shall be duly qualified.


Sec. 18.  (Repealed Nov. 2, 1999.)

(TEMPORARY TRANSITION PROVISIONS for Sec. 18: See Appendix, Note 1.)


Sec. 19.  (Repealed Nov. 6, 2001.)

(TEMPORARY TRANSITION PROVISION for Sec. 19: See Appendix, Note 3.)


Sec. 20.  MIXED ALCOHOLIC BEVERAGES; INTOXICATING LIQUORS; WINES; REGULATION; LOCAL OPTION.  (a) The Legislature shall have the power to enact a Mixed Beverage Law regulating the sale of mixed alcoholic beverages on a local option election basis.  The Legislature shall also have the power to regulate the manufacture, sale, possession and transportation of intoxicating liquors, including the power to establish a State Monopoly on the sale of distilled liquors.

Should the Legislature enact any enabling laws in anticipation of this amendment, no such law shall be void by reason of its anticipatory nature.

(b)  The Legislature shall enact a law or laws whereby the qualified voters of any county, justice's precinct or incorporated town or city, may, by a majority vote of those voting, determine from time to time whether the sale of intoxicating liquors for beverage purposes shall be prohibited or legalized within the prescribed limits; and such laws shall contain provisions for voting on the sale of intoxicating liquors of various types and various alcoholic content.

(c)  In all counties, justice's precincts or incorporated towns or cities wherein the sale of intoxicating liquors had been prohibited by local option elections held under the laws of the State of Texas and in force at the time of the taking effect of Section 20, Article XVI of the Constitution of Texas, it shall continue to be unlawful to manufacture, sell, barter or exchange in any such county, justice's precinct or incorporated town or city, any spirituous, vinous or malt liquors or medicated bitters capable of producing intoxication or any other intoxicants whatsoever, for beverage purposes, unless and until a majority of the qualified voters in such county or political subdivision thereof voting in an election held for such purpose shall determine such to be lawful; provided that this subsection shall not prohibit the sale of alcoholic beverages containing not more than 3.2 per cent alcohol by weight in cities, counties or political subdivisions thereof in which the qualified voters have voted to legalize such sale under the provisions of Chapter 116, Acts of the Regular Session of the 43rd Legislature.

(d)  The legislature may enact laws and direct the Alcoholic Beverage Commission or its successor to set policies for all wineries in this state, regardless of whether the winery is located in an area in which the sale of wine has or has not been authorized by local option election, for the manufacturing of wine, including the on-premises selling of wine to the ultimate consumer for consumption on or off the winery premises, the buying of wine from or the selling of wine to any other person authorized under general law to purchase and sell wine in this state, and the dispensing of wine without charge, for tasting purposes, for consumption on the winery premises, and for any purpose to promote the wine industry in this state.

(Amended Aug. 11, 1891, May 24, 1919, Aug. 26, 1933, Aug. 24, 1935, and Nov. 3, 1970; Subsec. (d) added Sept. 13, 2003.)

Sec. 21.  PUBLIC PRINTING AND BINDING; REPAIRS AND FURNISHINGS; CONTRACTS.  All stationery, printing, fuel used in the legislature and departments of the government other than the judicial department, printing and binding of the laws, journals, and department reports, and all other printing and binding and the repairing and furnishing of the halls and rooms used during meetings of the legislature and in committees, except proclamations and such products and services as may be done by handicapped individuals employed in nonprofit rehabilitation facilities providing sheltered employment to the handicapped in Texas, shall be performed under contract, to be given to the lowest responsible bidder, below such maximum price and under such regulations as shall be prescribed by law.  No member or officer of any department of the government shall in any way have a financial interest in such contracts, and all such contracts or programs involving the state use of the products and services of handicapped individuals shall be subject to such requirements as might be established by the legislature.

(Amended Nov. 7, 1978.)


Sec. 22.  (Repealed Nov. 6, 2001.)

(TEMPORARY TRANSITION PROVISION for Sec. 22: See Appendix, Note 3.)


Sec. 23.  REGULATION OF LIVE STOCK; PROTECTION OF STOCK RAISERS; INSPECTIONS; BRANDS.  The Legislature may pass laws for the regulation of live stock and the protection of stock raisers in the stock raising portion of the State, and exempt from the operation of such laws other portions, sections, or counties; and shall have power to pass general and special laws for the inspection of cattle, stock and hides and for the regulation of brands; provided, that any local law thus passed shall be submitted to the qualified voters of the section to be affected thereby, and approved by them, before it shall go into effect.

(Amended Nov. 6, 2001.)  (TEMPORARY TRANSITION PROVISION for Sec. 23:

See Appendix, Note 3.)

Sec. 24.  ROADS AND BRIDGES.  The Legislature shall make provision for laying out and working public roads, for the building of bridges, and for utilizing fines, forfeitures, and convict labor to all these purposes.

Sec. 25.  DRAWBACKS AND REBATEMENT TO CARRIERS, SHIPPERS, MERCHANTS, ETC.  That all drawbacks and rebatement of insurance, freight, transportation, carriage, wharfage, storage, compressing, baling, repairing, or for any other kind of labor or service of, or to any cotton, grain, or any other produce or article of commerce in this State, paid or allowed or contracted for, to any common carrier, shipper, merchant, commission merchant, factor, agent, or middleman of any kind, not the true and absolute owner thereof, are forever prohibited, and it shall be the duty of the Legislature to pass effective laws punishing all persons in this State who pay, receive or contract for, or respecting the same.

Sec. 26.  HOMICIDE; LIABILITY IN DAMAGES.  Every person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide.

Sec. 27.  VACANCIES FILLED FOR UNEXPIRED TERM.  In all elections to fill vacancies of office in this State, it shall be to fill the unexpired term only.

Sec. 28.  GARNISHMENT OF WAGES.  No current wages for personal service shall ever be subject to garnishment, except for the enforcement of court-ordered:
        (1)  child support payments; or
        (2)  spousal maintenance.

(Amended Nov. 8, 1983, and Nov. 2, 1999.)

Sec. 29.   (Repealed Aug. 5, 1969.)

Sec. 30.   DURATION OF OFFICES; RAILROAD COMMISSION.   (a) The duration of all offices not fixed by this Constitution shall never exceed two years.

(b)   When a Railroad Commission is created by law it shall be composed of three Commissioners who shall be elected by the people at a general election for State officers, and their terms of office shall be six years.   And one Railroad Commissioner shall be elected every two years.   In case of vacancy in said office the Governor of the State shall fill said vacancy by appointment until the next general election.

(c)   The Legislature may provide that members of the governing board of a district or authority created by authority of Article III, Section 48-e, Article III, Section 52(b)(1) or (2), or Article XVI, Section 59, of this Constitution serve terms not to exceed four years.

(d)   The Legislature by general or special law may provide that members of the governing board of a hospital district serve terms not to exceed four years.

(Amended Nov. 6, 1894, and Nov. 2, 1982; Subsec. (d) added Nov. 7, 1989; Subsec. (b) amended Nov. 2, 1999; Subsec. (c) amended Nov. 3, 2009.)   (TEMPORARY TRANSITION PROVISIONS for Sec. 30: See Appendix, Note 1.)


Sec. 30a.   MEMBERS OF BOARDS; TERMS OF OFFICE.   The Legislature may provide by law that the Board of Regents of the State University and boards of trustees or managers of the educational, eleemosynary, and penal institutions of the State, and such boards as have been, or may hereafter be established by law, may be composed of an odd number of three or more members who serve for a term of six (6) years, with one-third, or as near as one-third as possible, of the members of such boards to be elected or appointed every two (2) years in such manner as the Legislature may determine; vacancies in such offices to be filled as may be provided by law, and the Legislature shall enact suitable laws to give effect to this section.   The Legislature may provide by law that a board required by this constitution be composed of members of any number divisible by three (3) who serve for a term

of six (6) years, with one-third of the members elected or appointed every two (2) years.

(Added Nov. 5, 1912; amended Nov. 2, 1999.)


Sec. 30b.  CIVIL SERVICE OFFICES; DURATION.  Wherever by virtue of Statute or charter provisions appointive offices of any municipality are placed under the terms and provisions of Civil Service and rules are set up governing appointment to and removal from such offices, the provisions of Article 16, Section 30, of the Texas Constitution limiting the duration of all offices not fixed by the Constitution to two (2) years shall not apply, but the duration of such offices shall be governed by the provisions of the Civil Service law or charter provisions applicable thereto.

(Added Nov. 5, 1940.)


Sec. 31.  PRACTITIONERS OF MEDICINE.  The Legislature may pass laws prescribing the qualifications of practitioners of medicine in this State, and to punish persons for mal-practice, but no preference shall ever be given by law to any schools of medicine.


Sec. 32.  (Repealed Aug. 5, 1969.)


Sec. 33.  SALARY OR COMPENSATION PAYMENTS TO PERSONS HOLDING MORE THAN ONE OFFICE.  The accounting officers in this State shall neither draw nor pay a warrant or check on funds of the State of Texas, whether in the treasury or otherwise, to any person for salary or compensation who holds at the same time more than one civil office of emolument, in violation of Section 40.

(Amended Nov. 2, 1926, Nov. 8, 1932, Nov. 11, 1967, and Nov. 7, 1972.)


Sec. 34.  (Repealed Aug. 5, 1969.)


Sec. 35.  (Repealed Aug. 5, 1969.)


Sec. 36.  (Repealed Aug. 5, 1969.)

Sec. 37.  LIENS OF MECHANICS, ARTISANS, AND MATERIAL MEN. Mechanics, artisans and material men, of every class, shall have a lien upon the buildings and articles made or repaired by them for the value of their labor done thereon, or material furnished therefor; and the Legislature shall provide by law for the speedy and efficient enforcement of said liens.

Sec. 38.  (Repealed Aug. 5, 1969.)

Sec. 39.  APPROPRIATIONS FOR HISTORICAL MEMORIALS.  The Legislature may, from time to time, make appropriations for preserving and perpetuating memorials of the history of Texas, by means of monuments, statues, paintings and documents of historical value.

Sec. 40.  HOLDING MORE THAN ONE OFFICE; EXCEPTIONS; RIGHT TO VOTE.  (a)  No person shall hold or exercise at the same time, more than one civil office of emolument, except that of Justice of the Peace, County Commissioner, Notary Public and Postmaster, Officer of the National Guard, the National Guard Reserve, and the Officers Reserve Corps of the United States and enlisted men of the National Guard, the National Guard Reserve, and the Organized Reserves of the United States, and retired officers of the United States Army, Air Force, Navy, Marine Corps, and Coast Guard, and retired warrant officers, and retired enlisted men of the United States Army, Air Force, Navy, Marine Corps, and Coast Guard, and officers and enlisted members of the Texas State Guard and any other active militia or military force organized under state law, and the officers and directors of soil and water conservation districts, unless otherwise specially provided herein. Provided, that nothing in this Constitution shall be construed to prohibit an officer or enlisted man of the National Guard, the National Guard Reserve, the Texas State Guard, and any other active militia or military force organized under state law, or an officer in the Officers Reserve Corps of the United States, or an enlisted man in the Organized Reserves of the United States, or retired officers of the United States Army, Air Force, Navy, Marine Corps, and Coast Guard, and retired warrant officers, and retired enlisted men of the United States Army, Air Force, Navy, Marine Corps, and Coast Guard, and officers of the State soil and water conservation

districts, from holding at the same time any other office or position of honor, trust or profit, under this State or the United States, or from voting at any election, general, special or primary in this State when otherwise qualified.

(b)  State employees or other individuals who receive all or part of their compensation either directly or indirectly from funds of the State of Texas and who are not State officers, shall not be barred from serving as members of the governing bodies of school districts, cities, towns, or other local governmental districts.  Such State employees or other individuals may not receive a salary for serving as members of such governing bodies, except that:

(1)  a schoolteacher, retired schoolteacher, or retired school administrator may receive compensation for serving as a member of a governing body of a school district, city, town, or local governmental district, including a water district created under Section 59, Article XVI, or Section 52, Article III; and

(2)  a faculty member or retired faculty member of a public institution of higher education may receive compensation for serving as a member of a governing body of a water district created under Section 59 of this article or under Section 52, Article III, of this constitution.

(c)  It is further provided that a nonelective State officer may hold other nonelective offices under the State or the United States, if the other office is of benefit to the State of Texas or is required by the State or Federal law, and there is no conflict with the original office for which he receives salary or compensation.

(d)  No member of the Legislature of this State may hold any other office or position of profit under this State, or the United States, except as a notary public if qualified by law.

(Amended Nov. 2, 1926, Nov. 8, 1932, Nov. 7, 1972, Nov. 6, 2001, and Sept. 13, 2003; Subsec. (a) amended Nov. 3, 2009.)


Sec. 41.  BRIBERY AND ACCEPTANCE OF BRIBES.  Any person who shall, directly or indirectly, offer, give, or promise, any money or thing of value, testimonial, privilege or personal advantage, to any executive or judicial officer or member of the Legislature to influence him in the performance of any of his public or official

duties, shall be guilty of bribery, and be punished in such manner as shall be provided by law.  And any member of the Legislature or executive or judicial officer who shall solicit, demand or receive, or consent to receive, directly or indirectly, for himself, or for another, from any company, corporation or person, any money, appointment, employment, testimonial, reward, thing of value or employment, or of personal advantage or promise thereof, for his vote or official influence, or for withholding the same, or with any understanding, expressed or implied, that his vote or official action shall be in any way influenced thereby, or who shall solicit, demand and receive any such money or other advantage matter or thing aforesaid for another, as the consideration of his vote or official influence, in consideration of the payment or promise of such money, advantage, matter or thing to another, shall be held guilty of bribery, within the meaning of the Constitution, and shall incur the disabilities provided for said offenses, with a forfeiture of the office they may hold, and such other additional punishment as is or shall be provided by law.

Sec. 42.  (Repealed Aug. 5, 1969.)

Sec. 43.  (Repealed Nov. 6, 2001.)

(TEMPORARY TRANSITION PROVISION for Sec. 43: See Appendix, Note 3.)

Sec. 44.  COUNTY TREASURER AND COUNTY SURVEYOR.  (a) Except as otherwise provided by this section, the Legislature shall prescribe the duties and provide for the election by the qualified voters of each county in this State, of a County Treasurer and a County Surveyor, who shall have an office at the county seat, and hold their office for four years, and until their successors are qualified; and shall have such compensation as may be provided by law.

(b)  The office of County Treasurer or County Surveyor does not exist in those counties in which the office has been abolished pursuant to constitutional amendment or pursuant to the authority of Subsection (c) of this section.

(c)  The Commissioners Court of a county may call an election to abolish the office of County Surveyor in the county.  The office of

County Surveyor in the county is abolished if a majority of the voters of the county voting on the question at that election approve the abolition.  If an election is called under this subsection, the Commissioners Court shall order the ballot for the election to be printed to provide for voting for or against the proposition:  "Abolishing the office of county surveyor of this county."  If the office of County Surveyor is abolished under this subsection, the maps, field notes, and other records in the custody of the County Surveyor are transferred to the county officer or employee designated by the Commissioners Court of the county in which the office is abolished, and the Commissioners Court may from time to time change its designation as it considers appropriate.

(Amended Nov. 2, 1954; Subsec. (a) amended and (b) and (c) added Nov. 2, 1982; Subsec. (a) amended and (b)(1) added Nov. 6, 1984; Subsecs. (a)-(c) amended and (d)-(f) added Nov. 5, 1985; Subsecs. (c) and (d) amended and (f) and (g) added Nov. 3, 1987; Subsec. (f) added Nov. 7, 1989; Subsec. (e) amended and two Subsecs. (h) added Nov. 2, 1993; Subsec. (h), as added by Acts 1993, 73rd Leg., R.S., H.J.R. 21, relating to the office of County Surveyor in Jackson County, repealed Nov. 4, 1997;  Subsec. (b) amended, Subsecs. (c)-(g) deleted, and Subsec. (h), as added by Acts 1993, 73rd Leg., R.S., H.J.R. 37, relating to abolition of the office of County Surveyor, redesignated as Subsec. (c) Nov. 2, 1999.)  (TEMPORARY TRANSITION PROVISIONS for Sec. 44: See Appendix, Note 1.)


     Sec. 45.   (Repealed Aug. 5, 1969.)

     Sec. 46.   (Repealed Aug. 5, 1969.)

     Sec. 47.   (Repealed Nov. 2, 1999.)

(TEMPORARY TRANSITION PROVISIONS for Sec. 47: See Appendix, Note 1.)


     Sec. 48.   EXISTING LAWS TO CONTINUE IN FORCE.  All laws and parts of laws now in force in the State of Texas, which are not repugnant to the Constitution of the United States, or to this Constitution, shall continue and remain in force as the laws of this

State, until they expire by their own limitation or shall be amended or repealed by the Legislature.

Sec. 49.  PROTECTION OF PERSONAL PROPERTY FROM FORCED SALE.  The Legislature shall have power, and it shall be its duty, to protect by law from forced sale a certain portion of the personal property of all heads of families, and also of unmarried adults, male and female.

Sec. 50.  HOMESTEAD; PROTECTION FROM FORCED SALE; MORTGAGES, TRUST DEEDS, AND LIENS.  (a) The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for:
          (1)  the purchase money thereof, or a part of such purchase money;
          (2)  the taxes due thereon;
          (3)  an owelty of partition imposed against the entirety of the property by a court order or by a written agreement of the parties to the partition, including a debt of one spouse in favor of the other spouse resulting from a division or an award of a family homestead in a divorce proceeding;
          (4)  the refinance of a lien against a homestead, including a federal tax lien resulting from the tax debt of both spouses, if the homestead is a family homestead, or from the tax debt of the owner;
          (5)  work and material used in constructing new improvements thereon, if contracted for in writing, or work and material used to repair or renovate existing improvements thereon if:
                (A)  the work and material are contracted for in writing, with the consent of both spouses, in the case of a family homestead, given in the same manner as is required in making a sale and conveyance of the homestead;
                (B)  the contract for the work and material is not executed by the owner or the owner's spouse before the fifth day after the owner makes written application for any extension of credit for the work and material, unless the work and material are necessary to complete immediate repairs to conditions on the homestead property that materially affect the health or safety of the owner or person residing in the homestead and the owner of the homestead acknowledges such in writing;

(C)   the contract for the work and material expressly provides that the owner may rescind the contract without penalty or charge within three days after the execution of the contract by all parties, unless the work and material are necessary to complete immediate repairs to conditions on the homestead property that materially affect the health or safety of the owner or person residing in the homestead and the owner of the homestead acknowledges such in writing; and

(D)   the contract for the work and material is executed by the owner and the owner's spouse only at the office of a third-party lender making an extension of credit for the work and material, an attorney at law, or a title company;

(6)   an extension of credit that:

(A)   is secured by a voluntary lien on the homestead created under a written agreement with the consent of each owner and each owner's spouse;

(B)   is of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead on the date the extension of credit is made;

(C)   is without recourse for personal liability against each owner and the spouse of each owner, unless the owner or spouse obtained the extension of credit by actual fraud;

(D)   is secured by a lien that may be foreclosed upon only by a court order;

(E)   does not require the owner or the owner's spouse to pay, in addition to any interest, fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit that exceed, in the aggregate, three percent of the original principal amount of the extension of credit;

(F)   is not a form of open-end account that may be debited from time to time or under which credit may be extended from time to time unless the open-end account is a home equity line of credit;

(G)   is payable in advance without penalty or other charge;

(H)   is not secured by any additional real or personal

property other than the homestead;

(I)   is not secured by homestead property that on the date of closing is designated for agricultural use as provided by statutes governing property tax, unless such homestead property is used primarily for the production of milk;

(J)   may not be accelerated because of a decrease in the market value of the homestead or because of the owner's default under other indebtedness not secured by a prior valid encumbrance against the homestead;

(K)   is the only debt secured by the homestead at the time the extension of credit is made unless the other debt was made for a purpose described by Subsections (a)(1)-(a)(5) or Subsection (a)(8) of this section;

(L)   is scheduled to be repaid:

(i)   in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment; or

(ii)   if the extension of credit is a home equity line of credit, in periodic payments described under Subsection (t)(8) of this section;

(M)   is closed not before:

(i)   the 12th day after the later of the date that the owner of the homestead submits a loan application to the lender for the extension of credit or the date that the lender provides the owner a copy of the notice prescribed by Subsection (g) of this section;

(ii)   one business day after the date that the owner of the homestead receives a copy of the loan application if not previously provided and a final itemized disclosure of the actual fees, points, interest, costs, and charges that will be charged at closing. If a bona fide emergency or another good cause exists and the lender obtains the written consent of the owner, the lender may provide the documentation to the owner or the lender may modify previously provided documentation on the date of closing; and

(iii)   the first anniversary of the closing date

of any other extension of credit described by Subsection (a)(6) of this section secured by the same homestead property, except a refinance described by Paragraph (Q)(x)(f) of this subdivision, unless the owner on oath requests an earlier closing due to a state of emergency that:

(a)  has been declared by the president of the United States or the governor as provided by law; and

(b)  applies to the area where the homestead is located;

(N)  is closed only at the office of the lender, an attorney at law, or a title company;

(O)  permits a lender to contract for and receive any fixed or variable rate of interest authorized under statute;

(P)  is made by one of the following that has not been found by a federal regulatory agency to have engaged in the practice of refusing to make loans because the applicants for the loans reside or the property proposed to secure the loans is located in a certain area:

(i)  a bank, savings and loan association, savings bank, or credit union doing business under the laws of this state or the United States;

(ii)  a federally chartered lending instrumentality or a person approved as a mortgagee by the United States government to make federally insured loans;

(iii)  a person licensed to make regulated loans, as provided by statute of this state;

(iv)  a person who sold the homestead property to the current owner and who provided all or part of the financing for the purchase;

(v)  a person who is related to the homestead property owner within the second degree of affinity or consanguinity; or

(vi)  a person regulated by this state as a mortgage broker; and

(Q)  is made on the condition that:

(i)  the owner of the homestead is not required to apply the proceeds of the extension of credit to repay another debt except debt secured by the homestead or debt to another lender;

(ii)   the owner of the homestead not assign wages as security for the extension of credit;

(iii)   the owner of the homestead not sign any instrument in which blanks relating to substantive terms of agreement are left to be filled in;

(iv)   the owner of the homestead not sign a confession of judgment or power of attorney to the lender or to a third person to confess judgment or to appear for the owner in a judicial proceeding;

(v)   at the time the extension of credit is made, the owner of the homestead shall receive a copy of the final loan application and all executed documents signed by the owner at closing related to the extension of credit;

(vi)   the security instruments securing the extension of credit contain a disclosure that the extension of credit is the type of credit defined by Section 50(a)(6), Article XVI, Texas Constitution;

(vii)   within a reasonable time after termination and full payment of the extension of credit, the lender cancel and return the promissory note to the owner of the homestead and give the owner, in recordable form, a release of the lien securing the extension of credit or a copy of an endorsement and assignment of the lien to a lender that is refinancing the extension of credit;

(viii)   the owner of the homestead and any spouse of the owner may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge;

(ix)   the owner of the homestead and the lender sign a written acknowledgment as to the fair market value of the homestead property on the date the extension of credit is made;

(x)   except as provided by Subparagraph (xi) of this paragraph, the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender's or holder's obligations under the extension of credit and fails to correct the failure to comply not later than the 60th day after the date the lender or holder is notified by the borrower of the lender's failure to comply by:

(a)   paying to the owner an amount equal to

any overcharge paid by the owner under or related to the extension of credit if the owner has paid an amount that exceeds an amount stated in the applicable Paragraph (E), (G), or (O) of this subdivision;

(b)   sending the owner a written acknowledgement that the lien is valid only in the amount that the extension of credit does not exceed the percentage described by Paragraph (B) of this subdivision, if applicable, or is not secured by property described under Paragraph (H) or (I) of this subdivision, if applicable;

(c)   sending the owner a written notice modifying any other amount, percentage, term, or other provision prohibited by this section to a permitted amount, percentage, term, or other provision and adjusting the account of the borrower to ensure that the borrower is not required to pay more than an amount permitted by this section and is not subject to any other term or provision prohibited by this section;

(d)   delivering the required documents to the borrower if the lender fails to comply with Subparagraph (v) of this paragraph or obtaining the appropriate signatures if the lender fails to comply with Subparagraph (ix) of this paragraph;

(e)   sending the owner a written acknowledgement, if the failure to comply is prohibited by Paragraph (K) of this subdivision, that the accrual of interest and all of the owner's obligations under the extension of credit are abated while any prior lien prohibited under Paragraph (K) remains secured by the homestead; or

(f)   if the failure to comply cannot be cured under Subparagraphs (x)(a)-(e) of this paragraph, curing the failure to comply by a refund or credit to the owner of $1,000 and offering the owner the right to refinance the extension of credit with the lender or holder for the remaining term of the loan at no cost to the owner on the same terms, including interest, as the original extension of credit with any modifications necessary to comply with this section or on terms on which the owner and the lender or holder otherwise agree that comply with this section; and

(xi)   the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of

the extension of credit if the extension of credit is made by a person other than a person described under Paragraph (P) of this subdivision or if the lien was not created under a written agreement with the consent of each owner and each owner's spouse, unless each owner and each owner's spouse who did not initially consent subsequently consents;

(7)  a reverse mortgage; or

(8)  the conversion and refinance of a personal property lien secured by a manufactured home to a lien on real property, including the refinance of the purchase price of the manufactured home, the cost of installing the manufactured home on the real property, and the refinance of the purchase price of the real property.

(b)  An owner or claimant of the property claimed as homestead may not sell or abandon the homestead without the consent of each owner and the spouse of each owner, given in such manner as may be prescribed by law.

(c)  No mortgage, trust deed, or other lien on the homestead shall ever be valid unless it secures a debt described by this section, whether such mortgage, trust deed, or other lien, shall have been created by the owner alone, or together with his or her spouse, in case the owner is married.  All pretended sales of the homestead involving any condition of defeasance shall be void.

(d)  A purchaser or lender for value without actual knowledge may conclusively rely on an affidavit that designates other property as the homestead of the affiant and that states that the property to be conveyed or encumbered is not the homestead of the affiant.

(e)  A refinance of debt secured by a homestead and described by any subsection under Subsections (a)(1)-(a)(5) that includes the advance of additional funds may not be secured by a valid lien against the homestead unless:

(1)  the refinance of the debt is an extension of credit described by Subsection (a)(6) of this section; or

(2)  the advance of all the additional funds is for reasonable costs necessary to refinance such debt or for a purpose described by Subsection (a)(2), (a)(3), or (a)(5) of this section.

(f)  A refinance of debt secured by the homestead, any portion of which is an extension of credit described by Subsection (a)(6) of this section, may not be secured by a valid lien against the homestead

unless the refinance of the debt is an extension of credit described by Subsection (a)(6) or (a)(7) of this section.

(g)  An extension of credit described by Subsection (a)(6) of this section may be secured by a valid lien against homestead property if the extension of credit is not closed before the 12th day after the lender provides the owner with the following written notice on a separate instrument:

"NOTICE CONCERNING EXTENSIONS OF CREDIT DEFINED BY SECTION 50(a)(6), ARTICLE XVI, TEXAS CONSTITUTION:

"SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION ALLOWS CERTAIN LOANS TO BE SECURED AGAINST THE EQUITY IN YOUR HOME.  SUCH LOANS ARE COMMONLY KNOWN AS EQUITY LOANS.  IF YOU DO NOT REPAY THE LOAN OR IF YOU FAIL TO MEET THE TERMS OF THE LOAN, THE LENDER MAY FORECLOSE AND SELL YOUR HOME.  THE CONSTITUTION PROVIDES THAT:

"(A) THE LOAN MUST BE VOLUNTARILY CREATED WITH THE CONSENT OF EACH OWNER OF YOUR HOME AND EACH OWNER'S SPOUSE;

"(B) THE PRINCIPAL LOAN AMOUNT AT THE TIME THE LOAN IS MADE MUST NOT EXCEED AN AMOUNT THAT, WHEN ADDED TO THE PRINCIPAL BALANCES OF ALL OTHER LIENS AGAINST YOUR HOME, IS MORE THAN 80 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME;

"(C) THE LOAN MUST BE WITHOUT RECOURSE FOR PERSONAL LIABILITY AGAINST YOU AND YOUR SPOUSE UNLESS YOU OR YOUR SPOUSE OBTAINED THIS EXTENSION OF CREDIT BY ACTUAL FRAUD;

"(D) THE LIEN SECURING THE LOAN MAY BE FORECLOSED UPON ONLY WITH A COURT ORDER;

"(E) FEES AND CHARGES TO MAKE THE LOAN MAY NOT EXCEED 3 PERCENT OF THE LOAN AMOUNT;

"(F) THE LOAN MAY NOT BE AN OPEN-END ACCOUNT THAT MAY BE DEBITED FROM TIME TO TIME OR UNDER WHICH CREDIT MAY BE EXTENDED FROM TIME TO TIME UNLESS IT IS A HOME EQUITY LINE OF CREDIT;

"(G) YOU MAY PREPAY THE LOAN WITHOUT PENALTY OR CHARGE;

"(H) NO ADDITIONAL COLLATERAL MAY BE SECURITY FOR THE LOAN;

"(I) THE LOAN MAY NOT BE SECURED BY HOMESTEAD PROPERTY THAT IS DESIGNATED FOR AGRICULTURAL USE AS OF THE DATE OF CLOSING, UNLESS THE AGRICULTURAL HOMESTEAD PROPERTY IS USED PRIMARILY FOR THE PRODUCTION OF MILK;

"(J) YOU ARE NOT REQUIRED TO REPAY THE LOAN EARLIER THAN AGREED SOLELY BECAUSE THE FAIR MARKET VALUE OF YOUR HOME DECREASES OR BECAUSE

YOU DEFAULT ON ANOTHER LOAN THAT IS NOT SECURED BY YOUR HOME;

"(K) ONLY ONE LOAN DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION MAY BE SECURED WITH YOUR HOME AT ANY GIVEN TIME;

"(L) THE LOAN MUST BE SCHEDULED TO BE REPAID IN PAYMENTS THAT EQUAL OR EXCEED THE AMOUNT OF ACCRUED INTEREST FOR EACH PAYMENT PERIOD;

"(M) THE LOAN MAY NOT CLOSE BEFORE 12 DAYS AFTER YOU SUBMIT A LOAN APPLICATION TO THE LENDER OR BEFORE 12 DAYS AFTER YOU RECEIVE THIS NOTICE, WHICHEVER DATE IS LATER; AND MAY NOT WITHOUT YOUR CONSENT CLOSE BEFORE ONE BUSINESS DAY AFTER THE DATE ON WHICH YOU RECEIVE A COPY OF YOUR LOAN APPLICATION IF NOT PREVIOUSLY PROVIDED AND A FINAL ITEMIZED DISCLOSURE OF THE ACTUAL FEES, POINTS, INTEREST, COSTS, AND CHARGES THAT WILL BE CHARGED AT CLOSING; AND IF YOUR HOME WAS SECURITY FOR THE SAME TYPE OF LOAN WITHIN THE PAST YEAR, A NEW LOAN SECURED BY THE SAME PROPERTY MAY NOT CLOSE BEFORE ONE YEAR HAS PASSED FROM THE CLOSING DATE OF THE OTHER LOAN, UNLESS ON OATH YOU REQUEST AN EARLIER CLOSING DUE TO A DECLARED STATE OF EMERGENCY;

"(N) THE LOAN MAY CLOSE ONLY AT THE OFFICE OF THE LENDER, TITLE COMPANY, OR AN ATTORNEY AT LAW;

"(O) THE LENDER MAY CHARGE ANY FIXED OR VARIABLE RATE OF INTEREST AUTHORIZED BY STATUTE;

"(P) ONLY A LAWFULLY AUTHORIZED LENDER MAY MAKE LOANS DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION;

"(Q) LOANS DESCRIBED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION MUST:

"(1) NOT REQUIRE YOU TO APPLY THE PROCEEDS TO ANOTHER DEBT EXCEPT A DEBT THAT IS SECURED BY YOUR HOME OR OWED TO ANOTHER LENDER;

"(2) NOT REQUIRE THAT YOU ASSIGN WAGES AS SECURITY;

"(3) NOT REQUIRE THAT YOU EXECUTE INSTRUMENTS WHICH HAVE BLANKS FOR SUBSTANTIVE TERMS OF AGREEMENT LEFT TO BE FILLED IN;

"(4) NOT REQUIRE THAT YOU SIGN A CONFESSION OF JUDGMENT OR POWER OF ATTORNEY TO ANOTHER PERSON TO CONFESS JUDGMENT OR APPEAR IN A LEGAL PROCEEDING ON YOUR BEHALF;

"(5) PROVIDE THAT YOU RECEIVE A COPY OF YOUR FINAL LOAN APPLICATION AND ALL EXECUTED DOCUMENTS YOU SIGN AT CLOSING;

"(6) PROVIDE THAT THE SECURITY INSTRUMENTS CONTAIN A DISCLOSURE THAT THIS LOAN IS A LOAN DEFINED BY SECTION 50(a)(6), ARTICLE XVI, OF THE TEXAS CONSTITUTION;

"(7) PROVIDE THAT WHEN THE LOAN IS PAID IN FULL, THE LENDER WILL SIGN AND GIVE YOU A RELEASE OF LIEN OR AN ASSIGNMENT OF THE LIEN, WHICHEVER IS APPROPRIATE;

"(8) PROVIDE THAT YOU MAY, WITHIN 3 DAYS AFTER CLOSING, RESCIND THE LOAN WITHOUT PENALTY OR CHARGE;

"(9) PROVIDE THAT YOU AND THE LENDER ACKNOWLEDGE THE FAIR MARKET VALUE OF YOUR HOME ON THE DATE THE LOAN CLOSES; AND

"(10) PROVIDE THAT THE LENDER WILL FORFEIT ALL PRINCIPAL AND INTEREST IF THE LENDER FAILS TO COMPLY WITH THE LENDER'S OBLIGATIONS UNLESS THE LENDER CURES THE FAILURE TO COMPLY AS PROVIDED BY SECTION 50 (a)(6)(Q)(x), ARTICLE XVI, OF THE TEXAS CONSTITUTION; AND

"(R) IF THE LOAN IS A HOME EQUITY LINE OF CREDIT:

"(1) YOU MAY REQUEST ADVANCES, REPAY MONEY, AND REBORROW MONEY UNDER THE LINE OF CREDIT;

"(2) EACH ADVANCE UNDER THE LINE OF CREDIT MUST BE IN AN AMOUNT OF AT LEAST $4,000;

"(3) YOU MAY NOT USE A CREDIT CARD, DEBIT CARD, OR SIMILAR DEVICE, OR PREPRINTED CHECK THAT YOU DID NOT SOLICIT, TO OBTAIN ADVANCES UNDER THE LINE OF CREDIT;

"(4) ANY FEES THE LENDER CHARGES MAY BE CHARGED AND COLLECTED ONLY AT THE TIME THE LINE OF CREDIT IS ESTABLISHED AND THE LENDER MAY NOT CHARGE A FEE IN CONNECTION WITH ANY ADVANCE;

"(5) THE MAXIMUM PRINCIPAL AMOUNT THAT MAY BE EXTENDED, WHEN ADDED TO ALL OTHER DEBTS SECURED BY YOUR HOME, MAY NOT EXCEED 80 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME ON THE DATE THE LINE OF CREDIT IS ESTABLISHED;

"(6) IF THE PRINCIPAL BALANCE UNDER THE LINE OF CREDIT AT ANY TIME EXCEEDS 50 PERCENT OF THE FAIR MARKET VALUE OF YOUR HOME, AS DETERMINED ON THE DATE THE LINE OF CREDIT IS ESTABLISHED, YOU MAY NOT CONTINUE TO REQUEST ADVANCES UNDER THE LINE OF CREDIT UNTIL THE BALANCE IS LESS THAN 50 PERCENT OF THE FAIR MARKET VALUE; AND

"(7) THE LENDER MAY NOT UNILATERALLY AMEND THE TERMS OF THE LINE OF CREDIT.

"THIS NOTICE IS ONLY A SUMMARY OF YOUR RIGHTS UNDER THE TEXAS CONSTITUTION. YOUR RIGHTS ARE GOVERNED BY SECTION 50, ARTICLE XVI, OF THE TEXAS CONSTITUTION, AND NOT BY THIS NOTICE."

If the discussions with the borrower are conducted primarily in a language other than English, the lender shall, before closing,

provide an additional copy of the notice translated into the written language in which the discussions were conducted.

(h)   A lender or assignee for value may conclusively rely on the written acknowledgment as to the fair market value of the homestead property made in accordance with Subsection (a)(6)(Q)(ix) of this section if:

(1)   the value acknowledged to is the value estimate in an appraisal or evaluation prepared in accordance with a state or federal requirement applicable to an extension of credit under Subsection (a)(6); and

(2)   the lender or assignee does not have actual knowledge at the time of the payment of value or advance of funds by the lender or assignee that the fair market value stated in the written acknowledgment was incorrect.

(i)   This subsection shall not affect or impair any right of the borrower to recover damages from the lender or assignee under applicable law for wrongful foreclosure.  A purchaser for value without actual knowledge may conclusively presume that a lien securing an extension of credit described by Subsection (a)(6) of this section was a valid lien securing the extension of credit with homestead property if:

(1)   the security instruments securing the extension of credit contain a disclosure that the extension of credit secured by the lien was the type of credit defined by Section 50(a)(6), Article XVI, Texas Constitution;

(2)   the purchaser acquires the title to the property pursuant to or after the foreclosure of the voluntary lien; and

(3)   the purchaser is not the lender or assignee under the extension of credit.

(j)   Subsection (a)(6) and Subsections (e)-(i) of this section are not severable, and none of those provisions would have been enacted without the others.  If any of those provisions are held to be preempted by the laws of the United States, all of those provisions are invalid.  This subsection shall not apply to any lien or extension of credit made after January 1, 1998, and before the date any provision under Subsection (a)(6) or Subsections (e)-(i) is held to be preempted.

(k)   "Reverse mortgage" means an extension of credit:

(1)   that is secured by a voluntary lien on homestead property created by a written agreement with the consent of each owner and each owner's spouse;

(2)   that is made to a person who is or whose spouse is 62 years or older;

(3)   that is made without recourse for personal liability against each owner and the spouse of each owner;

(4)   under which advances are provided to a borrower:

(A)   based on the equity in a borrower's homestead; or

(B)   for the purchase of homestead property that the borrower will occupy as a principal residence;

(5)   that does not permit the lender to reduce the amount or number of advances because of an adjustment in the interest rate if periodic advances are to be made;

(6)   that requires no payment of principal or interest until:

(A)   all borrowers have died;

(B)   the homestead property securing the loan is sold or otherwise transferred;

(C)   all borrowers cease occupying the homestead property for a period of longer than 12 consecutive months without prior written approval from the lender;

(C-1)   if the extension of credit is used for the purchase of homestead property, the borrower fails to timely occupy the homestead property as the borrower's principal residence within a specified period after the date the extension of credit is made that is stipulated in the written agreement creating the lien on the property; or

(D)   the borrower:

(i)   defaults on an obligation specified in the loan documents to repair and maintain, pay taxes and assessments on, or insure the homestead property;

(ii)   commits actual fraud in connection with the loan; or

(iii)   fails to maintain the priority of the lender's lien on the homestead property, after the lender gives notice to the borrower, by promptly discharging any lien that has priority or may obtain priority over the lender's lien within 10 days after the

date the borrower receives the notice, unless the borrower:

(a)  agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to the lender;

(b)  contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings so as to prevent the enforcement of the lien or forfeiture of any part of the homestead property; or

(c)  secures from the holder of the lien an agreement satisfactory to the lender subordinating the lien to all amounts secured by the lender's lien on the homestead property;

(7)  that provides that if the lender fails to make loan advances as required in the loan documents and if the lender fails to cure the default as required in the loan documents after notice from the borrower, the lender forfeits all principal and interest of the reverse mortgage, provided, however, that this subdivision does not apply when a governmental agency or instrumentality takes an assignment of the loan in order to cure the default;

(8)  that is not made unless the prospective borrower and the spouse of the prospective borrower attest in writing that the prospective borrower and the prospective borrower's spouse received counseling regarding the advisability and availability of reverse mortgages and other financial alternatives that was completed not earlier than the 180th day nor later than the 5th day before the date the extension of credit is closed;

(9)  that is not closed before the 12th day after the date the lender provides to the prospective borrower the following written notice on a separate instrument, which the lender or originator and the borrower must sign for the notice to take effect:

"IMPORTANT NOTICE TO BORROWERS

RELATED TO YOUR REVERSE MORTGAGE

"UNDER THE TEXAS TAX CODE, CERTAIN ELDERLY PERSONS MAY DEFER THE COLLECTION OF PROPERTY TAXES ON THEIR RESIDENCE HOMESTEAD.  BY RECEIVING THIS REVERSE MORTGAGE YOU MAY BE REQUIRED TO FORGO ANY PREVIOUSLY APPROVED DEFERRAL OF PROPERTY TAX COLLECTION AND YOU MAY BE REQUIRED TO PAY PROPERTY TAXES ON AN ANNUAL BASIS ON THIS PROPERTY.
"THE LENDER MAY FORECLOSE THE REVERSE MORTGAGE AND YOU MAY LOSE YOUR

HOME IF:

      "(A)   YOU DO NOT PAY THE TAXES OR OTHER ASSESSMENTS ON THE HOME
EVEN IF YOU ARE ELIGIBLE TO DEFER PAYMENT OF PROPERTY TAXES;

      "(B)   YOU DO NOT MAINTAIN AND PAY FOR PROPERTY INSURANCE ON THE
HOME AS REQUIRED BY THE LOAN DOCUMENTS;

      "(C)   YOU FAIL TO MAINTAIN THE HOME IN A STATE OF GOOD CONDITION
AND REPAIR;

      "(D)   YOU CEASE OCCUPYING THE HOME FOR A PERIOD LONGER THAN 12
CONSECUTIVE MONTHS WITHOUT THE PRIOR WRITTEN APPROVAL FROM THE LENDER
OR, IF THE EXTENSION OF CREDIT IS USED FOR THE PURCHASE OF THE HOME,
YOU FAIL TO TIMELY OCCUPY THE HOME AS YOUR PRINCIPAL RESIDENCE WITHIN
A PERIOD OF TIME AFTER THE EXTENSION OF CREDIT IS MADE THAT IS
STIPULATED IN THE WRITTEN AGREEMENT CREATING THE LIEN ON THE HOME;

      "(E)   YOU SELL THE HOME OR OTHERWISE TRANSFER THE HOME WITHOUT
PAYING OFF THE LOAN;

      "(F)   ALL BORROWERS HAVE DIED AND THE LOAN IS NOT REPAID;

      "(G)   YOU COMMIT ACTUAL FRAUD IN CONNECTION WITH THE LOAN; OR

      "(H)   YOU FAIL TO MAINTAIN THE PRIORITY OF THE LENDER'S LIEN ON
THE HOME, AFTER THE LENDER GIVES NOTICE TO YOU, BY PROMPTLY
DISCHARGING ANY LIEN THAT HAS PRIORITY OR MAY OBTAIN PRIORITY OVER THE
LENDER'S LIEN WITHIN 10 DAYS AFTER THE DATE YOU RECEIVE THE NOTICE,
UNLESS YOU:

         "(1)   AGREE IN WRITING TO THE PAYMENT OF THE OBLIGATION
SECURED BY THE LIEN IN A MANNER ACCEPTABLE TO THE LENDER;

         "(2)   CONTEST IN GOOD FAITH THE LIEN BY, OR DEFEND AGAINST
ENFORCEMENT OF THE LIEN IN, LEGAL PROCEEDINGS SO AS TO PREVENT THE
ENFORCEMENT OF THE LIEN OR FORFEITURE OF ANY PART OF THE HOME; OR

         "(3)   SECURE FROM THE HOLDER OF THE LIEN AN AGREEMENT
SATISFACTORY TO THE LENDER SUBORDINATING THE LIEN TO ALL AMOUNTS
SECURED BY THE LENDER'S LIEN ON THE HOME.
"IF A GROUND FOR FORECLOSURE EXISTS, THE LENDER MAY NOT COMMENCE
FORECLOSURE UNTIL THE LENDER GIVES YOU WRITTEN NOTICE BY MAIL THAT A
GROUND FOR FORECLOSURE EXISTS AND GIVES YOU AN OPPORTUNITY TO REMEDY
THE CONDITION CREATING THE GROUND FOR FORECLOSURE OR TO PAY THE
REVERSE MORTGAGE DEBT WITHIN THE TIME PERMITTED BY SECTION 50(k)(10),
ARTICLE XVI, OF THE TEXAS CONSTITUTION.  THE LENDER MUST OBTAIN A
COURT ORDER FOR FORECLOSURE EXCEPT THAT A COURT ORDER IS NOT REQUIRED
IF THE FORECLOSURE OCCURS BECAUSE:

"(1)   ALL BORROWERS HAVE DIED; OR

"(2)   THE HOMESTEAD PROPERTY SECURING THE LOAN IS SOLD OR OTHERWISE TRANSFERRED."

"YOU SHOULD CONSULT WITH YOUR HOME COUNSELOR OR AN ATTORNEY IF YOU HAVE ANY CONCERNS ABOUT THESE OBLIGATIONS BEFORE YOU CLOSE YOUR REVERSE MORTGAGE LOAN.  TO LOCATE AN ATTORNEY IN YOUR AREA, YOU MAY WISH TO CONTACT THE STATE BAR OF TEXAS."

"THIS NOTICE IS ONLY A SUMMARY OF YOUR RIGHTS UNDER THE TEXAS CONSTITUTION.  YOUR RIGHTS ARE GOVERNED IN PART BY SECTION 50, ARTICLE XVI, OF THE TEXAS CONSTITUTION, AND NOT BY THIS NOTICE.";

(10)   that does not permit the lender to commence foreclosure until the lender gives notice to the borrower, in the manner provided for a notice by mail related to the foreclosure of liens under Subsection (a)(6) of this section, that a ground for foreclosure exists and gives the borrower at least 30 days, or at least 20 days in the event of a default under Subdivision (6)(D)(iii) of this subsection, to:

(A)   remedy the condition creating the ground for foreclosure;

(B)   pay the debt secured by the homestead property from proceeds of the sale of the homestead property by the borrower or from any other sources; or

(C)   convey the homestead property to the lender by a deed in lieu of foreclosure; and

(11)   that is secured by a lien that may be foreclosed upon only by a court order, if the foreclosure is for a ground other than a ground stated by Subdivision (6)(A) or (B) of this subsection.

(l)   Advances made under a reverse mortgage and interest on those advances have priority over a lien filed for record in the real property records in the county where the homestead property is located after the reverse mortgage is filed for record in the real property records of that county.

(m)   A reverse mortgage may provide for an interest rate that is fixed or adjustable and may also provide for interest that is contingent on appreciation in the fair market value of the homestead property.  Although payment of principal or interest shall not be required under a reverse mortgage until the entire loan becomes due and payable, interest may accrue and be compounded during the term of

the loan as provided by the reverse mortgage loan agreement.

(n)  A reverse mortgage that is secured by a valid lien against homestead property may be made or acquired without regard to the following provisions of any other law of this state:

(1)  a limitation on the purpose and use of future advances or other mortgage proceeds;

(2)  a limitation on future advances to a term of years or a limitation on the term of open-end account advances;

(3)  a limitation on the term during which future advances take priority over intervening advances;

(4)  a requirement that a maximum loan amount be stated in the reverse mortgage loan documents;

(5)  a prohibition on balloon payments;

(6)  a prohibition on compound interest and interest on interest;

(7)  a prohibition on contracting for, charging, or receiving any rate of interest authorized by any law of this state authorizing a lender to contract for a rate of interest; and

(8)  a requirement that a percentage of the reverse mortgage proceeds be advanced before the assignment of the reverse mortgage.

(o)  For the purposes of determining eligibility under any statute relating to payments, allowances, benefits, or services provided on a means-tested basis by this state, including supplemental security income, low-income energy assistance, property tax relief, medical assistance, and general assistance:

(1)  reverse mortgage loan advances made to a borrower are considered proceeds from a loan and not income; and

(2)  undisbursed funds under a reverse mortgage loan are considered equity in a borrower's home and not proceeds from a loan.

(p)  The advances made on a reverse mortgage loan under which more than one advance is made must be made according to the terms established by the loan documents by one or more of the following methods:

(1)  an initial advance at any time and future advances at regular intervals;

(2)  an initial advance at any time and future advances at regular intervals in which the amounts advanced may be reduced, for

one or more advances, at the request of the borrower;

(3)  an initial advance at any time and future advances at times and in amounts requested by the borrower until the credit limit established by the loan documents is reached;

(4)  an initial advance at any time, future advances at times and in amounts requested by the borrower until the credit limit established by the loan documents is reached, and subsequent advances at times and in amounts requested by the borrower according to the terms established by the loan documents to the extent that the outstanding balance is repaid; or

(5)  at any time by the lender, on behalf of the borrower, if the borrower fails to timely pay any of the following that the borrower is obligated to pay under the loan documents to the extent necessary to protect the lender's interest in or the value of the homestead property:

(A)  taxes;

(B)  insurance;

(C)  costs of repairs or maintenance performed by a person or company that is not an employee of the lender or a person or company that directly or indirectly controls, is controlled by, or is under common control with the lender;

(D)  assessments levied against the homestead property; and

(E)  any lien that has, or may obtain, priority over the lender's lien as it is established in the loan documents.

(q)  To the extent that any statutes of this state, including without limitation, Section 41.001 of the Texas Property Code, purport to limit encumbrances that may properly be fixed on homestead property in a manner that does not permit encumbrances for extensions of credit described in Subsection (a)(6) or (a)(7) of this section, the same shall be superseded to the extent that such encumbrances shall be permitted to be fixed upon homestead property in the manner provided for by this amendment.

(r)  The supreme court shall promulgate rules of civil procedure for expedited foreclosure proceedings related to the foreclosure of liens under Subsection (a)(6) of this section and to foreclosure of a reverse mortgage lien that requires a court order.

(s)  The Finance Commission of Texas shall appoint a director to

conduct research on the availability, quality, and prices of financial services and research the practices of business entities in the state that provide financial services under this section.  The director shall collect information and produce reports on lending activity of those making loans under this section.  The director shall report his or her findings to the legislature not later than December 1 of each year.

(t)  A home equity line of credit is a form of an open-end account that may be debited from time to time, under which credit may be extended from time to time and under which:

(1)  the owner requests advances, repays money, and reborrows money;

(2)  any single debit or advance is not less than $4,000;

(3)  the owner does not use a credit card, debit card, or similar device, or preprinted check unsolicited by the borrower, to obtain an advance;

(4)  any fees described by Subsection (a)(6)(E) of this section are charged and collected only at the time the extension of credit is established and no fee is charged or collected in connection with any debit or advance;

(5)  the maximum principal amount that may be extended under the account, when added to the aggregate total of the outstanding principal balances of all indebtedness secured by the homestead on the date the extension of credit is established, does not exceed an amount described under Subsection (a)(6)(B) of this section;

(6)  no additional debits or advances are made if the total principal amount outstanding exceeds an amount equal to 50 percent of the fair market value of the homestead as determined on the date the account is established;

(7)  the lender or holder may not unilaterally amend the extension of credit; and

(8)  repayment is to be made in regular periodic installments, not more often than every 14 days and not less often than monthly, beginning not later than two months from the date the extension of credit is established, and:

(A)  during the period during which the owner may request advances, each installment equals or exceeds the amount of accrued interest; and

(B)   after the period during which the owner may request advances, installments are substantially equal.

(u)   The legislature may by statute delegate one or more state agencies the power to interpret Subsections (a)(5)-(a)(7), (e)-(p), and (t), of this section. An act or omission does not violate a provision included in those subsections if the act or omission conforms to an interpretation of the provision that is:

(1)   in effect at the time of the act or omission; and

(2)   made by a state agency to which the power of interpretation is delegated as provided by this subsection or by an appellate court of this state or the United States.

(v)   A reverse mortgage must provide that:

(1)   the owner does not use a credit card, debit card, preprinted solicitation check, or similar device to obtain an advance;

(2)   after the time the extension of credit is established, no transaction fee is charged or collected solely in connection with any debit or advance; and

(3)   the lender or holder may not unilaterally amend the extension of credit.

(Amended Nov. 6, 1973, and Nov. 7, 1995; Subsecs. (a)-(d) amended and (e)-(s) added Nov. 4, 1997;  Subsecs. (k), (p), and (r) amended Nov. 2, 1999; Subsec. (a) amended Nov. 6, 2001; Subsecs. (a), (f), and (g) amended and (t) and (u) added Sept. 13, 2003; Subsec. (p) amended and (v) added Nov. 8, 2005; Subsecs. (a), (g), and (t) amended Nov. 6, 2007; Subsec. (k) amended Nov. 5, 2013.)

Sec. 51.   AMOUNT OF HOMESTEAD; USES.  The homestead, not in a town or city, shall consist of not more than two hundred acres of land, which may be in one or more parcels, with the improvements thereon; the homestead in a city, town or village, shall consist of lot or contiguous lots amounting to not more than 10 acres of land, together with any improvements on the land; provided, that the homestead in a city, town or village shall be used for the purposes of a home, or as both an urban home and a place to exercise a calling or business, of the homestead claimant, whether a single adult person, or the head of a family; provided also, that any temporary renting of the homestead shall not change the character of the same, when no other

homestead has been acquired; provided further that a release or refinance of an existing lien against a homestead as to a part of the homestead does not create an additional burden on the part of the homestead property that is unreleased or subject to the refinance, and a new lien is not invalid only for that reason.
(Amended Nov. 3, 1970, Nov. 6, 1973, Nov. 8, 1983, and Nov. 2, 1999.)

NOTE:  The joint resolution amending Sec. 51 in 1983 included a section that did not purport to amend the constitution and that provided the following:  "This amendment applies to all homesteads in this state, including homesteads acquired before the adoption of this amendment."

Sec. 52.  DESCENT AND DISTRIBUTION OF HOMESTEAD; RESTRICTIONS ON PARTITION.  On the death of the husband or wife, or both, the homestead shall descend and vest in like manner as other real property of the deceased, and shall be governed by the same laws of descent and distribution, but it shall not be partitioned among the heirs of the deceased during the lifetime of the surviving husband or wife, or so long as the survivor may elect to use or occupy the same as a homestead, or so long as the guardian of the minor children of the deceased may be permitted, under the order of the proper court having the jurisdiction, to use and occupy the same.

Sec. 53.  (Repealed Nov. 2, 1999.)

(TEMPORARY TRANSITION PROVISIONS for Sec. 53: See Appendix, Note 1.)

Sec. 54.  (Repealed Aug. 5, 1969.)

Sec. 55.  (Repealed Aug. 5, 1969.)

Sec. 56.  (Repealed Nov. 6, 2001.)

(TEMPORARY TRANSITION PROVISION for Sec. 56: See Appendix, Note 3.)

Sec. 57.  (Repealed Aug. 5, 1969.)

Sec. 58.  (Repealed Aug. 5, 1969.)

Sec. 59.  CONSERVATION AND DEVELOPMENT OF NATURAL RESOURCES AND PARKS AND RECREATIONAL FACILITIES; CONSERVATION AND RECLAMATION DISTRICTS.  (a) The conservation and development of all of the natural resources of this State, and development of parks and recreational facilities, including the control, storing, preservation and distribution of its storm and flood waters, the waters of its rivers and streams, for irrigation, power and all other useful purposes, the reclamation and irrigation of its arid, semiarid and other lands needing irrigation, the reclamation and drainage of its overflowed lands, and other lands needing drainage, the conservation and development of its forests, water and hydro-electric power, the navigation of its inland and coastal waters, and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto.

(b)  There may be created within the State of Texas, or the State may be divided into, such number of conservation and reclamation districts as may be determined to be essential to the accomplishment of the purposes of this amendment to the constitution, which districts shall be governmental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privileges and functions concerning the subject matter of this amendment as may be conferred by law.

(c)  The Legislature shall authorize all such indebtedness as may be necessary to provide all improvements and the maintenance thereof requisite to the achievement of the purposes of this amendment.  All such indebtedness may be evidenced by bonds of such conservation and reclamation districts, to be issued under such regulations as may be prescribed by law.  The Legislature shall also authorize the levy and collection within such districts of all such taxes, equitably distributed, as may be necessary for the payment of the interest and the creation of a sinking fund for the payment of such bonds and for the maintenance of such districts and improvements.  Such indebtedness shall be a lien upon the property assessed for the payment thereof.  The Legislature shall not authorize the issuance of any bonds or provide for any indebtedness against any reclamation district unless such proposition shall first be submitted

to the qualified voters of such district and the proposition adopted.

(c-1) In addition and only as provided by this subsection, the Legislature may authorize conservation and reclamation districts to develop and finance with taxes those types and categories of parks and recreational facilities that were not authorized by this section to be developed and financed with taxes before September 13, 2003. For development of such parks and recreational facilities, the Legislature may authorize indebtedness payable from taxes as may be necessary to provide for improvements and maintenance only for a conservation and reclamation district all or part of which is located in Bexar County, Bastrop County, Waller County, Travis County, Williamson County, Harris County, Galveston County, Brazoria County, Fort Bend County, or Montgomery County, or for the Tarrant Regional Water District, a water control and improvement district located in whole or in part in Tarrant County. All the indebtedness may be evidenced by bonds of the conservation and reclamation district, to be issued under regulations as may be prescribed by law. The Legislature may also authorize the levy and collection within such district of all taxes, equitably distributed, as may be necessary for the payment of the interest and the creation of a sinking fund for the payment of the bonds and for maintenance of and improvements to such parks and recreational facilities. The indebtedness shall be a lien on the property assessed for the payment of the bonds. The Legislature may not authorize the issuance of bonds or provide for indebtedness under this subsection against a conservation and reclamation district unless a proposition is first submitted to the qualified voters of the district and the proposition is adopted. This subsection expands the authority of the Legislature with respect to certain conservation and reclamation districts and is not a limitation on the authority of the Legislature with respect to conservation and reclamation districts and parks and recreational facilities pursuant to this section as that authority existed before September 13, 2003.

(d)  No law creating a conservation and reclamation district shall be passed unless notice of the intention to introduce such a bill setting forth the general substance of the contemplated  law shall have been published at least thirty (30) days and not more than ninety (90) days prior to the introduction thereof in a newspaper or

newspapers having general circulation  in the county or counties in which said district or any part thereof is or will be located and by delivering a copy of such notice and such bill to the Governor who shall submit such notice and bill to the Texas Water Commission, or its successor, which shall file its recommendation as to such bill with the Governor, Lieutenant Governor and Speaker of the House of Representatives within thirty (30) days from date notice was received by the Texas Water Commission.  Such notice and copy of bill shall also be given of the introduction of any bill amending a law creating or governing a particular conservation and reclamation district if such bill (1) adds additional land to the district, (2) alters the taxing authority of the district, (3) alters the authority of the district with respect to the issuance of  bonds, or (4) alters the qualifications or terms of office of the members of the governing body of the district.

(e)  No law creating a conservation and reclamation district shall be passed unless, at the time notice of the intention to introduce a bill is published as provided in Subsection (d) of this section, a copy of the proposed bill is delivered to the commissioners court of each county in which said district or any part thereof is or will be located and to the governing body of each incorporated city or town in whose jurisdiction said district or any part thereof is or will be located.  Each such commissioners court and governing body may file its written consent or opposition to the creation of the proposed district with the governor, lieutenant governor, and speaker of the house of representatives.  Each special law creating a conservation and reclamation district shall comply with the provisions of the general laws then in effect relating to consent by political subdivisions to the creation of conservation and reclamation districts and to the inclusion of land within the district.

(f)  A conservation and reclamation district created under this section to perform any or all of the purposes of this section may engage in fire-fighting activities and may issue bonds or other indebtedness for fire-fighting purposes as provided by law and this constitution.

(Added Aug. 21, 1917; Subsec. (d) added Nov. 3, 1964; Subsec. (e) added Nov. 6, 1973; Subsec. (f) added Nov. 7, 1978; Subsec. (c) amended Nov. 2, 1999; Subsec. (a) amended and (c-1) added Sept. 13,

2003.)   (TEMPORARY TRANSITION PROVISIONS for Sec. 59: See Appendix, Note 1.)


Sec. 60.   (Repealed Aug. 5, 1969.)


Sec. 61.   COMPENSATION OF DISTRICT, COUNTY, AND PRECINCT OFFICERS; SALARY OR FEE BASIS; DISPOSITION OF FEES.   (a) All district officers in the State of Texas and all county officers  in counties having a population of twenty thousand (20,000) or more, according to the then last preceding Federal Census, shall be compensated on a salary basis.

(b)   In all counties in this State, the Commissioners Courts shall be authorized to determine whether precinct officers shall be compensated on a fee basis or on a salary basis, with the exception that it shall be mandatory upon the Commissioners Courts, to compensate all justices of the peace, constables, deputy  constables and precinct law enforcement officers on a salary basis.

(c)   In counties having a population of less than twenty thousand (20,000), according to the then last preceding Federal Census, the Commissioners Courts have the authority to determine whether  county officers shall be compensated on a fee basis or on a salary basis, with the exception that it shall be mandatory upon the Commissioners Courts to compensate all sheriffs, deputy sheriffs, county law enforcement officers including sheriffs who also perform the duties of assessor and collector of taxes, and their deputies, on a salary basis.

(d)   All fees earned by district, county and precinct officers shall be paid into the county treasury where earned for the account of the proper fund, provided that fees incurred by the State, county and any municipality, or in case where a pauper's oath is filed, shall be paid into the county treasury when collected and provided that where any officer is compensated wholly on a fee basis such fees may be retained by such officer or paid into the treasury of the county as the Commissioners Court may direct.

(e)   All Notaries Public, county surveyors and public weighers shall continue to be compensated on a fee basis.

(Added Aug. 24, 1935; amended Nov. 2, 1948, Nov. 7, 1972, and Nov. 2,

1999.)  (TEMPORARY TRANSITION PROVISIONS for Sec. 61: See Appendix, Note 1.)

Sec. 62.  (Repealed April 22, 1975.)

Sec. 63.  (Repealed April 22, 1975.)

Sec. 64.  TERMS OF OFFICE, CERTAIN OFFICES.  The elective district, county, and precinct offices which have heretofore had terms of two years, shall hereafter have terms of four years; and the holders of such offices shall serve until their successors are qualified.

(Added Nov. 2, 1954; amended Nov. 6, 2007.)

Sec. 65.  TERMS OF OFFICE;  AUTOMATIC RESIGNATION.  (a) This section applies to the following offices: District Clerks; County Clerks; County Judges; Judges of the County Courts at Law, County Criminal Courts, County Probate Courts and County Domestic Relations Courts; County Treasurers; Criminal District Attorneys; County Surveyors; County Commissioners; Justices of the Peace; Sheriffs; Assessors and Collectors of Taxes; District Attorneys; County Attorneys; Public Weighers; and Constables.

(b)  If any of the officers named herein shall announce their candidacy, or shall in fact become a candidate, in any General, Special or Primary Election, for any office of profit or trust under the laws of this State or the United States other than the office then held, at any time when the unexpired term of the office then held shall exceed one year and 30 days, such announcement or such candidacy shall constitute an automatic resignation of the office then held, and the vacancy thereby created shall be filled pursuant to law in the same manner as other vacancies for such office are filled.

(Added Nov. 2, 1954; amended Nov. 4, 1958, and Nov. 2, 1999; Subsec. (a) amended Nov. 6, 2007; Subsec. (b) amended Nov. 8, 2011.) (TEMPORARY TRANSITION PROVISIONS for Sec. 65: See Appendix, Note 1.)

Sec. 65A.  (Repealed Nov. 6, 2001.)

(TEMPORARY TRANSITION PROVISION for Sec. 65A: See Appendix, Note 3.)

Sec. 66.  PROTECTED BENEFITS UNDER CERTAIN PUBLIC RETIREMENT SYSTEMS.  (a) This section applies only to a public retirement system that is not a statewide system and that provides service and disability retirement benefits and death benefits to public officers and employees.

(b)  This section does not apply to a public retirement system that provides service and disability retirement benefits and death benefits to firefighters and police officers employed by the City of San Antonio.

(c)  This section does not apply to benefits that are:

(1)  health benefits;

(2)  life insurance benefits; or

(3)  disability benefits that a retirement system determines are no longer payable under the terms of the retirement system as those terms existed on the date the retirement system began paying the disability benefits.

(d)  On or after the effective date of this section, a change in service or disability retirement benefits or death benefits of a retirement system may not reduce or otherwise impair benefits accrued by a person if the person:

(1)  could have terminated employment or has terminated employment before the effective date of the change; and

(2)  would have been eligible for those benefits, without accumulating additional service under the retirement system, on any date on or after the effective date of the change had the change not occurred.

(e)  Benefits granted to a retiree or other annuitant before the effective date of this section and in effect on that date may not be reduced or otherwise impaired.

(f)  The political subdivision or subdivisions and the retirement system that finance benefits under the retirement system are jointly responsible for ensuring that benefits under this section are not reduced or otherwise impaired.

(g)  This section does not create a liability or an obligation to a retirement system for a member of the retirement system other than the payment by active members of a required contribution or a

future required contribution to the retirement system.

(h)  A retirement system described by Subsection (a) and the political subdivision or subdivisions that finance benefits under the retirement system are exempt from the application of this section if:

(1)  the political subdivision or subdivisions hold an election on the date in May 2004 that political subdivisions may use for the election of their officers;

(2)  the majority of the voters of a political subdivision voting at the election favor exempting the political subdivision and the retirement system from the application of this section; and

(3)  the exemption is the only issue relating to the funding and benefits of the retirement system that is presented to the voters at the election.

(Former Sec. 66 repealed Nov. 2, 1999; current Sec. 66 added Sept. 13, 2003.)


Sec. 67.  STATE AND LOCAL RETIREMENT SYSTEMS.  (a) General Provisions. (1) The legislature may enact general laws establishing systems and programs of retirement and related disability and death benefits for public employees and officers.  Financing of benefits must be based on sound actuarial principles.  The assets of a system are held in trust for the benefit of members and may not be diverted.

(2)  A person may not receive benefits from more than one system for the same service, but the legislature may provide by law that a person with service covered by more than one system or program is entitled to a fractional benefit from each system or program based on service rendered under each system or program calculated as to amount upon the benefit formula used in that system or program. Transfer of service credit between the Employees Retirement System of Texas and the Teacher Retirement System of Texas also may be authorized by law.

(3)  Each statewide benefit system must have a board of trustees to administer the system and to invest the funds of the system in such securities as the board may consider prudent investments.  In making investments, a board shall exercise the judgment and care under the circumstances then prevailing that persons of ordinary prudence, discretion, and intelligence exercise in the

management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income therefrom as well as the probable safety of their capital.  The legislature by law may further restrict the investment discretion of a board.

(4)  General laws establishing retirement systems and optional retirement programs for public employees and officers in effect at the time of the adoption of this section remain in effect, subject to the general powers of the legislature established in this subsection.

(b)  State Retirement Systems.  (1)  The legislature shall establish by law a Teacher Retirement System of Texas to provide benefits for persons employed in the public schools, colleges, and universities supported wholly or partly by the state.  Other employees may be included under the system by law.

(2)  The legislature shall establish by law an Employees Retirement System of Texas to provide benefits for officers and employees of the state and such state-compensated officers and employees of appellate courts and judicial districts as may be included under the system by law.

(3)  The amount contributed by a person participating in the Employees Retirement System of Texas or the Teacher Retirement System of Texas shall be established by the legislature but may not be less than six percent of current compensation.  The amount contributed by the state may not be less than six percent nor more than 10 percent of the aggregate compensation paid to individuals participating in the system.  In an emergency, as determined by the governor, the legislature may appropriate such additional sums as are actuarially determined to be required to fund benefits authorized by law.

(c)  Local Retirement Systems.  (1)  The legislature shall provide by law for:

(A)  the creation by any city or county of a system of benefits for its officers and employees;

(B)  a statewide system of benefits for the officers and employees of counties or other political subdivisions of the state in which counties or other political subdivisions may voluntarily participate; and

(C)  a statewide system of benefits for officers and

employees of cities in which cities may voluntarily participate.

(2)  Benefits under these systems must be reasonably related to participant tenure and contributions.

(d)  Judicial Retirement System.  (1)  Notwithstanding any other provision of this section, the system of retirement, disability, and survivors' benefits heretofore established in the constitution or by law for justices, judges, and commissioners of the appellate courts and judges of the district and criminal district courts is continued in effect.  Contributions required and benefits payable are to be as provided by law.

(2)  General administration of the Judicial Retirement System of Texas is by the Board of Trustees of the Employees Retirement System of Texas under such regulations as may be provided by law.

(e)  Anticipatory Legislation.  Legislation enacted in anticipation of this amendment is not void because it is anticipatory.

(f)  Retirement Systems Not Belonging to a Statewide System. The board of trustees of a system or program that provides retirement and related disability and death benefits for public officers and employees and that does not participate in a statewide public retirement system shall:

(1)  administer the system or program of benefits;

(2)  hold the assets of the system or program for the exclusive purposes of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the system or program; and

(3)  select legal counsel and an actuary and adopt sound actuarial assumptions to be used by the system or program.

(g)  If the legislature provides for a fire fighters' pension commissioner, the term of office for that position is four years.

(Added April 22, 1975; Subsec. (f) added Nov. 2, 1993; Subsec. (g) added Nov. 6, 2001.)


Sec. 68.  ASSOCIATIONS OF AGRICULTURAL PRODUCERS; ASSESSMENTS ON PRODUCT SALES TO FINANCE PROGRAMS OF MARKETING, PROMOTION, RESEARCH, AND EDUCATION.  The legislature may provide for the advancement of

food and fiber in this state by providing representative associations of agricultural producers with authority to collect such refundable assessments on their product sales as may be approved by referenda of producers.  All revenue collected shall be used solely to finance programs of marketing, promotion, research, and education relating to that commodity.

(Added Nov. 8, 1983.)


Sec. 69.  PRIOR APPROVAL OF EXPENDITURE OR EMERGENCY TRANSFER OF APPROPRIATED FUNDS.  The legislature may require, by rider in the General Appropriations Act or by separate statute, the prior approval of the expenditure or the emergency transfer of any funds appropriated to the agencies of state government.

(Added Nov. 5, 1985.)


Sec. 70.  (Added Nov. 8, 1988;  expired Sept. 1, 2008.)


Sec. 71.  TEXAS PRODUCT DEVELOPMENT AND SMALL BUSINESS INCUBATOR FUNDS; BONDS.  (a) The legislature by law may establish a Texas product development fund to be used without further appropriation solely in furtherance of a program established by the legislature to aid in the development and production of new or improved products in this state.  The fund shall contain a program account, an interest and sinking account, and other accounts authorized by the legislature.  To carry out the program authorized by this subsection, the legislature may authorize loans, loan guarantees, and equity investments using money in the Texas product development fund and the issuance of up to $25 million of general obligation bonds to provide initial funding of the Texas product development fund.  The Texas product development fund is composed of the proceeds of the bonds authorized by this subsection, loan repayments, guarantee fees, royalty receipts, dividend income, and other amounts received by the state from loans, loan guarantees, and equity investments made under this subsection and any other amounts required to be deposited in the Texas product development fund by the legislature.

(b)  The legislature by law may establish a Texas small business

incubator fund to be used without further appropriation solely in furtherance of a program established by the legislature to foster and stimulate the development of small businesses in the state.  The fund shall contain a project account, an interest and sinking account, and other accounts authorized by the legislature.  A small business incubator operating under the program is exempt from ad valorem taxation in the same manner as an institution of public charity under Article VIII, Section 2, of this constitution.  To carry out the program authorized by this subsection, the legislature may authorize loans and grants of money in the Texas small business incubator fund and the issuance of up to $20 million of general obligation bonds to provide initial funding of the Texas small business incubator fund.  The Texas small business incubator fund is composed of the proceeds of the bonds authorized by this subsection, loan repayments, and other amounts received by the state for loans or grants made under this subsection and any other amounts required to be deposited in the Texas small business incubator fund by the legislature.

(c)  The legislature may require review and approval of the issuance of bonds under this section, of the use of the bond proceeds, or of the rules adopted by an agency to govern use of the bond proceeds.  Notwithstanding any other provision of this constitution, any entity created or directed to conduct this review and approval may include members, or appointees of members, of the executive, legislative, and judicial departments of state government.

(d)  Bonds authorized under this section constitute a general obligation of the state.  While any of the bonds or interest on the bonds is outstanding and unpaid, there is appropriated out of the first money coming into the treasury in each fiscal year, not otherwise appropriated by this constitution, the amount sufficient to pay the principal of and interest on the bonds that mature or become due during the fiscal year, less any amount in any interest and sinking account at the end of the preceding fiscal year that is pledged to payment of the bonds or interest.

(Added Nov. 7, 1989; Subsec. (b) amended Nov. 2, 1999.)


Sec. 72.  TEMPORARY REPLACEMENT OF PUBLIC OFFICER ON MILITARY ACTIVE DUTY.  (a) An elected or appointed officer of the state or of

any political subdivision who enters active duty in the armed forces of the United States as a result of being called to duty, drafted, or activated does not vacate the office held, but the appropriate authority may appoint a replacement to serve as temporary acting officer as provided by this section if the elected or appointed officer will be on active duty for longer than 30 days.

(b)   For an officer other than a member of the legislature, the authority who has the power to appoint a person to fill a vacancy in that office may appoint a temporary acting officer. If a vacancy would normally be filled by special election, the governor may appoint the temporary acting officer for a state or district office, and the governing body of a political subdivision may appoint the temporary acting officer for an office of that political subdivision.

(c)   For an officer who is a member of the legislature, the member of the legislature shall select a person to serve as the temporary acting representative or senator, subject to approval of the selection by a majority vote of the appropriate house of the legislature. The temporary acting representative or senator must be:

(1)   a member of the same political party as the member being temporarily replaced; and

(2)   qualified for office under Section 6, Article III, of this constitution for a senator, or Section 7, Article III, of this constitution for a representative.

(d)   The officer who is temporarily replaced under this section may recommend to the appropriate appointing authority the name of a person to temporarily fill the office.

(e)   The appropriate authority shall appoint the temporary acting officer to begin service on the date specified in writing by the officer being temporarily replaced as the date the officer will enter active military service.

(f)   A temporary acting officer has all the powers, privileges, and duties of the office and is entitled to the same compensation, payable in the same manner and from the same source, as the officer who is temporarily replaced.

(g)   A temporary acting officer appointed under this section shall perform the duties of office for the shorter period of:

(1)   the term of the active military service of the officer who is temporarily replaced; or

(2)  the term of office of the officer who is temporarily replaced.

(h)  In this section, "armed forces of the United States" means the United States Army, the United States Navy, the United States Air Force, the United States Marine Corps, the United States Coast Guard, any reserve or auxiliary component of any of those services, or the National Guard.

(Added Sept. 13, 2003.)


Sec. 73.  VETERANS HOSPITALS.  The state may contribute money, property, and other resources for the establishment, maintenance, and operation of veterans hospitals in this state.

(Added Nov. 3, 2009.)



Vernon's Texas Rules Annotated Currentness
  Texas Rules of Civil Procedure
    Part VII. Rules Relating to Special Proceedings
      ↖▤ Section 1. Procedures Related to Foreclosures of Certain Liens
        ↖▤ Rule 735. Foreclosures Requiring a Court Order (Refs & Annos)
          ➡➡ **735.1. Liens Affected**

Rule 736 provides the procedure for obtaining a court order, when required, to allow foreclosure of a lien containing a power of sale in the security instrument, dedicatory instrument, or declaration creating the lien, including a lien securing any of the following:

(a) a home equity loan, reverse mortgage, or home equity line of credit under article XVI, sections 50(a)(6), 50(k), and 50(t) of the Texas Constitution;

(b) a tax lien transfer or property tax loan under sections 32.06 and 32. 065 of the Tax Code; or

(c) a property owners' association assessment under section 209.0092 of the Property Code.

CREDIT(S)

Adopted by order of Oct. 17, 2011, eff. Jan. 1, 2012. Amended by order of Dec. 12, 2011, and Dec. 30, 2011, eff. Jan. 1, 2012.

COMMENT--RULE 735

See comment following Rule 735.3.

RESEARCH REFERENCES

Encyclopedias

TX Jur. 3d Homesteads § 142, Foreclosure of Lien for Home Equity Loan or Reverse Mortgage.

Forms

Texas Jurisprudence Pleading & Practice Forms 2d Ed § 174:10, Application and Notice.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

1 West's Texas Forms § 11:4.10, Foreclosure of Certain Liens Requiring Court Orders.

Treatises and Practice Aids

Elliott, 11 Tex. Prac. Series § 12:34, Purpose of Rule 736 Expedited Home Equity Lien Foreclosure.

Cochran, 27 Tex. Prac. Series § 7.14, Foreclosure Procedures.

NOTES OF DECISIONS

Construction and application 1

1. Construction and application

Servicer for a junior home equity loan was not required, under state constitutional provision governing the creation and foreclosure of a lien securing a home equity loan, to obtain a court order in order to receive excess proceeds from the foreclosure of a senior, purchase money deed of trust. Patton v. Porterfield (App. 5 Dist. 2013) 411 S.W.3d 147, rehearing overruled , reconsideration en banc denied, review denied, rehearing of petition for review denied. Homestead ⚷ 109

Vernon's Ann. Texas Rules Civ. Proc., Rule 735.1, TX R RCP Rule 735.1

Current with amendments received through 3/15/2015

(C) 2015 Thomson Reuters

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Vernon's Texas Rules Annotated Currentness
  Texas Rules of Civil Procedure
    Part VII. Rules Relating to Special Proceedings
      Section 1. Procedures Related to Foreclosures of Certain Liens
        Rule 735. Foreclosures Requiring a Court Order (Refs & Annos)
          ➡➡ **735.3. Judicial Foreclosure Unaffected**

A Rule 736 order is not a substitute for a judgment for judicial foreclosure, but any loan agreement, contract, or lien that may be foreclosed using Rule 736 procedures may also be foreclosed by judgment in an action for judicial foreclosure.

CREDIT(S)

Adopted by order of Oct. 17, 2011, eff. Jan. 1, 2012. Amended by order of Dec. 12, 2011, and Dec. 30, 2011, eff. Jan. 1, 2012.

COMMENT--2011

Rules 735 and 736 have been rewritten and expanded to cover property owners' associations' assessment liens, in accordance with amendments to chapter 209 of the Property Code. Rule 735.1 makes the expedited procedures of Rule 736 available only when the lienholder has a power of sale but a court order is nevertheless required by law to foreclose the lien. Rule 735.2 makes clear that Rule 736 is procedural only and does not affect other contractual or legal rights or duties. Any lien which can be foreclosed under Rule 736 may also be foreclosed in an action for judicial foreclosure, as Rule 735.3 states, but no lienholder is required to obtain both a Rule 736 order and a judgment for judicial foreclosure. The requirement of conspicuousness in Rule 736.1(d)(5) has reference to section 1.201(b)(10) of the Business and Commerce Code.

RESEARCH REFERENCES

Forms

1 West's Texas Forms § 11:4.10, Foreclosure of Certain Liens Requiring Court Orders.

Treatises and Practice Aids

Elliott, 11 Tex. Prac. Series § 12:34, Purpose of Rule 736 Expedited Home Equity Lien Foreclosure.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cochran, 27 Tex. Prac. Series § 7.14, Foreclosure Procedures.

Vernon's Ann. Texas Rules Civ. Proc., Rule 735.3, TX R RCP Rule 735.3

Current with amendments received through 3/15/2015

(C) 2015 Thomson Reuters

END OF DOCUMENT